Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 1 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                                              1—4

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF GEORGIA
2                      MACON DIVISION

3     JARRETT LITTLE and CINDY LITTLE,
      as guardians and natural parents of
4     LINDSEY LITTLE,

5              Plaintiffs,

6     vs.            CASE NO.: 5:12-cv-147(MTT)

7     ALONZO K. McCLURE; ALEX LEE,
      Inc., MERCHANTS DISTRIBUTORS,
8     Inc., OF NORTH CAROLINA;
      MERCHANTS TRANSPORT OF
9     HICKORY, Inc., and THE TRAVELERS
      INDEMNITY COMPANY OF
10    CONNECTICUT,

11            Defendants.

12

13    DEPOSITION OF:    BRIAN BOGGESS, SEA

14    DATE:             October 31, 2013

15    TIME:             10:24 a.m.

16    LOCATION:         300 East McBee Avenue
                        Suite 500
17                      Greenville, SC

18    TAKEN BY:         Counsel for the Plaintiff

19    REPORTED BY:  SHARON G. HARDOON,
                    Court Reporter, Notary Public

20

21

22

23

24

25
```

Page 2

```
1     APPEARANCES:

2          ATTORNEYS FOR THE PLAINTIFF
               JARRETT LITTLE and CINDY LITTLE,
3              as guardians and natural parents of
               LINDSEY LITTLE:

4          THE LAW FORM OF KATHY MCARTHUR
5          BY:  KATHY MCARTHUR
               6055 Lakeside Commons Drive
6              Suite 400
               Macon, Georgia  31210
7              (478) 238-6600
               kmcarthur@mcarthurlawfirm.com
8

9          ATTORNEYS FOR THE DEFENDANT
               ALONZO K. McCLURE; ALEX LEE,
10             Inc., MERCHANTS DISTRIBUTORS,
               Inc., OF NORTH CAROLINA;
11             MERCHANTS TRANSPORT OF
               HICKORY, Inc., and THE TRAVELERS
12             INDEMNITY COMPANY OF
               CONNECTICUT:
13
               SMITH MOORE LEATHERWOOD, LLP
14             BY:   KURT M. ROZELSKY
               300 East McBee Avenue, Suite 500
15             Greenville, SC  29602
               (864) 242-6440
16             kurt.rozelsky@smithmoorelaw.com

17    Also Present:

18    John Hughes, Risk Management; Alex Lee, Inc.

19

20

21

22

23

24

25
```

Page 3

```
1                      INDEX
      WITNESS/EXAMINATION
2
      Witness Name                      Page   Line
3
      Brian Boggess
4
        Examination By Ms. McArthur      4     12
5
      Errata Page                       188    1
6     Certificate of Reporter           191    1

7

8                      EXHIBITS

9     Exhibit    Description            Page   Line

10    PLF. EXH.  CV; Boggess             4     24
      PLF. EXH.  3A, SEA 219651         15     17
11    PLF. EXH.  3B, Distance v. Time chart 15  19
      PLF. EXH.  3C, Screen shot        15     21
12    PLF. EXH.  3D, Data               15     23
      PLF. EXH.  3E, Definition of vehicles 186  6
13    PLF. EXH.  4-A, Bill; 5/22/12     122    13
      PLF. EXH.  4-B, Bill; 12/19/12    122    15
14    PLF. EXH.  5, Field Notes         127    3
      PLF. EXH.  6, Project Assignment Report; 128  22
15             3/16/12
      PLF. EXH.  7, DDEC reports        130    1
16    PLF. EXH.  8, Deposition summaries 135   1
      PLF. EXH.  9, Alexander Report    135    15
17    PLF. EXH.  10, Photos             142    16
      PLF. EXH.  11, Diagram            148    24

18

19

20

21

22

23

24

25
```

Page 4

1              STIPULATION
2         It is stipulated by and between counsel
3    that this deposition is being taken in accordance
4    with the South Carolina Rules of Civil Procedure;
5    that all objections as to notice of this deposition
6    are hereby waived; that all objections except as to
7    form are reserved until the time of trial; and that
8    the deponent does not waive reading and signing of
9    this deposition.
10             BRIAN BOGGESS,
11   being first duly sworn, testified as follows:
12             EXAMINATION
13   BY MS. MCARTHUR:
14   Q.  State your name for the record, please.
15   A.  Brian Boggess.
16   Q.  Mr. Boggess, do you want to read and sign
17   the deposition transcript once it's typed, or do you
18   want to waive that right?
19   A.  I would like to read and sign, please.
20   Q.  Okay.  You can consider yourself
21   continuously sworn so you don't have it in front
22   of a notary, okay?
23   A.  Okay, thank you.
24        (PLF. EXH. 1, CV; Boggess, was marked for
25   identification.)



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
5–8

Page 5

1  BY MS. MCARTHUR:
2      Q.  I marked as Plaintiff's Exhibit 1 the CV
3  that you provided.  Are there any -- is this up to
4  date?
5      A.  I believe so, yes, ma'am.
6      Q.  You've taken nothing in addition to being a
7  project engineer at SEA Limited, correct?
8      A.  That's my title.
9      Q.  Have you taken any other accident
10  reconstruction courses except the two at
11  Northwestern that you took in 2008?
12      A.  Those two classes are obviously
13  specifically entitled Accident Reconstruction.  Some
14  of the other courses that are listed pertain to
15  accident reconstruction above and beyond that.
16      Q.  Well, the first two that you took were the
17  Traffic Accident Reconstruction I and II at
18  Northwestern in February 2008, correct?
19      A.  Yes, ma'am.
20      Q.  And it wasn't that -- you really weren't
21  actively involved in reconstructing automobile
22  accidents before you took those two courses as part
23  of your work, were you?
24      A.  I had been doing accident reconstruction
25  and evaluations dating back to my time at the

Page 6

1  automotive safety lab in graduate school, so that
2  would be '99 through '01.
3      Q.  '99 through '01, you did some then?
4      A.  Yes, ma'am.  And then even at Honda.  I
5  mean, my job at Honda from '01 until '07 was
6  automotive safety, so we were crashing vehicles,
7  evaluating vehicles, evaluation crash dynamics of
8  vehicles.
9      Q.  Well, tell me then, during your time at
10  Honda how many crashes did you reconstruct?
11      A.  Full vehicle, I mean, our lab we crashed --
12      Q.  I'm talking about you, personally?
13      A.  I don't have a number.  Hundreds.
14      Q.  How many?
15      A.  Hundreds.
16      Q.  Hundreds while you were a safety engineer
17  at Honda?
18      A.  Yes, ma'am.
19      Q.  Who was your supervisor there?
20      A.  I had multiple managers over the division.
21  The Japanese chief engineer was a guy by the name of
22  Takayuki, T-A-K-A-Y-U-K-I, last name, Sugama,
23  S-U-G-A-M-A.
24      Q.  Was he where you were?
25      A.  Yes, he was.

Page 7

1      Q.  Is he still there?
2      A.  I believe he has returned to Japan.
3      Q.  Who was still there that was there when you
4  were there?
5      A.  I believe a guy by the name of John Turley,
6  T-U-R-L-E-Y, would still be there.
7      Q.  Who were the others that you just mentioned
8  were your supervisors?
9      A.  John Turley was the manager.  Also we had a
10  guy by the name of Charles Thomas was a manager as
11  well during my time there.
12      Q.  Who else was in the department with you
13  during that time?
14      A.  I mean, in terms of co-workers,
15  supervisors?  I mean, there's 35 or so safety
16  engineers probably in the division.
17      Q.  So there were 35 people in the same
18  department -- the same job you had?
19      A.  Everybody had a different role, different
20  responsibilities, but, yes.  I mean, they were all
21  tasked with the development of the vehicles for
22  safety purposes.
23      Q.  How many of them were also reconstructing
24  hundreds of crashes as you say you were?
25      A.  Several.

Page 8

1      Q.  How many?
2      A.  I don't know.
3      Q.  Who were they?
4      A.  Guys by the name of Matt Seman, S-E-M-A-N,
5  Grant Foreman, F-O-R-E-M-A-N.
6      Q.  Are they still there?
7      A.  I believe they are.
8      Q.  Same job, as far as you know?
9      A.  What do you mean by same job?
10      Q.  Are they still in the same job position, as
11  far as you know?
12      A.  I'm sure they've been promoted to some
13  degree, but I don't know to what.
14      Q.  Are you in touch with them?
15      A.  Maybe once is a while I might run into them
16  at a conference.  Not on a regular basis.
17      Q.  When was the last time you saw either one
18  of them?
19      A.  It's been a few years.  I don't know the
20  last time.
21      Q.  What is Claims & Litigation Management
22  Alliance?
23      A.  It's an organization of claims litigation
24  folks.  I know that there's insurance adjusters,
25  there's attorneys involved.  There's consulting



Page 9

1  engineering firms like ourselves.  I mean, I've been
2  at meetings of the CMLA, or CLM.
3      Q.  Is it something that -- you're actually
4  listed as part of the Claims & Litigation Management
5  Alliance, correct?
6      A.  I believe I'm registered as part of the
7  group.  I'm not -- as far as I'm aware, there's not
8  a fee or anything.  I did join.  I've not been to
9  the conference.
10     Q.  What role does SEA Limited play in Claim &
11  Litigation Management Alliance?
12     A.  I believe to some degree they sponsor, but
13  I do not know to what extent.
14     Q.  And that is an organization that is
15  primarily for advancing the defense of lawsuits, is
16  it not?
17     A.  Not to my understanding, no.
18     Q.  Is it about plaintiff's cases?
19     A.  I believe it's geared toward managing
20  claims, managing cost of claims.  I've had several
21  people -- attorneys, defense counsel that have told
22  me even that they are members of it because of the
23  number of people involved.  But then again, they
24  don't like the organization because it's managing
25  their cases and cutting down their bills and their

Page 10

1  work on cases and making cases go away.  So in some
2  cases, it's hurting them.
3         I don't know the exact role that the
4  organization has.  I know that we are somewhat
5  involved in it.
6      Q.  So do you know what the mission of it is?
7      A.  I don't.
8      Q.  Why would it show you in your biography as
9  part of it?  I mean, why would your picture and your
10  biography be on the Claims & Litigation Management
11  Alliance?
12     A.  Again, when you join, they ask you to post
13  a bio.  I registered and I had to do that because --
14  specifically, I participated on a panel at one of
15  the meetings a couple years ago, so I had to upload
16  a biography at that point.
17     Q.  CLM's members and fellows include risk and
18  litigation managers, insurance and claims
19  professionals, corporate counsel, outside counsel
20  and third-party vendors.  Is that your understanding
21  too?
22     A.  If it says that.  It sounds similar to what
23  I've seen or heard.
24     Q.  Mr. Boggess, nothing about CLM has anything
25  to do with representing injured plaintiffs other

Page 11

1  than to try to, quote, manage their claims,
2  correct?
3      A.  I don't know their full mission.
4      Q.  It's a defense group, isn't it?
5      A.  I don't know if it's the exact -- from what
6  you read, I don't hear the word injured party or
7  other in that mission, but I don't know their full
8  purpose.
9      Q.  Are you unwilling to say that the Claims &
10  Litigation Management Alliance is a defense -- is an
11  organization devoted to defending litigation claims
12  made by injured parties?
13     A.  I don't know enough about it to agree or
14  disagree with you.
15     Q.  Well, you've been a part of it for how
16  long?
17     A.  A couple years.
18     Q.  You actually were invited to speak at it,
19  were you not?
20     A.  I applied to speak and was allowed to,
21  yes.
22     Q.  You were invited to speak last year,
23  correct?
24     A.  Again, for the speaking opportunities, they
25  ask if you're interested and you apply.  So it's not

Page 12

1  necessarily an invitation as opposed to an
2  application that's been approved.
3      Q.  You don't know what role SEA plays in
4  Claims & Litigation Management Alliance?
5      A.  As I said before, I that SEA does some type
6  of sponsorship.  The degree, I do not know.
7      Q.  It says that its mission -- one of its
8  missions is communication -- to foster communication
9  between all parties; risk managers, claims managers,
10  and adjusters, general counsel, insurance company
11  executives, attorneys, brokers and service
12  providers.
13        Are you aware that that's one of the
14  missions of that group.
15     A.  I don't know that I read that.  I take it
16  you're reading off their website or some information
17  that they put out.
18     Q.  I mean, it doesn't mention injured parties,
19  does it?
20     A.  Not in that statement, no.
21     Q.  In the last year, tell me any plaintiffs
22  attorneys that you worked with?
23     A.  Brent Stewart out of Rock Hill.  The
24  Charles Monnett firm out of Charlotte.
25     Q.  Okay.

Page 13

1    A. There's definitely more of those. There's
2  a couple more as I sit here.
3    Q. I marked as Exhibit Number 2 -- oh, have
4  you had -- since 2008, other than the two courses
5  that you mentioned at Northwestern, have you had any
6  other traffic accident reconstruction courses
7  specifically?
8    A. Sure.
9    Q. Where?
10    A. As you go up through there. I mean, the
11  crash data retrieval courses. A course dedicated to
12  imaging and studying the electronic data stored on a
13  vehicle's electronic controls modules.
14    Q. You're just getting the data off the
15  computer systems and other devices on a vehicle,
16  correct?
17    A. That's part of the reconstruction, yes.
18    Q. But it's not as far as the actual -- you're
19  going to use that data then at some other point to
20  help reconstruct, right? This is just a course on
21  retrieving the data, correct?
22    MR. ROZELSKY: Object to the form.
23    THE WITNESS: It touches on both.
24  Interpretation of the data, how to use the
25  data, the meaning of the data, which obviously

Page 14

1  directly affects reconstruction.
2  BY MS. MCARTHUR:
3    Q. Well, it's titled Crash Data Retrieval
4  Technician course, correct?
5    A. It is.
6    Q. So what else would you say is an accident
7  reconstruction course?
8    A. Accessing and Interpreting Heavy Vehicle
9  Data Recorders.
10    Q. Which is a similar thing to the one you
11  just mentioned?
12    A. Yes. Again, that's retrieving the data,
13  studying the data, understanding the data, using the
14  data.
15    The next one, EDC Vehicle Dynamics Crash
16  Simulations. It's a class reconstructing accidents
17  and using computer tools to do so.
18    Q. Have you done that with this case?
19    A. I have.
20    Q. What of the materials that you have here
21  would demonstrate that for me?
22    A. The set of images I think you marked as
23  Exhibit 3 in the analysis file. Some of the inputs,
24  outputs are the tables of data that support that
25  data.

Page 15

1    Q. I don't have any other images other than
2  data images that would be part of the 3C.
3    A. These tables here are the inputs -- some of
4  the inputs and outputs from that particular data
5  attached in this folder here entitled Analysis.
6    Q. Have those been provided before today?
7    A. To Mr. Rozelsky or other?
8    Q. Yes.
9    A. No.
10    Q. I don't think he provided me with those
11  tables today.
12    A. I'm sure we can get you copies.
13    Q. Those will be 3D.
14    MS. MCARTHUR: The things provided
15  today, for the record, are 3A, 3B and 3C, and
16  now 3D as far as things that we were unaware.
17    (PLF. EXH. 3A, SEA 219651, was marked for
18  identification.)
19    (PLF. EXH. 3B, Distance v. Time chart,
20  was marked for identification.)
21    (PLF. EXH. 3C, Screen shot, was marked
22  for identification.)
23    (PLF. EXH. 3D, Data, was marked for
24  identification.)
25    MS. MCARTHUR: 3A is the calculations,

Page 16

1  3B is distance and time graph, 3C is the things
2  you need a magnifying glass to read, and 3D is
3  this list of data.
4    MR. ROZELSKY: Data inputs.
5  BY MS. MCARTHUR:
6    Q. Have you done a computer simulation of this
7  wreck?
8    A. Yes.
9    Q. Is it something that can be shown on a
10  computer?
11    A. It could be visually looked at as well as
12  looking at the raw data.
13    Q. Is it something that you can show me
14  today?
15    A. I do not have, I guess, output video type
16  files at this point, no.
17    Q. Well, how am I going to see it?
18    A. The images in 3C are screen shots of kind
19  of the start and end of each one of them and I can
20  explain each one.
21    Q. As far as the simulation that you've done
22  on the computer, is it something that's a moving
23  thing that -- over time where the vehicles are
24  moving, a simulation?
25    A. They would. Again, the computer program



Page 17

1  you set the inputs, so you set where vehicle one and
2  vehicle two start, and then you set the parameters;
3  throttle, braking, steering. Those parameters which
4  are in those tables. And then it marches forward in
5  time in small increments of time.
6        The images there kind of show the beginning
7  and the end. Obviously, there's going to be a
8  series of images between those.
9      Q. Can you put it on a DVD or PDF file, or
10  whatever, and send it to me?
11     A. Yes, I can output the video files for each
12  one of the cases that you have the images for.
13     Q. Okay. When did you actually do this
14  simulation?
15     A. Within the last two weeks.
16     Q. What caused you to do that?
17     A. Based upon Mr. Rozelsky's request in the
18  last two weeks to put together more reconstruction
19  work on this case.
20     Q. When were you personally first contacted
21  about this case?
22     A. I'd have to have the file material that I
23  think is being copied right now to know for sure.
24  It was shortly before the first inspection that
25  would have occurred over a year ago, almost a year

Page 18

1  and-a-half ago.
2      Q. Is it your testimony that you participated
3  in the inspection?
4      A. I was not present at the inspection, no.
5      Q. So you didn't inspect the scene, did you?
6      A. I have not, no, ma'am.
7      Q. And you didn't inspect either of the
8  vehicles, did you?
9      A. No. One of my colleagues did.
10     Q. Is that Mr. Peters?
11     A. It is.
12     Q. And what is Mr. Peters' role with the
13  company?
14     A. He is a project engineer, as far as I'm
15  aware.
16     Q. What types of things does he do?
17     A. He does accident reconstruction. He has
18  specialty in tire issues with his background.
19     Q. What other types of -- does he just do
20  general reconstructions and testify in court too?
21     A. He could, yes. I don't know what all work
22  he does. I know that he does reconstruction as well
23  and does testify.
24     Q. And he's the one who did all the
25  measurements of the scene?

Page 19

1      A. He did take measurements of the scene, yes,
2  ma'am.
3      Q. And are you basing your opinions on
4  measurements that he took at the scene?
5      A. I have certainly factored those in, yes.
6      Q. Have you discussed the case with
7  Mr. Peters?
8      A. To some degree, yes, ma'am.
9      Q. And he's an employee of SEA also?
10     A. He is.
11     Q. He's in Lawrenceville, Georgia?
12     A. Yes, ma'am.
13     Q. What were you personally initially asked to
14  do on this case?
15     A. Initially, I believe Mr. Rozelsky called me
16  about this case and asked me to do the inspection,
17  the initial inspection. I was unavailable to due to
18  prior engagements, so Mr. Peters went out to do the
19  inspection, which turned into inspections.
20     Q. Has Mr. Peters done anything else besides
21  that work?
22     A. He compiled certainly some of the drawing
23  files and has done photogrammetry of the pictures
24  that he collected for purposes of measurement as
25  well.

Page 20

1      Q. All of the pictures that have been taken in
2  the file, in your file are Mr. Peters' photos,
3  right?
4      A. Of the vehicles and the scene, yes. I
5  don't believe I've taken any photos.
6      Q. You haven't been to the scene, correct?
7      A. Correct.
8      Q. The drawings that were in the materials
9  that I've sent out to be copied those are Mr. Peters
10  drawings?
11     A. I believe so, yes, ma'am.
12     Q. Have you met with Mr. Peters to discuss his
13  thinking about it?
14     A. I don't believe we discussed this case face
15  to face. We've done it over the phone. I've
16  certainly seen Mr. Peters, but I don't believe I've
17  talked to about this case face-to-face with him.
18     Q. How many times have you talked to him about
19  it?
20     A. I don't know. A handful certainly.
21     Q. Has he also reconstructed this case?
22     A. Not to my knowledge.
23     Q. Do you know if Mr. Peters initially went to
24  the wrong site for his inspection of the scene?
25     A. I'm not aware of that if he did.



Page 21

1    Q. I was talking to you about other courses
2 here on accident reconstruction and you've gotten to
3 the E.D.C course it's like seven or eight down. Any
4 others?
5    A. Certainly factors in some of the other
6 classes. The applied vehicle dynamics is of course
7 put on by the Society of Automotive Engineers.
8 Basically, it comes down to the handling of a
9 vehicle, the dynamics of a vehicle. What a vehicle
10 can and can't do which directly affects
11 reconstruction.
12       And then, you know, aside from specific
13 courses, there's a number of conferences that I've
14 attended that deal with presentations by other
15 reconstructionists on their research, on their
16 testing, on their reconstruction methodology.
17    Q. You've been never been a law enforcement
18 officer, have you?
19    A. No, ma'am.
20    Q. And you've had any reconstruction training
21 similar to what -- well, the law enforcement
22 training that officers who reconstruct wrecks have
23 typically as far as the numbers and courses they
24 take, have you?
25    MR. ROZELSKY: Object to the form.

Page 22

1    THE WITNESS: Well, first of all, the
2 class, that Traffic Accident Reconstruction,
3 Northwestern, if I recall there was probably
4 between 15 and 20 persons in that two class.
5 There were two engineers, like myself, and the
6 rest were law enforcement personnel. So those
7 are the courses that they take in order to be
8 able to, I believe, to sit to take the ACTAR,
9 basically police certification for
10 reconstruction.
11       In order to take that course as an
12 engineer, I was not required to take the precursors
13 for those, which is basic scene documentation that
14 the officers would have been required to take given
15 my engineering background.
16       I mean, the trainings are quite different
17 from an engineering perspective versus a police
18 officer investigation.
19    Q. I don't see where you've taking any mapping
20 courses. Have you taken any mapping courses?
21    A. The 3D laser scanning is a mapping course,
22 put on by folks from Farah, which is basically 3D
23 scanning of scenes or vehicles or otherwise.
24    Q. Tell me, during your time at Honda, what
25 was the primary focus of your work?

Page 23

1    A. Development of vehicles for crash
2 protection.
3    Q. And what else did you do, though? I mean,
4 tell me what your job was.
5    A. It was -- again, I worked as a safety
6 engineer, so Honda --
7       (Interruption in the proceedings.)
8    THE WITNESS: Can you repeat the
9 question?
10 BY MS. MCARTHUR:
11    Q. I wanted to know your job duties while you
12 were employed by Honda.
13    A. I was a safety engineer. So, I mean,
14 you're probably aware, Honda makes vehicles, so we
15 were tasked with developing new vehicles for the
16 American and international fleet of vehicles.
17       So in order to sell vehicles, they have to
18 meet certain regulated requirements as well as
19 internal requirements of so it was developing the
20 vehicles for safety. I did everything from
21 pedestrian safety to occupant safety, full vehicle
22 structure, seat belts, air bags.
23       The work involved, you know, studying the
24 safety industry as a whole, what's going on in
25 accidents, how can we better protect the motoring

Page 24

1 public?
2    Q. I don't see anywhere in your CV where it
3 says that as a senior engineer at Honda that you did
4 any accident reconstruction.
5    A. Every vehicle --
6    MR. ROZELSKY: Let me object. Was
7 that a question or was that a statement.
8 BY MS. MCARTHUR:
9    Q. Is it there?
10    A. Part of the development of the safety
11 systems is crashing testing. And every crash that
12 goes in, it has to be reconstructed and evaluated
13 for its performance.
14    Q. So you may have done crash testing the, or
15 you did do crash testing; is that right?
16    A. Yes, ma'am.
17    Q. But you didn't do going out to the scene of
18 a wreck that had happened and actually doing the
19 reconstruction?
20    A. No, not at Honda.
21    Q. Okay. So, then from '99 to 2001, you
22 didn't actually do any going to a scene and
23 reconstructing a wreck as part of your work as a
24 research assistant at Automobile Safety Center of
25 Applied Biomechanics, did you?



Page 25

1    A. We were provided information from real
2  world crashes and were tasked with reconstructing
3  those accidents in some cases, yes. I did not go to
4  scenes specifically, but we were provided
5  documentation of the accidents and tasked with some
6  aspects at least of reconstruction on those.
7    Q. Actually, in your work from '99 to 2000
8  focusing on injury caused by wrecks, not
9  reconstructing the wreck itself, isn't that true?
10    A. Some of it was speed related or dynamics
11  related. It's a biomechanics lab, so the strong
12  focus of it was assessment, injury and mitigation.
13    Q. You never, during the course of that work
14  from '99 to 2000 actually went to a scene and took
15  photographs of it or measurements to be the person
16  who did the accident reconstruction to determine
17  specifically what happened and the forces in the
18  wreck, that's not what you were doing from '99 to
19  2001, was it?
20    MR. ROZELSKY: Object to the form.
21  You can answer.
22    THE WITNESS: Again, as I stated, I
23  did not go to the scenes. We did reconstruct
24  the accidents with regards to forces involved
25  so that we could understand the injuries.

Page 26

1  BY MS. MCARTHUR:
2    Q. Who sent you information?
3    A. Nitza for one.
4    Q. I mean, were you -- who else would send you
5  information where you would do any type of
6  reconstruction?
7    A. The University the Virginia's lab was
8  partnered with what's called one of the Ciren
9  Centers, C-I-R-E-N, which are sponsored by Nitza.
10  We were paired with the trauma center in Northern
11  Virginia. And if they got certain criteria of
12  injured persons in from a certain type of accident,
13  we would get the details of the accident and be
14  tasked with reconstructing those accidents to
15  understand the injury patterns and the accident
16  itself.
17    Q. Well, you actually said here in your CV
18  that your specific work included development of test
19  methodologies for assessment fact based deformation
20  and the subsequent injury risk of ballistic helmets
21  for the United States military?
22    A. I did that as well, yes, ma'am.
23    Q. And this was a two-year period that you
24  were?
25    A. I was, yes.

Page 27

1    Q. So what percentage of your time was working
2  on helmets?
3    A. I didn't touch helmets my first year there,
4  so certainly less than 50. I don't have a
5  percentage to give you.
6    Q. Well, a lot of your work was about helmets,
7  wasn't it, when you were at the research
8  institute?
9    A. My thesis was on helmets specifically. I
10  had a lot to do automotive exposures as well. My
11  entire first year was dedicated to automotive work,
12  as I recall.
13    Q. But it wasn't specifically -- it was trying
14  to determine -- your focus was on what injuries
15  would come from specific forces, wasn't it?
16    A. That was certainly one aspect, yes.
17    Q. That was the primary aspect of what you
18  were studying, wasn't it?
19    A. Again, to say primary, what percentage, I
20  don't know. The lab, as I said before, was a
21  biomechanics lab tasked with understanding injury,
22  risk thresholds, what does it take to injure the
23  body, and then loading environments. It could be
24  ballistic military, it could be automotive, but how
25  does the body respond to loading. In order to do

Page 28

1  that, you have to understand the loading so you have
2  to understand the vehicle crash. It all interplays.
3    Q. You were saying airbag deployments and
4  injuries, correct?
5    A. I did, yes.
6    Q. You actually wrote some articles about risk
7  injuries in females during that time, correct?
8    A. I did write a number of papers with regards
9  to that, yes.
10    Q. Right. It was -- as far as what your
11  papers were about were -- Injury Risk Function for
12  the Small Female Risk in Axial Loading. That's one
13  of them, right?
14    A. Which page are you on.
15    Q. Page 6. And Injury Risk Functions for the
16  Fifth Percentile Female Upper Extremity.
17    A. I was involved in that study, yes.
18    Q. Then you had the analysis of Upper
19  Extremity Response Under Side Airbag Loading,
20  Characterization of Elbow Joint Loading, Accident
21  Analysis and Prevention, correct?
22    A. Yes, ma'am.
23    Q. Those were the articles that had to do with
24  automobile injury that you wrote pursuant to the
25  work that you did from '99 to 2001, correct?



Page 29

1    A. Those are a couple of the papers, yes.
2    Q. There's another one down -- I guess we have
3  some more of the elbow fracture and risk fracture at
4  the bottom of this, but -- actually, the last four
5  on that page. In between there, we're talking about
6  the helmet and head injuries, correct?
7    A. Some of them, yes, ma'am.
8    Q. None of your publications have to do with
9  doing accident reconstruction of wrecks like the
10  Lindsey Little case, do they?
11    A. Some of the publications have to do with
12  accident reconstruction, yes, they do.
13    Q. Tell me which ones.
14    A. I mean, if we just go back to -- start on
15  Page 5, there's papers on electronic data recovery
16  -- or evaluation of electronic data for vehicles,
17  the first one.
18        The third one has to with commercial
19  vehicles. Braking capabilities of commercial
20  vehicles with regards to accidents, or potential
21  accidents.
22        The fourth one is again, heavy truck
23  evaluations. Using hard stop data from on vehicle
24  data.
25        The next paper is a reconstruction paper

Page 30

1  looking at the crush of the vehicle published with
2  accident analysis and prevention in 2009.
3        The third from the bottom is a paper
4  about -- well, again, injury potential, how a person
5  interacts with the vehicle in the occupant space in
6  a crash.
7        And the last two, again, are heavy vehicle
8  with regards to braking and hard stops, which all
9  factor into accident reconstruction.
10    Q. Do any of these publications have any
11  application to any of the issues in this case?
12    A. Insofar as some of them have to do with
13  braking capabilities of the vehicles, yes. The
14  second paper on the list is basically scientific
15  methodology to analyze any forensic case. It's a
16  methodology paper. So certainly the steps utilized
17  would be applicable.
18    Q. Nothing else?
19    A. To some degree, there are several vehicle
20  crash, vehicle investigations, so certainly the
21  methodologies are similar. The vehicle dynamics
22  that we're talking about, maybe with regard to this
23  accident -- I don't believe any of these papers deal
24  with the vehicle dynamics outside of the braking.
25  Maybe some strain characteristics.

Page 31

1    Q. The courses taught Accident Reconstruction
2  Heavy Vehicle Braking Systems, where have you taught
3  that?
4    A. It's been a few years since I've given that
5  one. I don't recall who all I've given that to.
6  I've given it a few times.
7    Q. To who?
8    A. I've given it as continuing education
9  classes to insurance adjusters for one.
10    Q. When and where?
11    A. I don't recall the group. Like I said,
12  it's been a few years.
13    Q. What about -- I mean, it certainly would
14  have been since you have been away from Honda,
15  wouldn't it?
16    A. Yes, ma'am.
17    Q. So we're not talking about -- I mean, that
18  would have been since 2008, right?
19    A. Yes, ma'am.
20    Q. In the last five years, we're talking
21  about, right?
22    A. Yes.
23    Q. So what about Accident Reconstruction,
24  Making Effective Use of Your Reconstructionist, to
25  whom have you taught that?

Page 32

1    A. Again, it would be probably a group of
2  adjusters and/or maybe even some counsel. I don't
3  recall the exact venue.
4    Q. When have you done that?
5    A. I've given that or similar, you know,
6  probably a handful of times over the years to
7  various groups.
8    Q. To groups of insurance adjusters?
9    A. Could be one.
10    Q. Claims representatives?
11    A. Could be, yes, ma'am.
12    Q. How many times?
13    A. Four or five maybe.
14    Q. How many times on the heavy braking
15  systems?
16    A. Probably four or five.
17    Q. What about Biomechanical Analysis and
18  Vehicle Crashes, when have you given or taught a
19  course on that?
20    A. Again, a number of times over my years with
21  SEA. Similar type of groups.
22    Q. Insurance adjusters, claims managers?
23    A. Could be, yes. I mean, often times --
24  again, our SEA has marketing folks and they will ask
25  if I can come and give a speak to whoever they might



Page 33

1   have a presentation set up with.
2       Q.  But you can't tell me when and where you've
3   given a presentation on biomechanical analysis and
4   vehicle crashes?
5       A.  I believe I've -- I mean, I believe I've
6   given that within the last year in Atlanta even to a
7   group of adjusters.
8       Q.  What about Biomechanical Engineering,
9   Relation of Injury and Loading in Vehicle Accidents
10  and Premises Liability, when have you given that and
11  to whom?
12      A.  I've probably given a couple times.  I
13  believe I gave that specific talk maybe three years
14  ago in North Carolina to a group of attorneys that I
15  was invited to speak to.
16      Q.  What group was it?
17      A.  I believe it was the NCADA.
18      Q.  NC what?
19      A.  ADA.
20      Q.  What does that stand for?
21      A.  I believe it's the North Carolina
22  Association of Defense Attorneys.
23      Q.  Okay.  Then, Biomechanics and Products
24  Liability, Do The Claims Match the Evidence.  When
25  have you given that and to whom?

Page 34

1       A.  I believe it was five years ago.  That was
2   a group of adjusters.  I don't even remember, again,
3   which group.
4       Q.  Electronic Control Modules, Effective Data
5   Retrieval, when have you given that and to whom?
6       A.  I believe it was a group of adjusters that
7   deal with a lot with heavy vehicles.  It covered
8   again the passenger vehicle and heavy vehicle, but I
9   believe it geared more toward heavy vehicle data
10  recovery.
11      Q.  What about use technology and accident
12  reconstruction?
13      A.  Again the audiences varied, but probably
14  similar type of groups we've been talking about.
15      Q.  Same thing with vehicle accident
16  reconstruction and biomechanical engineering?
17      A.  Yes, ma'am.
18      Q.  Are these all presentations that are set up
19  for you to speak through the marketing efforts of
20  SEA?
21      A.  Typically, yes.
22      Q.  And all of these presentations were to
23  claims adjusters or defense attorney groups that
24  you've just -- all of those presentations and course
25  teachings; isn't that correct?

Page 35

1       A.  That's what comes to mind.  Again, I don't
2   know what all groups I've talked to over the years
3   and who all has been there to listen.  I show up and
4   I give a presentation and I leave.
5       Q.  It's your memory that all of these
6   presentations were even given to claims
7   representatives or defense attorneys, correct?
8       MR. ROZELSKY:  Object to the form.
9       THE WITNESS:  For the ones I
10  specifically recall, yes.
11      THE WITNESS:  For the ones I
12  specifically recall, yes.
13  BY MS. MCARTHUR:
14      Q.  The group that you're a member of, the
15  professional affiliations, there's like three of
16  them.  Is SEA -- okay.  Society of Automotive
17  Engineers, when did you join that?
18      A.  Sometime in college.
19      Q.  And what does that have to do with?
20      A.  I mean, it's exactly the name, Society of
21  Automotive Engineers.  So it's everything from OEMs,
22  like Honda, Ford, GM to tier three suppliers and
23  support consultants like ourselves, and they hold --
24  you know, they do a lot of work.  They host a lot of
25  conferences, including ones on accident

Page 36

1   reconstruction that I've attended.  Biomechanics
2   that I've attended.
3       Q.  What else do you offer, yourself, as a
4   person who can assist in the investigation of other
5   than automobile wrecks, like elevator accidents, I
6   think, premises liability?
7       A.  Yes, ma'am.
8       Q.  What types of things are you offered as an
9   expert on, Mr. Boggess?
10      A.  My degrees are mechanical and aerospace
11  engineering.  And I have consulted on a number of
12  mechanical engineering type of cases, whether that
13  be simple mechanical failures of some type of
14  appliance or HVAC system, plumbing fixture, forklift
15  accident, workplace accidents with conveyors.  You
16  know, all those systems are machines of some type of
17  or another that mechanical engineers would be in a
18  place to evaluate or consult on.
19      Q.  What percentage of your work would you say
20  has to do with automobile wrecks versus workplace
21  accidents, forklift accidents, elevator accidents,
22  premises liability cases?
23      MR. ROZELSKY:  Object to the form.
24      THE WITNESS:  I've never added it up.
25  I mean, I would certainly say that more of it



Page 37

1 than not is accident, vehicle accident related,
2 but if I had to guess -- I haven't added it
3 up.
4 BY MS. MCARTHUR:
5     Q.  You don't know is the answer?
6     A.  I do not know.
7     MR. ROZELSKY:  Object to the form.
8 BY MS. MCARTHUR:
9     Q.  So this Federal court query that we're
10 looking that is Plaintiff's Exhibit Number 2, let's
11 start with October 1st, 2013 deposition, tell me
12 what that was about.
13     A.  It was a two-vehicle accident in
14 Oklahoma.
15     Q.  What's your role in the case?
16     A.  It was an accident reconstruction and
17 associate biomechanical evaluation of the
18 accident.
19     Q.  Which side retained your services?
20     A.  Counsel for the trucking carrier.
21     Q.  And as far as how the wreck occurred, can
22 you give me a thumbnail of that?
23     A.  Two vehicles making a right turn in a
24 business district.  The trailer offtracks and makes
25 sidewipe contact to two vehicles on the inside of

Page 38

1 the turn, and there was alleged injuries within the
2 passenger vehicle.
3     Q.  Was your role to reconstruct the wreck?
4     A.  It was.  Part of it.
5     Q.  Did you say that the trailer came off?
6     A.  No. It just offtracked, so the trailer took
7 an -- based on the articulation of the tractor,
8 takes a narrower path than the tractor does.  So it
9 moves to the right or takes a tighter radius turn
10 than the tractor.  Basically made kind of a
11 sidewiping contact to the passenger vehicle.
12     Q.  Is your role in that case to give an
13 opinion whether the injuries claimed were caused by
14 the impact of the wreck?
15     A.  That's one of them, yes, ma'am.
16     Q.  What else?
17     A.  Speeds of vehicles, changes in velocity,
18 accelerations.  And then subsequent to that would be
19 the injury potential thereof.
20     Q.  Tell me about the 9/16/13 deposition.
21     A.  That is a pseudo vehicle accident case.
22 The claim is that Mr. Courtney -- well, Mr. Courtney
23 had a rock come through the windshield of his
24 vehicle.  The claim is that it came off of a dump
25 truck being driven by -- or operated by Blythe

Page 39

1 Construction and/or Blue Max.  And the question is
2 whether or not the rock did, in fact, come off the
3 truck as alleged.
4     Q.  And what's your role?
5     A.  I was retained by counsel for Blue Max in
6 that case.
7     Q.  What's your role?
8     A.  To evaluate if, in fact, the rock came from
9 the vehicle as alleged or not.
10     Q.  Your opinion is it did not?
11     A.  Given the dynamics, that's basically my
12 opinion.
13     Q.  So that was a defense case as well?
14     A.  Yes, ma'am.
15     Q.  Tell me about the deposition 9/10/13.
16     A.  This is a pseudo, again, vehicle case:
17 Miss Barton is in her vehicle in an automatic car
18 wash, the roller brush snagged the wiper arm of the
19 vehicle she was in causing damage to her vehicle.
20 She has alleged, for one thing, that the vehicle was
21 picked up in the air three feet, swung around, and
22 the question was, from a mechanical standpoint,
23 whether that is physical possible or not given the
24 construction of the equipment; and two, whether or
25 the injuries claimed are consistent with the forces

Page 40

1 involved.
2     Q.  You were retained by Magic Wand?
3     A.  Better Car Wash's counsel.
4     Q.  That was also a defense case?
5     A.  Yes.
6     Q.  Tell me about the 8/19/13 deposition.
7     A.  A three-vehicle accident on I-85.
8 Mr. Coursey was killed in the accident.  The counsel
9 that retained me was counsel for Heartland Express.
10 There's basically an accident reconstruction only in
11 that case assessing the accident, the dynamics of
12 the accident, perceptionary action, human factors
13 issues in regards to that accident.
14     Q.  What were the -- and I don't want you to
15 get into anything other than -- what's the mechanic
16 of the accident?
17     A.  The tractor trailer in this particular case
18 makes a left lane change to the right, makes contact
19 to the vehicle through its right, they end up
20 yawning into the median jersey barrier.  And
21 sometime later Mr. Coursey comes along and drives
22 into the now disabled vehicle at a high rate of
23 speed, and as a result, suffered fatal injuries.
24     Q.  And your thumbnail sketch of what you're
25 testifying to in that case is what?



Page 41

1    A. Essentially that, given the witnesses, the
2 evidence at hand that Mr. Coursey, as I recall, was
3 traveling at an excess rate of speed and executed no
4 perceptionary action prior to the accident, but had
5 every opportunity to have done so.
6    Q. So it's another case where you're
7 testifying as to whether Mr. Coursey could have
8 avoided the wreck?
9    A. That's certainly one aspect, yes, ma'am.
10    Q. Did any of these have anything to do with
11 anyone being on a telephone?
12    A. Not that I recall.
13    Q. On Page 1 of this testimony, do any of
14 these cases have anything to do with anyone being on
15 a telephone?
16    A. Not so far as I can recall on Page 1.
17    Q. Tell me about the deposition August 9th,
18 2013.
19    A. Vehicle versus pedestrian. It is a 26-foot
20 straight truck traveling down a highway at night.
21 There is a pedestrian off the road to the right. As
22 the truck approaches the pedestrian, which is kind
23 of right at the fog line initially, they basically
24 start to go ease over to go around. The pedestrian
25 was highly intoxicated. They stepped out into the

Page 42

1 path of the vehicle almost as if trying to thumb a
2 ride or something and was struck by the vehicle.
3    Q. And you're role in what is?
4    A. Reconstruction of the accident. What were
5 the speeds of the vehicle. The perceptionary action
6 of the driver, the behavior of the pedestrian, the
7 position of the pedestrian at the time of impact.
8    Q. All right. So you were retained by the
9 defendant?
10    A. In that one, yes, ma'am.
11    Q. What's the next one, the 8/1/ 2013?
12    A. That is a case involving a gentleman,
13 Mr. Cloud, who's unloading a pallet of Quikrete
14 concrete bags at the Handy Andy Store. In the
15 course of doing so, he's using a -- like a car
16 hauling trailer that has basically open floor
17 between two rails. And in the unloading process, he
18 falls from the trailer and reportedly suffers
19 injury. There's questions as to -- or allegations
20 that the operation of the forklift, which was
21 holding the bags of concrete, somehow affected him
22 and caused him to fall as opposed to him just
23 misstepping.
24    Q. What is your role in that case?
25    A. I was retained by counsel for Handy Andy.

Page 43

1    Q. And a thumbnail of what you're testifying
2 to on that is what?
3    A. That the movement of the forklift did not
4 affect Mr. Cloud's in his off loading, if you will,
5 of the product. Basically, he simply misstepped and
6 fell from the trailer. And from a biomechanical
7 standpoint that the alleged injuries -- or the fall
8 itself lacks the mechanism to cause the injury that
9 he is claiming as a result.
10    Q. Tell me about the trial July 26th, 2013.
11    A. Two-passenger vehicle. Miss Tucker struck
12 Mr. Meece in the rear. Again, sedan versus pickup
13 truck. And it was a reconstruction and a
14 biomechanical evaluation of whether or not the
15 injuries claimed by Mr. Meece were, in fact, a
16 result of the accident or not.
17    Q. You were retained by whom?
18    A. Counsel for the defense.
19    Q. What was the result of that trial?
20    A. Defense verdict.
21    Q. Tell me about 7/16/13 deposition.
22    A. One of the Mr. Stewarts is operating a
23 John Deere tractor with a flatbed of round bails of
24 hay making a left turn. Mr. Spangler is approaching
25 from the opposite direction on a motorcycle. I was

Page 44

1 retained by counsel for Mr. Stewart's defense. And
2 essentially at the time the tractor began it's left
3 turn Mr. Spangler would have been over the crest of
4 a hill out of sight -- out of the line of sight of
5 Mr. Stewart, and furthermore, Mr. Spangler's
6 reaction was not -- was highly delayed and he could
7 have given the time and distance and he could have
8 avoided the collision all together.
9    Q. Why was his reaction delayed in your
10 opinion?
11    A. Either inattention. I know that he had
12 been at a biker bar for sometime, admitting to
13 drinking, consuming some amount of alcohol prior.
14    Q. You're not a human factor's expert, are
15 you?
16    A. Certain factors, yes.
17    Q. What factors?
18    A. I mean, certainly with reconstruction the
19 studies that I've done, the research I've done,
20 would be the visual perception field. And, in fact,
21 I published a paper on visual --
22    Q. Conspicuity?
23    A. That would be -- one aspect would be
24 conspicuity, one is just the visual field of the eye
25 all together, the resolution thereof. And then with



Page 45

1  reconstruction, certainly we have to study the
2  timing of things, how long does it take to perceive
3  a certain type of hazard in a certain type of
4  situation, and then how long does it take to react,
5  you know, and things like steering, braking,
6  accelerating.
7      Q.  The area of typical reaction of a driver in
8  an emergency situation, is that an area of human
9  factors that you believe that you are qualified as
10  an expert in?
11      A.  Certainly some aspects of that, yes,
12  ma'am.
13      Q.  Would you agree with me that Ms. Little was
14  in an emergency situation caused by the truck
15  merging into her lane where she was already in the
16  lane?
17      MR. ROZELSKY:  Object to the form.
18      THE WITNESS:  Certainly the lane
19  change of the truck presents a hazard to her
20  that she had to react to.
21  BY MS. MCARTHUR:
22      Q.  And it was an emergency too, wasn't it?
23      A.  It needed to be reacted too, yes, ma'am.  I
24  don't know if I would use the word emergency, but
25  yes.

Page 46

1      Q.  Why would you not use the word emergency,
2  Mr. Boggess?
3      A.  Again, it's a hazard.  I don't know the
4  exact definition you want to characterize emergency
5  with.  I use the word -- she was presented with a
6  hazard, and the question remains as to whether or
7  not she had the opportunity to react to it.
8      Q.  What's the definition of emergency?  What's
9  your definition?
10      A.  Again, I don't know necessarily have a
11  great definition for it.  So I don't -- that's why I
12  don't use the word.  She was presented with a hazard
13  and the question remain as to whether or not she
14  executed any reaction to that or what reaction she
15  did have to that hazard.
16      Q.  Would you agree with me that an emergency
17  is a situation that when you're driving in -- an
18  emergency as applies to your driving, is a situation
19  wherein you must react immediately or else injury to
20  yourself or others might occur.  Can you agree that
21  that's a definition of an emergency when driving?
22      A.  That could be a reasonable definition.
23  Again, question is:  What's immediately, what kind
24  of time -- I'm an engineer.  I put numbers to
25  things.  And I guess the question is:

Page 47

1  Instantaneous, you know, some amount of perception
2  reaction.  What kind of time are you talking?
3      Q.  You agree with me that the situation with
4  Mr. McClure coming over into Ms. Little's lane was
5  an ongoing emergency situation that didn't stop in
6  just one act, correct?
7      A.  There were certainly multiple phases of the
8  contacts, yes.  I mean, it's an ongoing hazard
9  situation, yes.
10      Q.  It had the ongoing hazard situation created
11  by Mr. McClure merging into Ms. Little's lane while
12  she was there, had the potential for serious injury
13  or death for Ms. Little, didn't it?
14      A.  It depends on what develops next.
15      Q.  Do you agree with me that it had the
16  potential for serious injury or death to Ms. Little,
17  Mr. Boggess, when the truck merged into her lane
18  with her vehicle there?
19      A.  A vehicle merging into another lane on the
20  highway has the potential.  In this particular case,
21  we know essentially -- roughly where the vehicle
22  starts from, where it ends up.  So it's not a -- for
23  something like this particular one, I would say that
24  we look at the start, the end result, and then
25  assess whether or not death or serious injury is a

Page 48

1  factor or not.
2      Q.  Are you unwilling to say that when the
3  truck merged into Ms. Little's lane of travel with
4  her vehicle beside it, that that had the potential
5  for injury or death of Ms. Little?  You're unwilling
6  to say that?
7      A.  It has the potential.  Again, any lane
8  change has that, has a potential.
9      Q.  You do agree with me that there is no
10  excuse for Mr. McClure not to see Ms. Little in the
11  lane prior to his merging into the lane on top of
12  her vehicle, is there?
13      MR. ROZELSKY:  Object to the form.
14      THE WITNESS:  As evaluated, it seems
15  that Ms. Little was in his blind spot or
16  somewhere along the side and he missed her.
17  So, you know, again, should you see the
18  vehicle?  And I say you should, yes.
19  BY MS. MCARTHUR:
20      Q.  As a professional truck driver, Mr. McClure
21  is held to a higher standard of driver safety than
22  passenger car drivers on the road, is he not?
23      MR. ROZELSKY:  Object to the form.
24      THE WITNESS:  They certainly have
25  different licensing, yes.



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
49–52

Page 49

1  BY MS. MCARTHUR:
2      Q. He certainly is required to abide by
3  Federal Motor Carrier regulations, isn't he?
4      A. He would, yes.
5      Q. Mr. McClure was not allowed to merge into a
6  lane that was already occupied by a vehicle in that
7  lane, was he?
8      A. One should not do that, no.
9      Q. Well, Mr. McClure was not allowed to merge
10  into the lane where Ms. Little's vehicle already was
11  there, correct?
12      MR. ROZELSKY: Object to the form.
13      THE WITNESS: That would be correct.
14  BY MS. MCARTHUR:
15      Q. And Mr. McClure -- as you recall, Mr.
16  McClure testified even on deposition that when he
17  started his merge that Ms. Little was not there, do
18  you recall that?
19      A. I believe those were his words or very
20  similar.
21      Q. He was adamant about that, wasn't he, that
22  he would not even assume that Ms. Little was there
23  when he merged into the lane she was in. Do you
24  recall that he would not even assume that fact?
25      A. I believe I recall that. Again, he

Page 50

1  believes that she wasn't there. He missed her.
2      Q. Well, he would not even agree that she was
3  there. It wasn't even a "he missed her" belief. He
4  wouldn't assume it, would he?
5      A. Yes. I don't believe he would.
6      Q. Okay. But you agree with me, don't you,
7  that when Mr. McClure merged into the right lane,
8  Ms. Little's vehicle was there beside his truck,
9  wasn't it?
10      A. Yes, I believe it was.
11      Q. In fact, the first part of his truck that
12  hit her car was one of the wheels of his cab, wasn't
13  it? The truck itself, not the trailer.
14      A. I believe it was a portion of his tractor
15  is what contacts her, yes.
16      Q. And she didn't him, did she? He hit her.
17      A. In the act of merging, yes.
18      Q. Right. So in which of the -- was it the
19  front right wheel instep there that hit
20  Miss Little's car first?
21      A. I definitely see the evidence of the step
22  makes contact to her vehicle. I'm not convinced
23  that the steer tire at this point did or did not.
24      Q. And the step is up into the passenger
25  component of the truck, correct?

Page 51

1      A. It is, yes.
2      Q. That is the first piece that you're willing
3  to say for sure hit Ms. Little's car, correct?
4      A. That's the most forward portion on his
5  vehicle, yes.
6      Q. So you agree that that's what hit her car
7  first or not?
8      A. Yes.
9      Q. What part of her car did it hit first?
10      A. Given the swirl marks on the steps, it
11  would be the wheel of her vehicle.
12      Q. The front left wheel?
13      A. Yes, ma'am.
14      Q. So the step --
15      A. The rear portion of the step, yes.
16      Q. It would be under the passenger door of the
17  truck, correct?
18      A. Correct.
19      Q. And that hit the front tire area of
20  Ms. Little's car?
21      A. Yes. Given the swirl marks that we see,
22  the abrasions in the step, yes.
23      Q. That happened while both vehicles were on
24  the bridge, didn't it?
25      A. Thereabouts, yes, ma'am. Yes.

Page 52

1      Q. And regardless of how it occurred,
2  Ms. Little's car became entrapped under the trailer
3  of Mr. McClure's truck, didn't it?
4      A. Ultimately, it slid rearward along the
5  vehicle and became caught at the rear tandems of the
6  trailer.
7      Q. In fact, it actually slammed with some
8  force into the rear tandems of the trailer, didn't
9  it, creating a lot of damage to rear of Ms. Little's
10  vehicle?
11      A. It certainly left rear damage to
12  Ms. Little's vehicle as a result of that contact,
13  yes.
14      Q. At the point that her vehicle slammed into
15  the rear of the trailer tires, at that point, her
16  vehicle was caught or imprisoned or it was -- how
17  would you say it, captured by the trailer
18  undercarriage and the wheel there?
19      A. It was caught up on the side of the
20  trailer.
21      Q. At the point that Ms. Little's car was
22  captured by the back wheels of the trailer and the
23  undercarriage of the trailer, there was no way for
24  that vehicle to be steered anymore, correct, by
25  Ms. Little?



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
53–56

Page 53

1    A.  At that point, I mean, you can still steer
2  the vehicle.  I mean, you can turn the wheel
3  presumably assuming that the steering wheel is not
4  broken.  You're not going to be able to steer it and
5  brake because, obviously, you're being caught from
6  the rear.  It's a front-wheel drive vehicle, you may
7  be able to get some traction on the front wheels.
8  I'm not sure.
9    Q.  At that point, Ms. Little's vehicle is
10  being dragged down the road by the truck, is it
11  not?
12    A.  It would be, yes.  Given the -- in this
13  particular accident, yes.  Once it got caught up, it
14  was being dragged, yes.
15    Q.  And the location where the rear of
16  Ms. Little's vehicle slammed into the tires of the
17  trailer, her vehicle and the truck were still on the
18  bridge, weren't they?
19    A.  They were toward the end of the bridge, but
20  not off the bridge as I recall.
21    Q.  Was Ms. Little's vehicle still on the
22  bridge at the point where her vehicle was captured
23  by the trailer or not?
24    A.  As I look back at the evidence, I don't
25  recall as I sit here.

Page 54

1    Q.  Well, do you have something you can look at
2  quickly and make your determination of that?  If so,
3  what is it, and let's look at it.
4    A.  I was going to look at the photographs
5  first from the scene and see what the evidence --
6  actually, the police photographs.
7    MR. ROZELSKY:  While he's looking at
8  that, can we take a quick break so I can use
9  the restroom?
10    MS. MCARTHUR:  Sure.
11    (A break was taken from 11:35 to 11:39.)
12  BY MS. MCARTHUR:
13    Q.  Mr. Boggess, my question was:  Didn't
14  Ms. Little's vehicle become captured by the trailer
15  at the back wheels of the truck trailer on the
16  bridge while her vehicle was still on the bridge?
17    A.  Yes, ma'am, it does appear from the
18  photographs and roadway evidence.
19    Q.  Tell me what the physical evidence shows as
20  far as how far the truck traveled on the bridge
21  after first striking her vehicle in her lane of
22  travel.  What's the distance on the bridge from the
23  point of first impact to the end of the bridge?
24    A.  I'm not sure I have a drawing with me that
25  would show that distance.  I mean, it's in the

Page 55

1  drawing file that I have, but I don't have the
2  called out number to provide you as we sit here.  I
3  know it's on the bridge from the photographs in the
4  drawings.
5    Q.  You have another file folder of drawings
6  that's not here?
7    A.  Well, you have my drawing folder, which is
8  just some basic -- is an overhead, but it's not -- I
9  don't have that dimension called out in that drawing
10  and printout.  I'd have to go into the file and
11  actually physically measure and call up that
12  dimension if you want me to give you that number.
13    Q.  How much do you think it is?
14    MR. ROZELSKY:  Object to the form.
15  BY MS. MCARTHUR:
16    Q.  You can look at the drawing file and see if
17  you give us a descent mechanical engineering
18  estimate.
19    A.  The drawing that I have here, I'd say it's
20  at least -- it's better than 150 feet.  But again,
21  it's not -- that's as best as I can do given the
22  drawing that I have in front of me.
23    Q.  Tell me what the truck did as far as where
24  it first started pushing the car into the bridge and
25  for how long was it scraping the car alongside of

Page 56

1  the bridge?
2    MR. ROZELSKY:  Object to the form.
3    THE WITNESS:  Using the, I guess,
4  guardrail edge of the bridge to -- on the right
5  side just saying that they're measuring that
6  distance, it's going to be in the neighborhood
7  of 100 feet, it appears, from this drawing, but
8  I'd have to go back and look at the drawing
9  file to be sure.
10  BY MS. MCARTHUR:
11    Q.  So tell me what happened from the -- after
12  the truck first hit the front left wheel of the
13  little vehicle with the step area?  I'm not
14  concerned about driver maneuver at all here.  What
15  was the interaction of the two vehicles with each
16  other and the bridge?
17    MR. ROZELSKY:  Object to the form.
18    THE WITNESS:  There is varied contact
19  along the side of the tractor trailer.  So
20  there's initial contact at the step.  There's
21  contact damage to the right outer axle to the
22  wheel which was replaced after the accident for
23  repair.  And then there's varied marks along
24  the rubber rail or the lower rail, right rail
25  of the enclosed trailer in tow.



Page 57

1  So there's going to be multiple
2  contacts, on/off contacts as the Civic is
3  moving rearward relative to the tractor
4  trailer.
5       Again, once there's initial contact as
6  Ms. Little's indicated, she has -- she drops
7  her phone, she stops -- or she never really, I
8  guess, dynamically reacts to the accident, but
9  she is making her move, as we all know, to get
10  out of the vehicle ultimately.
11       But, you know, she's not putting any
12  inputs in, so, of course, a vehicle without
13  throttle input is going to be slowing. So her
14  vehicle is slowing. The truck is continuing to
15  go by her, and it's going to be sliding --
16  bouncing down the right side of her vehicle --
17  or his vehicle, excuse me.
18  BY MS. MCARTHUR:
19       Q.  The truck is bouncing down the left side of
20  her vehicle?
21       A.  She is going to be -- he's going -- given
22  his size and his merge, he's maintaining his merge
23  over because he thinks -- once he gets that contact,
24  he testifies that he thought he got bumped in the
25  rear, so ultimately continues over and then pulls

Page 58

1  off. He's basically maintains his path.
2       Her vehicle without any real input is
3  going to be sitting there kind of bouncing off
4  of his vehicle, off the guardrail, kind of in a
5  back and forth motion as it's working its way
6  down the side of the trailer relative.
7       Q.  Her vehicle was dragged down the side of
8  the bridge for a distance of a 100 feet or so,
9  wasn't it?
10       A.  There are some marks along the bridge over
11  distance in that neighborhood, yes.
12       Q.  And there's marks on the side of her car
13  that correspond with marks on the bridge from being
14  dragged down the side of the bridge for 100 feet or
15  more, correct?
16       A.  Again, there's a variation of heavy marks,
17  lighter marks, heavier marks, lighter marks as if
18  it's being kind of bounced around in that space
19  between the side of the trailer and the bridge
20  itself.
21       Q.  So what's your opinion -- was it being --
22  you know, I think that you told us that her vehicle
23  had been captured by the trailer -- was at the back
24  wheels of the trailer from 100 feet from the end of
25  the bridge. That's what we were just covering.

Page 59

1       So at 100 feet, her vehicle was at the back
2  trailer tires and stopped by them, correct?
3       A.  Yes.
4       Q.  So, for 100 feet her vehicle is not going
5  any further back, is it?
6       A.  Not relative to his vehicle, no.
7       Q.  So whatever her vehicle was doing from 100
8  feet before the end of the bridge was being dictated
9  by the path of the truck, correct?
10       A.  It was.
11       Q.  The truck was --
12       A.  Generally speaking.
13       Q.  -- even with her trapped there under the
14  undercarriage of its trailer was continuing to make
15  his merge into Ms. Little's lane, wasn't it?
16       A.  To some degree, yes.
17       Q.  And further compressing her car into the
18  bridge side, at the bridge -- the side of the bridge
19  wasn't it? That's where -- I mean, that's where the
20  marks -- 100 feet out is where the marks on the side
21  of the bridge show that her car is being scraped
22  along the side of the bridge, doesn't it?
23       A.  Realistically for the last 100 feet,
24  there's not -- his trailer is generally almost all
25  the way over. There may be some slight movements,

Page 60

1  but it's more just the two vehicles moving. And
2  because of the positioning, her vehicle is being
3  pulled and rubbed against the concrete edge, kind of
4  the curb edge of the rail.
5       Q.  Let me ask you to assume that according to
6  Mr. Hunter's testimony that the -- that he and
7  Ms. Little entered from the Spring Street entrance
8  ramp onto I-16, remained in the right lane, and that
9  as they were approaching and coming on to the bridge
10  area that Mr. McClure's truck overtook them and that
11  he -- he passed Mr. Hunter and he overtook
12  Ms. Little, according his testimony, and -- are you
13  getting out his affidavit?
14       A.  His affidavit, yes, ma'am.
15       Q.  Right. And that it was at the point where
16  he was passing Ms. Little that he began his merge
17  into her lane. Can you assume that?
18       A.  Okay.
19       Q.  That's what Mr. Hunter said; isn't it?
20       A.  Generally.
21       Q.  It was Mr. Hunter's impression that
22  Ms. Little was being passed by the truck at the time
23  the truck began to merge into her lane, correct?
24       A.  Again, he says that the truck passed me and
25  then when it was beside the Honda Civic, its right



Page 61

1  turn signal was turned on to move into our lane and
2  it proceeded to move over.
3      Q.  So it was his impression the truck was
4  passing Ms. Little -- it had just passed him and was
5  passing Ms. Little at the time it began to move
6  over, correct?
7      MR. ROZELSKY:  Object to the form.
8  BY MS. MCARTHUR:
9      Q.  Into Ms. Little's lane.
10     A.  I don't know if it was continuing to pass,
11  but it had moved up along the certainly.
12     Q.  Having just passed Mr. Hunter and with
13  Ms. Little, do you agree that Ms. Little was
14  directly ahead of Mr. Hunter in the lane of
15  travel?
16     A.  It would seem that way, yes.
17     Q.  And having just passed Mr. Hunter and with
18  Ms. Little being the next car ahead of Mr. Hunter,
19  there's no excuse at all for Mr. McClure not knowing
20  that Ms. Little's vehicle was there in the right
21  lane, was there?
22     A.  It depends on all the timing.  Again, he
23  should be able to see -- or should see a vehicle
24  beside him.  I mean, we've talked about that.  I
25  mean, there are reasons as you back up to the merge

Page 62

1  and the gore point for the on ramp as to why he may
2  have missed her, but, I mean, ultimately, she was
3  beside him when he started merging over.
4      Q.  Well, I mean, the fact is that as he was
5  coming up beside Mr. Hunter and coming up beside --
6  I mean, the testimony of Mr. Hunter is the truck
7  came up beside him and then went up beside
8  Ms. Hunter, not he and Ms. Little came up
9  beside the truck, correct?  That's what Mr. Hunter
10  says, that the truck came up beside them, passing
11  them in the last lane, correct?
12     MR. ROZELSKY:  Object to the form.
13     THE WITNESS:  He indicates that they
14  came in the right lane and the truck passed
15  him.  As far as -- we know that the on ramp has
16  to merge into a parallel lane to the right of
17  them.
18  BY MS. MCARTHUR:
19     Q.  He says after we were on I-16, a tractor
20  trailer was traveling faster than we were and
21  overtook us in the left of I-16 beside it.  The
22  truck passed me and then, when it was beside the
23  Honda Civic -- so that's his testimony is.  The
24  truck overtook him and then overtook Ms. Little,
25  correct?

Page 63

1      MR. ROZELSKY:  Object to the form.
2      THE WITNESS:  Yes, it would have to.
3  BY MS. MCARTHUR:
4      Q.  All right.  So assuming that that's
5  Mr. Hunter's testimony, Ms. Little would have been
6  in plain view for Mr. McClure to see as he was
7  overtaking Mr. Hunter, wouldn't she?
8      A.  She would have been forward of the Charger,
9  which she was in, and to his right.
10     Q.  Ms. Little was not in his blind spot at all
11  as Mr. McClure was passing Mr. Hunter, was she?
12     A.  The placement articulated from this
13  affidavit is not 100 percent clear.  Again, when is
14  he saying he's on I-16?  Is it on the ramp when the
15  ramp was still merging in?  How far over was the
16  Civic and the Charger at the time?  Was it
17  immediately beside?  Was there some distance between
18  them as they're coming together?  I don't know.
19     Q.  Mr. Boggess, this says: "After we were on
20  I-16, the tractor trailer was traveling faster than
21  we were and overtook us in the left lane of I-16
22  beside us."  He's not talking about the ramp.  He's
23  on I-16, and the truck overtook them traveling
24  faster than they were beside them.  Did he not say
25  that in his affidavit?

Page 64

1      MR. ROZELSKY:  Object to the form.
2      THE WITNESS:  Those are basically the
3  words, yes.
4  BY MS. MCARTHUR:
5      Q.  Right.  And the truck then passed him,
6  correct?
7      A.  He said: "The truck passed me."
8      Q.  All right.  So at the point where the truck
9  is passing Mr. Hunter, Ms. Little is in plain view
10  of the truck, isn't she?
11     MR. ROZELSKY:  Object to the form.
12     THE WITNESS:  If they're already on
13  I-16 established in the lane, then yes.  If
14  we're back in the merged area -- and the
15  question is, what is on I-16?  Is it when he
16  turns onto the ramp?  Is he halfway down the
17  ramp?  Is he at the gore point?  It's not
18  clear.
19  BY MS. MCARTHUR:
20     Q.  He said he's on I-16.  He doesn't say he's
21  on the ramp, doesn't he?
22     A.  He says on I-16.  The ramp is - I mean, the
23  ramp itself, as I understand, is controlled by the
24  same highway and it would be part of I-16.  It
25  doesn't put an X on the spot, so...



Page 65

1    Q. What he describes is the truck overtaking
2  them and being beside him as he's being overtaken,
3  correct?
4    A. He says beside, yes. Doesn't say how far
5  beside, but beside, yes.
6    Q. And the truck is going faster than he is
7  according his testimony, correct?
8    A. At that time, yes. But both the Civic and
9  the Charger are merging in, so -- and they're going
10  to be accelerating down the on ramp, so, again,
11  maybe they caught up to him and they matched speeds
12  by the time this happens. I'm not sure.
13    Q. That's not what Mr. Hunter says, is it?
14  That's just what you're supposing, isn't it?
15    A. He says the truck passed him, and then when
16  it was beside the Honda, its right turn signal was
17  on. It's never articulated as to, was the truck
18  continually passing the Civic and to what degree?
19    Q. He says: "I was traveling at about 50 or
20  55 miles an hour, a safe distance behind the Honda
21  Civic. After we were on I-16, a tractor trailer was
22  traveling faster than we were and overtook us in the
23  left lane of I-16 beside us. The truck passed me
24  and then when it was beside the Honda Civic, its
25  right signal was turned to move into our lane and

Page 66

1  proceeded to move over." That's what he said, isn't
2  it?
3    A. Yes. You just read the affidavit, yes,
4  ma'am.
5    Q. So there was no obstruction to
6  Mr. McClure's view of Ms. Little's vehicle that you
7  know of, was there?
8    A. Other than what his mirrors can or can't
9  show, no.
10    Q. Other than what?
11    A. What his mirrors and/or his vehicle
12  obstruction would offer, no.
13    Q. I mean, he's looking out his windshield as
14  he's passing Mr. Hunter's vehicle, and Ms. Little
15  was ahead of Mr. Hunter, so she would have been in
16  plain view the right lane, would she not?
17    A. At some point, I mean, according to this,
18  he came up and would have moved passed them. So at
19  some point he could have looked over to the right.
20  Again, it would have been back on the ramp with some
21  separation. It would have been right there in the
22  immediate lane. I don't know. But she would have
23  over there and could have been seen.
24    Q. Will you agree with me that Ms. Little was
25  in plain view of Mr. McClure as he was approaching

Page 67

1  Mr. Hunter and Ms. Little's vehicle from the rear?
2    A. Can you restate that, please?
3    Q. Can you agree with me that Ms. Little's
4  vehicle was in plain view of Mr. McClure as he was a
5  approaching Mr. Hunter's vehicle from the rear to
6  pass Mr. Hunter?
7    A. She would have been at some position
8  pulling to the right, yes. He could have reasonably
9  seen the Civic.
10    Q. And he should have seen her since he was
11  intending to do merge into that lane, shouldn't
12  he?
13    A. At some point, he should have seen the
14  Civic which was beside him at the time he merged,
15  yes.
16    Q. He should have seen Ms. Little's vehicle as
17  he was coming up on her, according to Mr. Hunter's
18  testimony, as he did, that he was coming up beside
19  her. She didn't come up beside him, according
20  Mr. Hunter, did she?
21    MR. ROZELSKY: Object to the form of
22  the question.
23    THE WITNESS: Not according
24  Mr. Hunter.
25  BY MS. MCARTHUR:

Page 68

1    Q. Do you dispute Mr. Hunter's testimony?
2    A. There's questions in terms -- as we were
3  just talking about clarifying some point, but I
4  don't dispute it, per se.
5    Q. I mean, do you find the physical evidence
6  to be different from what Mr. Hunter said? I mean,
7  do you think his rendition of the facts is
8  incorrect? Are you going to testify that he's
9  wrong?
10    MR. ROZELSKY: Object to the form of
11  the question.
12    THE WITNESS: I don't believe I find
13  anything wrong with his testimony. There are
14  some gaps and some clarification that is not in
15  here.
16  BY MS. MCARTHUR:
17    Q. Tell me the things you need to know from
18  Mr. Hunter.
19    A. Again, as we've just talked about: Was he
20  established in his lane? Where was he relative to
21  the Gore Point, the bridge when this supposedly
22  transpired? Was it at the merge -- were they still
23  in the process of merging? Were they already
24  established? Was it only three lanes at this point?
25  Those types of variables.



Page 69

1    Q. So it's clear from Mr. Hunter, Ms. Little
2  did not come from behind and overtake the truck.
3    A. He certainly does not say that, no.
4    Q. And you don't have the opinion that
5  Ms. Little came from behind and overtook the truck,
6  do you?
7    A. Not in the manner of, you know, zipping in
8  and out of traffic and rapidly accelerating up. We
9  know that from Mr. Hunter's testimony and
10  Ms. Little's testimony that -- Ms. Little's
11  testifies that she's alongside the trailer, and we
12  know -- at the time that he starts to merge, and
13  furthermore that the first contact point was closer
14  up to the tractor. So for some amount of time
15  during the merge, there is a differential speed
16  whereas the Civic has to catch up relative to the
17  truck to some degree.
18    Q. What do you mean when you say "catch up?"
19    A. Well, their relative positions have to
20  shift so that the Honda comes further forward
21  relative to the tractor trailer, the side of the
22  tractor trailer.
23    Q. Why is that?
24    A. Well, for one, again, Mr. Hunter places the
25  two vehicles beside each other. "The truck passed

Page 70

1  me when it was beside the Civic. His right turn
2  signals was turned on and started to move over." So
3  they are together. They're beside each other when
4  the merge begins.
5    Ms. Little is very clear in her testimony
6  referring to the rectangle marker light on the side
7  of the trailer that she's looking at this turn
8  signal that gets activated.
9    If that's the case, she sees that and then
10  it starts to merge, and we know the contact is
11  further up on the vehicle, either she has to have
12  more speed and kind of catch up or move past him in
13  the process of the merge, the truck has to slow
14  whether that be letting off the gas or some
15  combination thereof.
16    Q. Or it could be that she was wrong as to
17  when she first perceived him coming into her lane as
18  far as where she was on the road, correct?
19    MR. ROZELSKY: Object to the form.
20  BY MS. MCARTHUR:
21    Q. I mean, that's an optical --
22    A. I think she makes it pretty clear in her
23  testimony that she sees and even clarifies the big
24  rectangular marker like flashing right beside her.
25  That's what she saw. It's not, I was somewhere

Page 71

1  along truck, I think it was there. She was very
2  clear, in my opinion, in her testimony as to what
3  she saw.
4    Q. Well, she may have been, but you understand
5  about witness memory and wrecks, that witnesses and
6  individuals in wrecks are wrong all the time about
7  where they saw what and what happened, aren't
8  they?
9    MR. ROZELSKY: Object to the form.
10    THE WITNESS: Sometimes distance
11  things would be difficult, but again, once that
12  initial contact which we've discussed was at
13  the front of the tractor, that -- once that
14  transpires, it's no longer the truck is
15  merging. It's already hitting you.
16  BY MS. MCARTHUR:
17    Q. Right.
18    A. It's pretty clear to me that she says, "I
19  saw the turn signal come on, which is that big
20  flashing beacon on the side of the trailer, and she
21  was very clear as to what she was looking at. Once
22  she's been hit and sliding -- she hits the left
23  side of the cab, the drive wheel had been sliding
24  down along the side of the trailer, then the -- you
25  know, her recollection of seeing certain spots on

Page 72

1  the trailer is probably over and she's already doing
2  other things within her vehicle, making the decision
3  to get out, to jump as, she did, or other things.
4    Furthermore, as her vehicle slides by the
5  vehicle, that turn signal is taken out, so the very
6  turn signal that she very vividly recalls as having
7  been flashing.
8    Q. Mr. Boggess, Mr. Hunter never indicated
9  that either he or Ms. Little sped up, did he?
10    MR. ROZELSKY: Object to the form.
11    THE WITNESS: Neither one did, no.
12  BY MS. MCARTHUR:
13    Q. Right. Ms. Little said she didn't speed
14  up, didn't she?
15    A. She did not change her behavior. Did not
16  try to accelerate out from underneath, no, or brake
17  or steer.
18    Q. Mr. Hunter's description of what happened
19  is the truck was -- overtook him and then overtook
20  Ms. Little and then merged into her, isn't that
21  exactly what he said?
22    MR. ROZELSKY: Object to the form.
23    THE WITNESS: No, that's not exactly
24  what he said. We read it several times. He
25  said it passed her -- or passed him. The truck



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
73–76

Page 73

1  passed the Charger that Mr. Hunter was in.  And
2  then when it was beside the Civic, its right
3  turn signal was turned on to move into our
4  lane.
5  BY MS. MCARTHUR:
6      Q.  Right.  So the indication from Mr. Hunter
7  is that the truck was continuing to move faster than
8  he and Mr. Little were, correct -- and Ms. Little
9  were, correct?  That's what he says.
10      A.  It said it passed him, and then when it was
11  beside the Civic, his right turn signal was turned
12  on to move in.  It doesn't say that it's continually
13  moving past, it's braking, slowing or otherwise.
14          I mean, at this point, he's coming off the
15  ramp.  He's going to be making turn.  Has he let off
16  the throttle and has a dragger -- you know, the
17  rolling resistance dragging is slowing him slightly,
18  don't know.  Is Ms. Little continuously accelerating
19  as she is now shortly off the on ramp and just kind
20  of getting to speed, it's unknown.
21          We know that from her testimony that she
22  was looking at the turn signal of the trailer.
23  She's abreast of the trailer when he starts to
24  merge, and we know where the contact is at the
25  forward part of the tractor.

Page 74

1      Q.  You're really hanging your hat on the turn
2  signal, aren't you, as far as to say she was going
3  faster than the truck?
4      MR. ROZELSKY:  Object to the form.
5      THE WITNESS:  For some short time that
6  certainly factors in.  I mean, the Civic --
7  Mr. Hunter places them alongside each other.
8  He doesn't articulate exactly the relative
9  positions.
10  BY MS. MCARTHUR:
11      Q.  Mr. Boggess, this wreck was not
12  Ms. Little's fault, was it?
13      MR. ROZELSKY:  Object to the form.
14  BY MS. MCARTHUR:
15      Q.  It wasn't, was it?
16      A.  It wasn't necessarily initiated by her.
17  She certainly could have done things to avoid it, as
18  I outline in my report.
19      Q.  Well, this wreck was caused because
20  Mr. McClure merged into the right lane where
21  Ms. Little's vehicle already was, correct?
22      A.  As I said, it was initiated by that, yes.
23      Q.  And Mr. McClure is not allowed to merge
24  into a lane where a car is already there, is he, by
25  the rules of the road and by general driver safety,

Page 75

1  is he?
2      MR. ROZELSKY:  Object to the form.
3      THE WITNESS:  No more than any vehicle
4  is allowed to merge into another.
5  BY MS. MCARTHUR:
6      Q.  And he merged right into a lane where
7  another vehicle was and merged right on top of that
8  vehicle, didn't he?
9      A.  He merged into the side -- seemly merged
10  into the side of the Civic, yes.
11      Q.  And then he continued his merge and dragged
12  that vehicle some 735 feet, didn't he?
13      A.  He drug it for some distance, yes.
14      Q.  Have you attempted to put a speed on him to
15  the point where he's dragging that vehicle to get to
16  that kind of stop?
17      A.  He's testified that he wasn't in a panic
18  maneuver.  He thought he had been contacted in the
19  rear and was trying to get over the shoulder.  He
20  certainly does not know that she's hung up under the
21  wheels -- or the Civic is hung up under the wheels
22  of his vehicle.
23      Q.  How do you know that?
24      A.  In the testimony -- well, from his
25  testimony, his reaction.  I mean, I think if he knew

Page 76

1  that there was a vehicle caught underneath him, I
2  think you're going to stop fairly quickly and not
3  continue to drag a vehicle.
4          But that aside, I mean in terms of the
5  speed, Mr. Hunter says he was traveling 50 to 55 and
6  the truck moved past him.  No one -- no evidence
7  that I've seen from any of the witnesses, any of the
8  drivers have said that the tractor trailer was
9  moving at some aggressive speed past.  There was
10  some relative movements of the vehicles.
11      Q.  Mr. Hunter said 60 to 65.  Assuming that
12  the summary attached -- that the truck is going 60
13  or 65 miles per hour --
14      MR. ROZELSKY:  I'm going to object,
15  first of all, to the fact that you're going
16  back and forth between an affidavit where
17  you're referring to his testimony.
18          If you're summary to a summary of a
19  statement and you want to tell the witness that
20  you got a summary that he's not been provided,
21  then let him know where you think that
22  testimony comes from, please.
23  BY MS. MCARTHUR:
24      Q.  Let me ask you to assume that Mr. Hunter
25  will say that the truck was going 60 to 65 as he



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 20 of 94

BRIAN BOGGESS, SEA
LITTLE vs. McCLURE
October 31, 2013
77—80

Page 77

1  passed him and Ms. Little?
2      A. Okay. I can assume that.
3      Q. Is there any inconsistent with that in the
4  physical evidence that you've seen?
5      A. I mean, again, it would be -- it's a number
6  and it's an estimate. I mean, as we just talked
7  about. People's --
8      Q. The question was: Is there anything
9  inconsistent with that estimated speed of 60 to 65
10  of the truck based on the physical evidence?
11      MR. ROZELSKY: Object to the form.
12      THE WITNESS: Given the physical and
13  the witness evidence, yes. Because given the
14  position of Ms. Little's vehicle along the side
15  of the trailer and the ultimate point of
16  contact that would then suggest that the Civic
17  has to be going even hire to get up to the
18  position of initial contact.
19      Q. Well, that's if it is correct what
20  Ms. Little said about where it was when the struck
21  came over and hit her vehicle, correct?
22      MR. ROZELSKY: Object to the form.
23      THE WITNESS: So using your assumption
24  and the -- I am, I guess, assuming that your
25  client, Miss Little, does in fact recall the

Page 78

1  accident. But, again, she was very vivid that
2  she's looking at that light. She sees that
3  light. She's abreast of the trailer.
4      Mr. Hunter places the vehicles beside
5  one another, so I think it's certainly
6  reasonable to conclude that they were beside
7  each other.
8  BY MS. MCARTHUR:
9      Q. I didn't ask that.
10      A. Okay. Would you like to reask the question
11  and I'll do my best to answer. I thought I was
12  answering your question.
13      Q. I'll tell you what, let's go on and go
14  through these depositions some more.
15      A. Okay.
16      Q. Let's go to the June 17, 2013 deposition.
17  You know what I want to know when I ask you these:
18  I want to know what your role was, who retained you
19  and a thumbnail what you said.
20      A. Okay. The Nicol v. Del Cook, et al. vs.
21  The United States, it is a three-vehicle accident.
22  The van is going one direction, which is outfitted
23  for the military, a military contractor operated by
24  Ms. Del Cool, whose counsel retained myself, or SEA.
25  The Nicol vehicle was traveling in the opposite

Page 79

1  direction. Miss Cook's vehicle, right side wheels
2  went off the edge of the pavement which had a
3  excessively high -- I believe an eight- or nine-inch
4  edge drop. When she tried to reenter the road lost
5  control of the vehicle, the tractor crossed the road
6  and went head to head with Mr. Nicols vehicle
7  resulting in fatal injuries. The United States was
8  brought in as a third party because they were -- it
9  was a military roadway and they were responsible for
10  maintaining that roadway which had an excessive edge
11  drop.
12      Q. And your role was to say what?
13      A. Reconstruct the accident, the speeds,
14  timings of the vehicles, as well as assess the
15  affect of the edge drop leading to the out of
16  control of the vehicle, and also the vehicle
17  dynamics itself. The vehicle as constructed had
18  issues with its center of gravity and roll
19  tendency.
20      Q. Which vehicle?
21      A. The van operated by Del Cook.
22      Q. Okay. So you were defending the Del Cook
23  van?
24      A. Yes, essentially.
25      Q. What about the 4/5/2013 deposition?

Page 80

1      A. As I recall that is a passenger vehicle
2  versus a bicyclist accident. The differential --
3  Mr. Wilke was struck by the pick-up truck operated
4  by the employee, I believe, of Douglas Electric. I
5  was hired by counsel for Douglas Electric.
6  Mr. Wilke contends that he was traveling on the
7  right side of the roadway when the truck came up
8  from behind him and struck him. Douglas Electric
9  contends that the bicyclist crossed over the roadway
10  in front of his vehicle and basically pulled out in
11  front of him in his truck. The evidence suggested
12  that the vehicle was moving from right to left
13  laterally across the path, and furthermore Mr. Wilke
14  was -- I believe had been consuming alcohol.
15  There's question of what was his alcohol impairment.
16  He had very significant lower extremity injury, and
17  basically was taken home, as he testified, laid on
18  his kitchen floor for the next 36 hours without
19  seeking medical attention.
20      Q. All right. What's the next one, the
21  3/15/13 deposition?
22      A. I believe that is a three-vehicle chain
23  reaction accident. Mr. Witt was in the -- I'm
24  sorry, in the middle vehicle of three, Rowland
25  Transport. Contacted the rear of Mr. Wood's



Page 81

1  vehicle, propelling forward into the forward
2  vehicle.  It was an accident reconstruction and
3  biomechanics as to the alleged injuries of Mr. Witt.
4      Q.  Retained by Rowland Transportation?
5      A.  Counsel for, yes.
6      Q.  3/7/13?
7      A.  This was actually a plumbing related
8  matter.
9      Q.  Plumbing?
10     A.  Plumbing.  There was a -- I'm trying to
11  think.  I think it was an expansion tank on a water
12  heater that failed on the fourth floor of the
13  medical plaza that caused flooding or damage.  It
14  was a mechanical evaluation on the plumbing
15  system.
16     Q.  And on whose behalf?
17     A.  The general contractor.
18     Q.  Which?  Is that McDonald?
19     A.  Them or one of the other et. al.s, defense,
20  yes.
21     Q.  Okay.  3/4/13?
22     A.  As I recall two-vehicle impact.  Hired by
23  defense.  Accident reconstruction, biomechanics as
24  to the alleged injuries.
25     Q.  Perception reaction time involved at all?

Page 82

1      A.  Not that I recall.
2      Q.  Tell me about the trial 2/14/13.
3      A.  Two-vehicle rear impact Miss Vasquez was
4  operating a SUV, employee of Advanced Stores, which
5  counsel retained me for them, had made contact to
6  the rear of her vehicle.  Accident reconstruction
7  and biomechanics as to the alleged injuries.
8      Q.  Your opinion was that the injuries were not
9  caused by the wreck?
10     A.  Generally speaking, yes.
11     Q.  Tell me about the 1/31/13 deposition?
12     A.  I'm going to have to go back and say that
13  the case I told you about, McGomery Mutual vs.
14  McDonald York, the description I gave you was
15  actually that case.  I was hired by counsel for
16  Shelco on that case.
17     Q.  Okay.
18     A.  Going back up to 3/7, I don't recall the
19  specifics of that case.
20     Q.  Okay.
21     A.  Obviously, because I crossed them off.
22     Q.  Tell me about 1/16/13?
23     A.  Counsel for George Power retained me.  It
24  was a passenger vehicle versus a pedestrian.  It was
25  I believe an early morning 6:00 a.m., certainly

Page 83

1  pre-sunrise accident.  Mr. Boyd reportedly stepped
2  off and tried to cross on a dark unlit highway.  The
3  vehicle operated by George Power struck and killed
4  Mr. Boyd.  Questions in that case were contribution
5  issues, which I was not in, but I did the
6  biomechanics, so how was Mr. Boyd positioned, where
7  was he, and then given variations in perception
8  reaction, and speed other variables because he we
9  had the ECM data from the George Power vehicle
10  assessing the dynamics of the vehicle.  Would speed
11  have changed anything with regards to the accident
12  or not.
13     Q.  Okay.  Let's go to Page 2?
14     A.  Okay.
15     Q.  Tell me about the 1/3/13 deposition.
16     A.  Two-vehicle accident.  The Collum's Lumber
17  truck is forward of Brabham vehicle.  The Collum's
18  Lumber truck was attempting to back up and made
19  contact to the Brabham vehicle.  I was retained by
20  counsel for Collum's Lumber in accident
21  reconstruction and biomechanics relative to alleged
22  injuries.
23     Q.  Okay.  Tell me about December 10, 2012.
24     A.  Retained by counsel for Biltmore Forest
25  Club.  There was an employee who had left work.  A

Page 84

1  personal vehicle pulls out of a parking lot, is
2  struck in the side by a bicyclist, Mr. Smith.  The
3  questions in that case were speeds of both -- or
4  realistically the speed both vehicles, specifically
5  the bicyclist.  Was on a downhill.  There was video
6  surveillance, there was video analysis, it was
7  perception reaction, it was speed related issues.
8      Q.  Tell me about the 11/27/2012 deposition.
9      A.  Two-vehicle nighttime accident.  The Dean's
10  vehicle is making a left turn from a turn lane into
11  a drive.  Miss Mosley is coming up in the right
12  adjacent lane, ends up -- as the Dean's vehicle is
13  making a left.  I was hired by their counsel.  She
14  clips the rear end of the trailer in tow in the
15  course of its turning and suffered fatal injuries.
16     Q.  You were retained by Dean's?
17     A.  I was.
18     Q.  I know about the Middlebrooks case.
19     A.  Yes, ma'am.
20     Q.  What about the 10/17/12?
21     A.  I remember the name of the case, but I
22  don't remember the specifics of it.
23     Q.  Do you know which part of your testimony
24  was retained for?
25     A.  I believe counsel for Fairfield Trucking.



Page 85

1    Q.  What about the Stephens vs. KAM Trucking
2  case?
3    A.  I would say again I don't recall the
4  specifics.  I believe I was retained by counsel for
5  the KAM Trucking.
6    Q.  Blakemore vs. Estes Express Lines?
7    A.  Retained by counsel for Estes Express
8  Lines.  It was a -- Blakemore was operating a
9  commercial vehicle.  Rear impacted the rear of the
10  Estes vehicle, as I recall.  So it was an accident
11  reconstruction in that particular case.
12    Q.  Tell me about the Franklin vs. Perry and
13  Mitchell.
14    A.  I don't recall the specifics as we sit
15  here.
16    Q.  Do you know which party you were retained
17  by?
18    A.  I do not.
19    Q.  Tell me about Campbell v. Arch Aluminum &
20  Glass?
21    A.  Work place accident.  Miss Campbell was
22  aiding co-workers and unloading a crate of large
23  glass panels.  They were using a cart to kind of
24  role them into the facility.  The cart overturned
25  and caused crushing injuries to her.  The questions

Page 86

1  were -- I testified about the -- the defense party
2  that I was retained by had the delivered the
3  product, and then the work site was using their own
4  carts to transport it, so the question is whether or
5  not the load had technically been delivered and
6  still under the control of delivering company, and
7  also the appropriateness of the cart.  The cart was
8  custom by them.  Not by the delivery company, but my
9  the employer of Miss Campbell and was very unstable
10  given the loads they were using.
11    Q.  So you were defending the company that
12  delivered the material?
13    A.  Yes, ma'am.
14    Q.  What about Anderson vs. Littlefield?
15    A.  I do not recall the specifics on that one.
16    Q.  Do you not recall which party you were
17  retained by?
18    A.  I do not, no, ma'am.
19    Q.  Tell me about Van Hosse v. Gotthold Jordan.
20    A.  Gotthold Jordan, yes, ma'am.  The next two
21  are the same case.  I was retained by counsel for
22  Velez, which is the plaintiff in the second case
23  there.  And it would have been a co-defendant in the
24  first one, with Gotthold Jordan.  It was three
25  commercial vehicles, Van Hoose was the third vehicle

Page 87

1  in line.  Gotthold Jordan was getting on the highway
2  with a load that had shifted on the on ramp -- or
3  shortly after loading before he got to the on ramp,
4  as I recall.  The load was hanging off the side.  He
5  decided to still enter the highway.  The Velez
6  vehicle was following the Van Hoose vehicle on to
7  the highway, and then -- I'm sorry the Gotthold
8  Jordan vehicle on to the highway.  And then the Van
9  Hoose vehicle came along rear impacting Velez
10  shoving him into Gotthold Jordan.  Mr. Van Hoose
11  sustained injury.  So that's the general on that
12  case.
13    Q.  So the Velez was a defendant in the first
14  case there?
15    A.  Yes, and a plaintiff in the second one.
16    Q.  And your testimony was that the wreck was
17  caused by whom?
18    A.  The Gotthold Jordan -- the on ramp was over
19  three-tenths of a mile, as I recall, and it's on a
20  downgrade so you had clear visibility of the
21  vehicles coming in which were obviously slower than
22  highway speeds as they're merging in, so my
23  testimony was that Mr. Van Hoose essentially had
24  ample time for perception reaction to the accident.
25  Gotthold Jordan had an improper load securement,

Page 88

1  should not have attempted to enter the highway, and
2  further that Mr. Van Hoose was not wearing his seat
3  belt at the time of the accident and that was a
4  direct cause of the injury that he -- the biggest
5  injury that he sustained, which was that he struck
6  his face in the interior of the cab blinding himself
7  in one eye.
8    Q.  Were you initially retained -- is Velez a
9  person's name or is that a company?
10    A.  I believe it was a name.
11    Q.  Were you retained to defend the Van Hoose
12  case first?
13    A.  I believe I was retained sometime in 2011
14  after both were pending.  So all of them were going
15  on, I think, at the time I brought into the case.
16    Q.  Tell me about Warnick vs. Marriott?
17    A.  Premises liability to Marriott Hotel.  I
18  was working for counsel on behalf of Marriott
19  Hotels.  Mr. Warnick claimed to have sustained a
20  personal injury while on the premises of Marriott
21  property.
22    Q.  Okay.  What about Sparks v. Jason Groves?
23    A.  Counsel for Mr. Sparks, as plaintiff.  He
24  was rear impacted by Mr. Groves' vehicle and
25  sustained injury as a result.  I testified that



Page 89

1   Mr. Groves did not execute proper perception
2   reaction in that particular and should have not
3   struck Mr. Sparks as he did.
4      Q. What type of maneuver was it?
5      A. Straight line braking.
6      Q. Straight line braking?
7      A. Should have braked and did not.
8      Q. So is it a perception reaction case?
9      A. It was. It was certainly one aspect of
10  it.
11     Q. What was the result of that trial?
12     A. It was contributory negligence on both
13  parts. I don't remember the split.
14     Q. Tell me about Owens.
15     A. The next four are the same deposition. It
16  was multiple plaintiffs Owens, Grady and Knott
17  against a boat manufacturer and Marine East as a
18  supplier of parts. I was retained by counsel for
19  Marine East.
20     Q. Did you say it was a fire?
21     A. No. It was a boat that the plaintiffs
22  sustained personal injury on the boats.
23     Q. It was a boat accident?
24     A. Yes.
25     Q. Okay.

Page 90

1      A. As due to an alleged product issue with one
2   of the parts on the boat.
3      Q. Okay. Rose Acre Farms?
4      A. That is a HVAC case, H-V-A-C. There was
5   pneumonia leak at the Rose Acre Farms. I was hired
6   for counsel for Rose Acre Farms. There was a
7   pneumonia cooling system put in by Vilter, or
8   supplied by Vilter and caused a leak and damage to a
9   large amount of the product.
10     Q. It's a property damage case?
11     A. It was.
12     Q. All right. Butler v. Oerlikon?
13     A. Backing up there, I think there was some
14  minor exposure injuries, but I think the primary
15  focus of that was property damage.
16     Q. Okay.
17     A. Butler v. Oerlikon, as you just asked, that
18  was -- I was hired by counsel for Oerlikon, Neumag.
19  It was a workplace accident. Miss Butler suffered
20  fatal injuries with a piece of equipment. Oerlikon,
21  I guess, supplied this particular equipment or it
22  had been purchased from them some 40 or 45 years
23  prior and there was questions with regards to the
24  manner in which the accident happened, so I was
25  using biomechanics for that and then the mechanical

Page 91

1   design of the equipment itself and the
2   appropriateness or applicability of safety
3   standards.
4      Q. Okay. Tell me about Kaylor.
5      A. That was a property case. Mr. Kaylor, as I
6   recall, had filed charges -- or filed suit against
7   Mr. Chrisco. It was over -- I believe Mr. Chrisco
8   had done some engine work for a performance vehicle
9   of his. Mr. Kaylor subsequently blew up that engine
10  in use and said that there was defects with regards
11  to the engine construction by Mr. Chrisco.
12     Q. Whose side were you on?
13     A. I was hired by counsel for Mr. Chrisco.
14     Q. Tell me about the Bowerman Case.
15     A. This is a case Miss Bowerman pulled out
16  from a stop sign crossing over a roadway -- I'm
17  sorry. I'll back that up.
18        Mr. Bowerman was driving down a roadway
19  when a vehicle from her left had pulled out from the
20  stop sign and struck her in the side and killed her.
21  The vehicle was technically owned by Crawford
22  Roofing. It was actually the daughter of the owner
23  that was driving the vehicle. And there was
24  perception reaction questions. There was
25  allegations that the driver was on her cell phone.

Page 92

1      Q. Which one?
2      A. The driver. Not Miss Bowerman, the --
3      Q. The Crawford Roofing daughter?
4      A. Yes. Her name escapes me.
5      Q. You were retained by?
6      A. Counsel for defense.
7      Q. Did you testify about cell phone use in
8   that case?
9      A. To some degree, yes, ma'am.
10     Q. What did you testify about that?
11     A. One of the things we were asked to do in
12  that particular case was to go through the cell
13  phone records. Miss -- again, the daughter -- her
14  name escapes me -- that was driving the Crawford
15  Roofing vehicle had testified as to her location
16  over the preceding five to ten minutes, and what she
17  was doing. She had apparently been texting some
18  friends. She claims that she was not on the phone
19  at the time of the accident and had put the phone
20  down, so some of the stuff we did was essentially
21  lay out in time -- time and distance and articulate
22  to see if her account of where she was when she was
23  sending text messages lined up with typical travel
24  through through the residential area that she had
25  been traveling through the preceding several

BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
93–96

Page 93

1  minutes, and whether or not the record did or did
2  not show that she was actually on her phone when she
3  had pulled out from the stop sign.
4      Q.  So it was -- your work supported that she
5  was not on the phone at the time?
6      A.  From the cell phone records, there was no
7  evidence that she was on her phone at the -- I think
8  the minute, minute and-a-half preceding the actual
9  accident.
10     Q.  Have you been provided the 911 record for
11 this wreck?
12     A.  I don't believe I've seen that, no.
13     Q.  Have you been provided Mr. McClure's cell
14 phone record for this wreck?
15     A.  No, I don't believe I have.
16     Q.  It might been attached to his deposition,
17 but I'm not sure about that, as an exhibit.
18     A.  I have his deposition transcript, but not
19 his exhibits in my file at least at this point.
20     Q.  Have you formed an opinion that Mr. McClure
21 was or was not on the cell phone talking at the time
22 of this wreck?
23     A.  I have not been asked to do that in this
24 case.  I mean, I've seen his testimony that he had
25 set the headset down, but that's really the extent

Page 94

1  of my understanding of it.
2      Q.  And you've not been shown his cell phone
3  record that reflects that he may have been on in
4  excess of 30-minute phone call at the time of this
5  wreck?
6      A.  As I said, I have not seen the records.
7  So, no, I have not seen that.
8      Q.  You would agree with me that when a truck
9  driver is executing a -- do you agree that it's a
10 pretty complex maneuver of the truck to have to
11 change several lanes to merge onto I-75 North,
12 crossing that bridge area and then merging?
13         MR. ROZELSKY:  Object to the form.
14         THE WITNESS:  I mean, it's a behavior.
15 As he testified, he was in the -- what had been
16 the right through lane of I-16 and was going to
17 make a single lane change to the right kind of
18 preceding or as part of the merge to I-75.
19 It's a lane change.  I don't know that it's
20 that complex.
21     Q.  Well, it's important for the truck driver
22 to be paying attention to what cars are in what
23 lanes when he's making a lane change, isn't it?
24     A.  It's always important for truck drivers to
25 pay attention to their surroundings.

Page 95

1      Q.  The answer is, yes, it's important for
2  Mr. McClure to be paying attention what cars are in
3  the lanes when he's trying to make a lane change
4  with his truck, correct?
5          MR. ROZELSKY:  Object to the form.
6          THE WITNESS:  Yes.
7  BY MS. MCARTHUR:
8      Q.  And assuming Mr. McClure was talking on the
9  cell phone, then one plausible reason why he did not
10 see Ms. Little is he was distracted by talking on
11 cell phone, correct?
12         MR. ROZELSKY:  Object to the form.
13         THE WITNESS:  Under your assumption,
14 that could be a plausible reason.
15 BY MS. MCARTHUR:
16     Q.  And are you familiar with the studies that
17 talk about inattention blindness caused by cell
18 phone use?
19         MR. ROZELSKY:  Object to the form.
20         THE WITNESS:  Yes, I've studied a
21 number of research papers on that, yes.
22 BY MS. MCARTHUR:
23     Q.  What is inattention blindness caused by
24 cell phone use?
25     A.  I mean, the words almost speak for

Page 96

1  themselves.  If you're focused on another task,
2  you're diverting your cognitive processes away from
3  other things around you.  If you're doing one thing
4  and you're not looking, your blind maybe potentially
5  to something else.
6      Q.  And are you a person who ascribes to those
7  studies or believes in the efficacy of those studies
8  that people who are talking on cell phones don't see
9  things because of the connection of their brain to
10 their cell phone conversation?
11         MR. ROZELSKY:  Object to the form.
12         THE WITNESS:  I mean, I read each
13 study and take it for what it is.  If you're
14 texting and looking down, obviously your eyes
15 are not on the road.  If you're talking on a
16 cell phone on a headset, you certainly have the
17 ability to continue to scan and see the roadway
18 around you.
19         Furthermore, the research shows that
20 the people on cell phones typically leave more
21 space because they're aware that they might be
22 somewhat distracted.  They sometimes drive a
23 little bit slower, typically drive a little bit
24 slower, so there's a number of factors that go
25 into assessing a cell phone usage.



Page 97

1    BY MS. MCARTHUR:
2        Q.  Do you hold the opinion or not,
3    Mr. Boggess, that cell phone use while driving
4    causes inattention blindness?
5            MR. ROZELSKY:  Object to the form.
6            THE WITNESS:  It may.
7    BY MS. MCARTHUR:
8        Q.  And inattention blindness may be one
9    explanation for why Mr. McClure did not see
10   Ms. Little when she was there to be seen ahead of
11   him as he was coming up on her, isn't it?
12           MR. ROZELSKY:  Object to the form.
13           THE WITNESS:  If we assume he was on
14   his cell phone, it would be, as we said, a
15   possible or a plausible option.
16   BY MS. MCARTHUR:
17       Q.  And you have been provided information
18   about Miss Little and her cell phone records, have
19   you not?
20           MR. ROZELSKY:  Object to the form.
21           THE WITNESS:  I have not seen her
22   records.  I have her testimony that clearly
23   places her on the phone, holding the phone to
24   her ear.
25   BY MS. MCARTHUR:

Page 98

1        Q.  Right.  And she's admitted that she was
2    talking on phone, hasn't she?
3        A.  She did, yes.
4        Q.  But you have not been provided either the
5    911 record that reflects the first 911 call came in
6    at -- do you recall what it was, because I'm sure
7    you read it?
8            MR. ROZELSKY:  Object to the form of
9    the question.
10           THE WITNESS:  I don't recall the exact
11   time as we sit here.  As you said, it's in the
12   records.
13   BY MS. MCARTHUR:
14       Q.  You don't dispute the 911 call came in at
15   10:57:54 for this wreck, do you?
16       A.  According to that system, yes.  That's when
17   it came in.  And even when we got into the other
18   case in questioning was -- the computer times of one
19   computer system versus another can be different the
20   way ping of different servers and update their
21   clocks.
22           So, again, that's a log of when the 911
23   call came in based on their system.  I'm not here to
24   dispute that that is or is not the time it came
25   in.

Page 99

1        Q.  Well, assuming that that's when the 911
2    call came in then assuming that Mr. McClure had
3    begun a cell phone call at 10:28 a.m. that ended 31
4    minutes later that would put him at 10:59, would it
5    not?
6            MR. ROZELSKY:  Object to the form.
7    BY MS. MCARTHUR:
8        Q.  Just doing the math.
9        A.  Simple math, roughly, yes.
10       Q.  And if a cell phone -- if the 911 audio
11   record is correct that the cell phone -- that the
12   wreck was called in at 10:57:54, then that would,
13   assuming those times are correct, place him on the
14   cell phone at the time -- puts his cell phone in use
15   at the time that the wreck occurred on this case.
16           MR. ROZELSKY:  Object to the form.
17           THE WITNESS:  I would say two things
18   with that:  One, that assumes that the two
19   computers being used to -- both the cell phone
20   company and 911 are the same server.  And
21   they're mostly likely not the same service.
22   They could be.  But that also then implies
23   that, despite being an accident allowing time
24   for someone to call in a 911 call that
25   Mr. McClure, for some reason, stays on his call

Page 100

1    for, you know, two minutes or better after the
2    accident.  Which I would think, if I was in an
3    accident, I would hang up immediately.
4            So I find some questions with the
5    data -- a direct comparison with those two sets
6    of data.
7    BY MS. MCARTHUR:
8        Q.  It would imply that Mr. McClure's cell
9    phone was in use at the time of the wreck, would it
10   not, Mr. Boggess?
11           MR. ROZELSKY:  Object to the form.
12   BY MS. MCARTHUR:
13       Q.  If the wreck occurred right before
14   10:57:54.
15       A.  If those clocks are synced, yes.  There was
16   a signal going to his phone.  He testified that he
17   was having problems with that headset that didn't
18   hang up calls.
19           Again, I haven't really looked in -- like I
20   said, I have not looked into this data.  I'm not
21   offering opinions on it.  I'm simply saying that,
22   looking at the two times, that would imply that
23   there was some overlap.
24       Q.  So you're not even asked to assume that he
25   was on the phone.  You're asked to assume that he



Page 101

1   was not on the phone at the time of the wreck,
2   correct?
3       MR. ROZELSKY:  Object to the form.
4       THE WITNESS:  I haven't been asked to
5   assume either.  I have looked at it as a --
6   this particular accident is that Mr. McClure
7   made a left or right lane change and merging
8   into the right lane and what available options
9   realistically Miss Little had and what
10  distractions she may have had in this accident
11  as well.  That's been --
12      Q.   Actually --
13      A.   -- the request of counsel, to look at this.
14      Q.   If the wreck happened at the time on the
15  record wreck report, 11:05, he was also on the phone
16  at 11:01 for six minutes to Hickory, North Carolina.
17  So that would also put him to 11:07.
18      MR. ROZELSKY:  Object to the form of
19  the statement.
20      MS. MCARTHUR:  We can do the simple
21  math again.
22      THE WITNESS:  The accident report
23  lists the accident happens at 11:50 you say?
24  BY MS. MCARTHUR:
25      Q.   Yes.

Page 102

1       A.   Okay.
2       Q.   Does it not?
3       A.   It does.
4       Q.   So if he made a call to Hickory at 11:01,
5   six minutes that would put him at 11:07, wouldn't
6   it?
7       MR. ROZELSKY:  Kathy, when you're at a
8   break point --
9       MS. MCARTHUR:  Let me finish this
10  final question.
11      MR. ROZELSKY:  We're just talking
12  about what we want to do for lunch, that's all.
13      MS. MCARTHUR:  I don't want to break
14  for lunch.  I'll tell you that right now.
15      (Off the record.)
16      THE WITNESS:  I understand that -- or
17  I believe I recall that Mr. McClure calls his
18  office after the accident happens which implies
19  it would be consistent with the 11:01.
20      So whether it's 11:05 and the accident
21  report is actually accurate, if it's off a
22  different dispatch record of the officer, you
23  know, you a different time off of a different
24  computer, I can't say.
25  BY MS. MCARTHUR:

Page 103

1       Q.   Well, do you know the time that the truck
2   records reflect that he hit -- the button that he
3   said he had the wreck?
4       A.   I believe that computer system, if I
5   recall, says 10:58, if I recall.
6       Q.   And if the wreck happened -- that would be
7   consistent with the 911 call at 10:57:54, wouldn't
8   it?
9       A.   It would be close in time, yes.
10      Q.   And that would have him, assuming the
11  records are right, that his cell phone was in use at
12  that time, correct?
13      A.   Again, if all those different computer
14  clocks are actually synced, yes.  If not, no.
15      Q.   You had not --
16      A.   And again, as he testified, he thought he
17  ended call and set the headset down.  Whether that's
18  accurate or not, don't know.
19      Q.   Let's assume it was not accurate, okay?
20      A.   Okay.
21      Q.   Let's assume Mr. McClure was talking to
22  another truck driver from the trucking company at
23  the time he was making this lane change, what would
24  be your commentary on that, Mr. Boggess, about
25  Mr. McClure's cell phone use assuming he was doing

Page 104

1   that?  What would say about that?
2       MR. ROZELSKY:  I'm going to object to
3   the form.  He has not been held out as an
4   expert on that point.  It's not in any part of
5   Rule 26A report about whether or not he has
6   opinions as to the use of the cell phone by the
7   truck driver.
8       MS. MCARTHUR:  Well, he's been held
9   out as an expert on Ms. Little and her cell
10  phone use, so I think it's fair to ask him
11  about Mr. McClure, and I'm planning to.
12      MR. ROZELSKY:  Fair enough.
13      THE WITNESS:  Can you repeat the
14  question, please.
15  BY MS. MCARTHUR:
16      Q.   Do you hold yourself out as an expert on
17  the distraction caused by cell phone use while
18  driving?
19      A.   To some capacity.  I mean, I've researched
20  the topic.
21      Q.   Do you or don't you?  Yes or no.
22      A.   Yes, in certain aspects of it, yes.
23      Q.   All right.  So, assuming Mr. McClure was
24  talking on his cell phone to another truck driver
25  from the same company or anybody when he made the



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
105–108

Page 105

1  lane change or for 30 minutes prior to that, what
2  would be your comment or your opinion about the
3  effect of his use of the cell phone on this wreck
4  assuming you had been asked to look at that and give
5  your opinion?
6      MR. ROZELSKY:  Same objection.
7      THE WITNESS:  Again, assuming he's on
8  the cell phone with someone at the time, then,
9  as we said, it may be a reason -- it may factor
10  into why he missed the Civic alongside of him.
11  It may have simply been positional reasons.  It
12  may have been the way he scanned the mirrors.
13  I don't have an opinion beyond that.
14  BY MS. MCARTHUR:
15      Q.  I'm asking, assuming he was on the
16  telephone, what is your opinion about whether or not
17  he was distracted in his driving by the use of the
18  cell phone as he was changing lanes?  That's all I'm
19  asking you about, Mr. Boggess, is your opinion about
20  his cell phone use?
21      MR. ROZELSKY:  Object to the form.
22      THE WITNESS:  As I thought I just
23  said, it may have had some effect and it may
24  not have, if he was on the phone.  We know he
25  made a lane change from the left to the right

Page 106

1  into the Civic.
2  BY MS. MCARTHUR:
3      Q.  Well, I mean, you said affirmatively that
4  Miss Little was distracted, and, therefore, she
5  didn't perceive and react quickly, correct?  Isn't
6  that what you said?
7      A.  You can read the opinion.  It's similar to
8  that, what I said in my report, yes.
9      Q.  Well --
10      A.  We know her hands are off the steering
11  wheel.  She's using a hand held device and executes
12  -- admittedly executes no vehicle maneuver to react
13  to the accident.
14      Q.  Assuming that she -- let me ask you this:
15  Who had a duty in terms of a driver duty as far
16  as --
17      MS. MCARTHUR:  Let me just strike
18  that.
19  BY MS. MCARTHUR:
20      Q.  Did Miss Little have control of her lane of
21  travel when the truck merged into her lane?
22      A.  She seemingly was in her lane.
23      Q.  And she had a legal right to be in that
24  lane, didn't she?
25      MR. ROZELSKY:  Object to the form.

Page 107

1      THE WITNESS:  I'm not offering legal
2  opinions.  Again, she's seemingly established
3  in the right lane of travel.
4  BY MS. MCARTHUR:
5      Q.  And Mr. McClure had no business whatsoever
6  merging into Miss Little's lane virtually on top her
7  car, did he?
8      MR. ROZELSKY:  Object to the form.
9      THE WITNESS:  Mr. McClure or any other
10  car should not merge from the left line into
11  the right lane occupied by another vehicle.
12  BY MS. MCARTHUR:
13      Q.  And in fact, Mr. McClure could have pulled
14  back to the left, couldn't he, to avoid Miss Little
15  if he had been looking in his mirror and had seen
16  her?
17      A.  If he detected her that could have been an
18  option, yes.
19      Q.  Is it your testimony that Mr. McClure
20  couldn't see Miss Little's vehicle once it was
21  trapped by the trailer wheels down the side of his
22  truck if he had looked in the side mirror?
23      A.  I haven't tried to assess that.  Again, if
24  he checked his mirrors, he may have been reasonably
25  able to see her.  I belive the mirrors would be

Page 108

1  aimed down the side of his vehicle.
2      Q.  Well, he should have been able to see her
3  car trapped by his trailer at the point that it was
4  in his mirror on the side of his truck, shouldn't
5  he?
6      A.  Reasonably, he could have seen her.  But as
7  he testified, he felt he was hit in the rear.  He's
8  seeing in his -- at least in his left mirror, he's
9  seeing debris in the roadway as if maybe he's been
10  struck.  And he seemingly Diverted his attention
11  forward as if to pull off the road onto the shoulder
12  to get off the road.
13      Q.  He's also testified that Miss Little wasn't
14  there at all, hasn't he?
15      MR. ROZELSKY:  Object to the form.
16      THE WITNESS:  In his perception,
17  yes.
18  BY MS. MCARTHUR:
19      Q.  So Mr. McClure's memory of this is faulty,
20  isn't it, because Miss Little was there in that
21  lane?
22      A.  He missed her, yes.
23      Q.  Right.  So his memory on the other items
24  may be faulty as well.  Would you agree with that?
25      MR. ROZELSKY:  Object to the form.

Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 28 of 94

BRIAN BOGGESS, SEA                                        October 31, 2013
LITTLE vs. McCLURE                                              109–112

Page 109

1    THE WITNESS: I mean, as we said,
2  anybody can misjudge certain things, and he
3  obviously misjudged or missed Miss Little
4  beside him initially. Beyond that, he's trying
5  to drive his truck to the shoulder and assess
6  what just happened.
7  BY MS. MCARTHUR:
8    Q. My questions was whether he -- if he had
9  looked in his side-view mirror, once her vehicle is
10  trapped by his trailer, wouldn't he have been able
11  to see her?
12    A. As I said, yes, I believe in his mirror he
13  would have seen her. But he's probably looking
14  elsewhere to pull his vehicle over, so he's not
15  rechecking that mirror.
16    Q. Well, do you find it acceptable that he
17  dragged her vehicle 735 feet, Mr. Boggess?
18    MR. ROZELSKY: Object to the form.
19  BY MS. MCARTHUR:
20    Q. He did, didn't he? I mean, he did drag her
21  735 feet.
22    A. He did drag -- the truck drug the Honda
23  along the roadway, yes. In terms of acceptable, if
24  he knew he was dragging her, I would say probably
25  that's not acceptable. If he's unaware, it's not

Page 110

1  intentional. I don't think it falls under
2  acceptable or not.
3    Q. He smashed her vehicle into the guardrail
4  on the right site as well as into the bridge on the
5  right side, didn't he?
6    A. Her vehicle was pushed to the right, yes,
7  into both.
8    Q. How much of a mile is 735 feet?
9    A. Divide that by 5280. I mean, it's between
10  a tenth -- more than a tenth of a mile.
11    Q. More than a tenth of mile he dragged her
12  vehicle. And her wheels weren't rolling, were they,
13  all of them?
14    MR. ROZELSKY: Object to the form.
15  BY MS. MCARTHUR:
16    Q. Wasn't one of the wheels pinned?
17    MR. ROZELSKY: Object to the form.
18    THE WITNESS: It was, yes.
19  BY MS. MCARTHUR:
20    Q. So it's a function of a rolling car
21  being -- rolling along with the truck. It's a
22  vehicle with one wheel pinned being dragged, isn't
23  it?
24    MR. ROZELSKY: Object to the form.
25    THE WITNESS: Seemingly, yes.

Page 111

1  BY MS. MCARTHUR:
2    Q. How much did that car weigh?
3    A. Not accounting for her, roughly 2388
4  pounds, which compared to his vehicle is fairly
5  small.
6    Q. Have you used the weight of her vehicle
7  being dragged like a dead weight by the truck, not
8  something that's rolling, in order to calculate his
9  speed at the time he attempted to stop?
10    A. No. But he's also braking to some degree
11  too. So it's not just a function of her vehicle
12  being drug. I mean, for something like that, you're
13  going to have to look at the weight distribution.
14  We're talking about the rear left wheel being drug,
15  whereas the others potentially were still free
16  rolling, so the -- you know, the drag factor of a
17  2300-pound car versus a tractor trailer is really
18  not all that much.
19    Q. Can you figure the speed of the truck or
20  not at the point he decided he needed to stop?
21    A. Not outside of witness statements, no.
22    Q. Are you able to figure the speed and just
23  haven't done it?
24    A. We may be able to put bounds on it, but --
25  it's a maximum speed based on that distance. But

Page 112

1  certainly the true speed is going to be well under
2  that. I have not been asked to or needed to.
3    Q. Why would you say that the true speed is
4  going to be well under the maximum speed? One or
5  the would be correct, wouldn't it?
6    MR. ROZELSKY: Object to the form.
7    THE WITNESS: The tractor trailer did
8  not lock down all 18 -- you know, all 10 brake
9  chambers and slide for 735 or some odd number
10  of feet. If it did, it would have some
11  astronomical speed. We know it didn't do that.
12  I mean, the witnesses don't place it anywhere
13  near those kind of speeds, so we know it's
14  something less than that.
15    The magnitude of his braking, we don't
16  know. We know that he went with the intention
17  of going over on the shoulder and was braking,
18  but not -- as he testified, not in a panic or
19  an emergency type of maneuver.
20  BY MS. MCARTHUR:
21    Q. The looking at your list of cases, the
22  Larkins case, who were you retained by on that
23  case?
24    A. I believe counsel for East Coast
25  Contracting.



Page 113

1    Q. And McCray vs. Wilson Trucking who were you
2  retained by?
3    A. Counsel for Wilson Trucking.
4    Q. The same for this next one as well, Smith
5  vs. Shipping Utilities who were you retained by?
6    A. If I recall, that was a workplace accident
7  with a forklift. I was retained by counsel for
8  shipping utilities, but I can't be certain.
9    Q. What happened in that trial?
10    A. Defense verdict.
11    Q. Shuler vs. Werner Enterprises who were you
12  retained by?
13    A. I was retained by counsel for Werner
14  Enterprises. It was a two tractor trailer accident
15  with accident reconstruction and biomechanics
16  associated.
17    Q. The Shuler was not in the tractor trailer
18  was she, or was she?
19    A. It's been three and-a-half years, I can't
20  be sure. For some reason I want to say yes, she
21  was. It was another tractor trailer, but I may be
22  mistaken.
23    Q. Okay. Holder vs. Shelnutt.
24    A. That, it was actually sued in a counter
25  suit in that I recall. It was both those

Page 114

1  individuals were suing each other. It was a
2  two-vehicle accident and I was retained by counsel
3  for -- actually, I don't remember which one because
4  I don't which one was the initial and which one was
5  the counter suit.
6    Q. In the last -- it looks like four years
7  almost, you have not given a deposition in a car
8  wreck case for a plaintiff at all, have you, other
9  than the Velez case where you were also testifying
10  for Velez as a defendant, correct?
11    A. There's a few that I can't remember so I
12  can't be certain to answer your question. Of the
13  ones I remember, deposition wise, I think that was
14  the -- you were writing -- I think that was the only
15  plaintiff. There was the trial plaintiff that I was
16  not deposed on prior to trial.
17    Q. So would you say that your testimony at
18  deposition a over 90 percent -- 95 percent for
19  defense of -- defense of defendants?
20    A. Based on this testimony list only, or my
21  testimony?
22    Q. Based on your deposition list for the last
23  four years.
24    A. I haven't figured out a percentage.
25  Obviously, there's only a couple plaintiff cases

Page 115

1  listed here. Potential plaintiff cases.
2    Q. I only found one.
3    A. As I said, the Holder and Shelnutt case, I
4  was plaintiff on one, defense on the other, as I
5  recall. That was the last one on the last page.
6    Q. I thought you said you didn't know.
7    A. There was two suits. There was a -- both
8  were suing each other. I only listed it as one
9  here. So two-vehicle accident. They disagreed over
10  who was at fault.
11    Q. So are you -- what would be your testimony
12  as to the percentage of times in car wreck cases
13  that you are retained on behalf of the plaintiffs
14  versus defendants?
15    A. I've never added it up. In terms of
16  retention. I think it's higher than what list shows
17  in terms of that breakdown, meaning more plaintiff
18  cases. I think I probably testified in the past, if
19  you look at my -- if you track down prior testimony,
20  I probably said 75/25. Another time, I may have
21  said 80/20. But I've never add it up, so I don't
22  know.
23    Q. This is all of the depositions you've given
24  since December of 2009, correct?
25    A. October of '09, yes, ma'am.

Page 116

1    Q. October of '09?
2    A. It's a four year -- I apparently didn't
3  give one in November or October of '09.
4    Q. Okay. And you started with SEA --
5    A. October 2007.
6    Q. Okay. So you wouldn't have given any
7  depositions on accident reconstruction cases before
8  October of '07 or when you started with SEA, would
9  you?
10    A. No, ma'am.
11    Q. And you wouldn't have given any actually
12  with SEA until after you took the Northwestern
13  course, would you?
14    A. I could have. There's testimony that it's
15  dropped off this list that I don't recall as we sit
16  here.
17    Q. I think I probably have a year prior to
18  that in the Middlebrooks case?
19      MR. ROZELSKY: Object to the form of
20  the statement.
21  BY MS. MCARTHUR:
22    Q. What month did you start with SEA?
23    A. October of '07.
24    Q. Okay. So this list is from October of --
25    A. '09.



Page 117

1   Q. '09 forward.
2   A. Yes, ma'am.
3   Q. So this list contains every deposition
4 you've given for all but the first two years of your
5 work with SEA?
6   A. To my knowledge, yes, ma'am.
7   Q. All right. And then you didn't take the
8 Northwestern course until November of '08, correct?
9   A. January and February of '08.
10   Q. Where did I get November? Okay. January,
11 February.
12       Okay. So would you believe that you would
13 have given depositions on accident reconstruction
14 prior to taking that course.
15   A. Given my short time with the company, I
16 doubt it, but I don't recall for sure.
17   Q. So what we have here is at least two-thirds
18 of the depositions -- at least two-thirds of the
19 depositions you've given while you've been employed
20 by SEA, correct?
21   A. From a time standpoint, I don't know how
22 many I gave in that two-year window potentially.
23   Q. Okay. If you're trying to reconstruct this
24 wreck, it would be important for you to know -- in
25 order to be fair, it would be important for you to

Page 118

1 know whether Mr. McClure was on the cell phone or
2 not, wouldn't it?
3       MR. ROZELSKY: Object to the form.
4       THE WITNESS: It depends on what I'm
5 asked to do.
6 BY MS. MCARTHUR:
7   Q. Well, what you were asked to do in this
8 case was what?
9       MR. ROZELSKY: Can we take a short
10 break because this is a new line of
11 questioning? Do you mind?
12 BY MS. MCARTHUR:
13   Q. Can you answer the question and then we'll
14 stop?
15       MR. ROZELSKY: That's fine.
16       THE WITNESS: My report says that SEA
17 was specifically requested to inspect the scene
18 of the vehicles, review the provided discovery
19 documents, perform relevant research and
20 investigation and complete an accident
21 reconstruction analysis to the extent necessary
22 pursuant to the allegations and requests in the
23 subject case.
24 BY MS. MCARTHUR:
25   Q. So the question again: In order to be

Page 119

1 fair, based on the scope of the project you just
2 described, it would have been important for you to
3 know whether Mr. McClure was actually talking on the
4 phone, or whether there was evidence to support
5 that, wouldn't you, at the time of this wreck?
6       MR. ROZELSKY: Object to the form.
7       THE WITNESS: Again, based on the
8 requests of what I was asked to look at, no.
9 It's not a matter of fairness or otherwise.
10 It's a -- I mean, I think in the report I
11 readily say that the Honda was in the right
12 lane and the tractor trailer began to maneuver
13 from the, I guess, the middle lane into the
14 right lane.
15       The questions that I've been asked, as
16 outlined in my opinions in the report, are
17 focused on where this happened, the distances
18 between the vehicles, as Mr. Alexander has even
19 testified about, and then reaction potential
20 for Miss Little to avoid the accident.
21       That's what I was asked to do and
22 that's what I've done in this case.
23       MS. MCARTHUR: We can take a break.
24       (A break was taken from 1:02 p.m. to
25 1:08 p.m.)

Page 120

1       BY MS. MCARTHUR:
2   Q. Looking at your report, Mr. Boggess, you
3 don't indicate anywhere in this report that you did
4 not do the inspection of the vehicle in the scene,
5 do you?
6   A. I don't say that, no. I say that, I mean,
7 SEA did. Some person of SEA did. I don't say one
8 way or the other.
9   Q. You agree, don't you, that personally
10 viewing the scene and personally doing the
11 inspection in some cases is important, isn't it?
12       MR. ROZELSKY: Object to the form.
13       THE WITNESS: In some cases it could
14 be and in others it's meaningless.
15 BY MS. MCARTHUR:
16   Q. At any rate --
17   A. It depends on the documentation done, too.
18 I mean, in this case, you know, there's
19 documentation done both by Mr. Alexander and
20 Mr. Peters.
21   Q. You've not asked to go view the scene, have
22 you?
23   A. Not since getting further involved. As I
24 said, Mr. Rozelsky initially called me to go to the
25 scene. Due to my unavailability, Mr. Peters covered



Page 121

1  that inspection, which occurs or has occurred in the
2  past.
3      Q.  The question was -- or I asked you:  Have
4  you asked to go view the scene?
5      A.  I have not asked to go back to the scene.
6      Q.  Have you asked to go view the truck or the
7  Honda?
8      A.  I have not asked to go back and review
9  those.
10     Q.  Did you, in fact, pass the assignment along
11 to Mr. Peters because you were not available when it
12 first came in?
13     A.  I don't recall exactly how it all
14 transpired.  I know that I was unavailable.  I, you
15 know, probably told Mr. Rozelsky.  I said, I can't
16 go, but can offer you Mr. Peters who's in the
17 Atlanta area.  It would be closer than myself
18 anyway.  So he took me up on the offer and allowed
19 Mr. Peters to go.
20     Q.  Is it your testimony that it was not
21 intended for Mr. Peters to actually do the work then
22 since he went?
23     A.  I don't know what Mr. Rozelsky's intentions
24 were.
25     MS. MCARTHUR:  Did you all give me any

Page 122

1  bill yet?
2      MR. ROZELSKY:  There's -- she made
3  three copies.
4  BY MS. MCARTHUR:
5      Q.  Looking at this bill then, it actually
6  shows --
7      MR. ROZELSKY:  Have you marked that as
8  an exhibit?
9      MS. MCARTHUR:  I will.
10     MR. ROZELSKY:  I just didn't know if
11 you had.
12     MS. MCARTHUR:  Let's mark it P4.
13     (PLF. EXH. 4-A, Bill; 5/22/12 was marked
14 for identification.)
15     (PLF. EXH. 4-B, Bill; 12/19/12, was
16 marked for identification.)
17 BY MS. MCARTHUR:
18     Q.  I'm handing the one that's dated 4A.  It's
19 dated 4/16, or it's actually dated May 22nd, '12.
20 It shows that Mr. Peters has billed for an accident
21 reconstruction, doesn't it?
22     A.  He coded as that.  I mean, most of the
23 descriptions are Photo Modeler, which is a program
24 that's allowing him to get crush measurements and
25 scene measurements from the photos.

Page 123

1      Q.  And he's reviewed the ECM data also,
2  correct?
3      A.  It does appear that he did, yes.
4      Q.  Who downloaded the ECM?
5      A.  I don't recall exactly which person hooked
6  up and downloaded it.
7      Q.  Is there anything on the ECM -- you've
8  reviewed the data from that, right?
9      A.  Yes, ma'am.
10     Q.  Anything on the ECM pertaining to this
11 wreck?
12     A.  None of the hard brakes or the last stop
13 record are consistent with matching, so no.
14     Q.  Are consistent, what?
15     A.  With this actual event.
16     Q.  That's because the truck was driven
17 following this wreck, correct?
18     MR. ROZELSKY:  Object to the form.
19     THE WITNESS:  The hard brakes, I
20 believe, are older, so that's suggested that
21 the accident did not log a hard break event.
22 The last stop record would have been moved --
23 or would have been wiped presumably the second
24 the truck got moved and after it got released
25 by the officers from the side of the road.

Page 124

1  BY MS. MCARTHUR:
2      Q.  So, it's your belief that the ECM data had
3  nothing to do -- for this truck had nothing to do
4  with this case?
5      A.  As I said, the two hard stop events and the
6  last stop certainly not.  Yes.
7      Q.  Is there anything on it that pertains to
8  this wreck, the ECM data?
9      A.  Not that I recall unless there may be like
10 a governed speed, if we get into somewhat speed
11 potentials.  I don't recall what that number is as
12 we sit here though.
13     Q.  So the drawing production Mr. Simbro.  Who
14 is Mr. Simbro?
15     A.  He's actually a retired individual with SEA
16 now, but he apparently did some of the drawings --
17 compiled some of the drawings from Mr. Peters
18 following his efforts.
19     Q.  Mr. Austin preparing diagrams and photos?
20     A.  He likely processed the photographs.  He is
21 a technician in the front office and Mr. Peters
22 probably handed him a photo card when he came back
23 in, had him prepare the CDs and print photographs.
24     Q.  Then in looking at 4-B, Mr. Peters,
25 12/19/12, what does that reference?



BRIAN BOGGESS, SEA                                          October 31, 2013
LITTLE vs. McCLURE                                                  125–128

Page 125

1    A. Which date is that, I'm sorry?
2    Q. 12/19/12, the second.
3    A. At my request, he did some crush profiles
4  based on the photogrammetry.
5    Q. So, was anything at all on 4-A, the first
6  two pages we just looked that encompassed
7  Mr. Peters, Mr. Simbro, Mr. Austin, that whole bill
8  of $4,580.45, none of that was done at your request,
9  was it?
10    MR. ROZELSKY: Object to the form.
11    THE WITNESS: I don't have time on the
12  project at that point, so I don't necessarily
13  note my involvement at that point. So no, I
14  don't believe it was.
15  BY MS. MCARTHUR:
16    Q. So then looking at the bill that is 4-B,
17  when did you become involved after Mr. Peters did
18  all the work reflected on 4-A, plus I believe the
19  seat inspection and the Honda inspection March 28,
20  2012?
21    A. From the two billings that I have in front
22  of me, it appears that I got back involved
23  December 15, 2012.
24    Q. Why were you not involved between March of
25  2012 and December 15th, 2012?

Page 126

1    MR. ROZELSKY: Object to the form.
2    THE WITNESS: Because Mr. Rozelsky
3  didn't call me back an ask me to get involved,
4  I presume. I mean, it looks to me from the
5  billings that Mr. Peters did some initial leg
6  work and some analysis of the photographs using
7  Photo Model and created some drawings.
8    And it looks like it pretty much sat idle
9  until the December time frame when I got contacted,
10  apparently by Mr. Rozelsky, and did some analysis.
11  BY MS. MCARTHUR:
12    Q. Do you have a record of Mr. Rozelsky
13  contacting you in December of 2012?
14    A. I mean, if it's by email, it's probably in
15  my communications folder, if there's a right tab
16  marked as communications. Likely it would probably
17  just be a phone call that he was going to --
18  requesting my involvement.
19    Q. What I'd like to know is -- by the way,
20  looking at this 3/28/12, all these handwritten
21  notes?
22    A. Yes, ma'am.
23    Q. And drawings, field notes --
24    MS. MCARTHUR: And we'll mark that as
25  Plaintiff a Exhibit Number --

Page 127

1    MR. ROZELSKY: 5.
2    MS. MCARTHUR: 5.
3    (PLF. EXH. 5, Field Notes, was marked
4  for identification.)
5  BY MS. MCARTHUR:
6    Q. Whose notes are those?
7    A. Those are Mr. Peters.
8    Q. Have you used those notes?
9    A. I've certainly reviewed them, yes. I used
10  them in my analysis.
11    Q. Have you reviewed his accident
12  reconstruction?
13    A. He has provided me his materials to which
14  he did. I mean, a lot of it was simple drawing
15  compilations. I don't believe he had actual done
16  calculations. I think he's done some laying out of
17  the vehicles as you see in the drawing files, but
18  that was the extent.
19    Q. Have you seen his reconstruction,
20  Mr. Boggess?
21    MR. ROZELSKY: Object to the form.
22    THE WITNESS: To the extent that it
23  was done, I believe so, yes.
24  BY MS. MCARTHUR:
25    Q. And what would it reflect?

Page 128

1    A. Again, it would be the drawing files that
2  you have in front of you somewhere. There's a
3  couple PowerPoint looking filings that he sent me
4  that he's put some pictures together. I believe
5  actually, this is the crush profiles that he did for
6  me at my direction in December, actually. I'm
7  looking at them. That was the extent.
8    My understanding is, his reconstruction is
9  limited to photo modeling, drawing layouts and
10  engagement of the vehicles, and that was the extent
11  at that time.
12    Q. So what were you asked to do in December of
13  2012? What you're showing here in this report?
14    A. In December of 12th, Mr. Rozelsky, which
15  ties into what Mr. Peters is doing was to look at
16  the crush damage to the Civic and consider the
17  magnitude of the crush and the magnitude of the --
18  some of the contact interactions between the
19  vehicles.
20    Q. Looking at what we marked as Plaintiff
21  Exhibit Number 6 --
22    (PLF. EXH. 6, Project Assignment Report;
23  3/16/12, was marked for identification.)
24    MR. ROZELSKY: Kathy, to the extent
25  that you're marking the originals, which I



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
129–132

Page 129

1  don't object, I would just ask that you not
2  hand write on the originals. I noticed you
3  wrote on some of the copies.
4       MS. MCARTHUR: Right.
5       MR. ROZELSKY: But --
6       MS. MCARTHUR: I'm not going to write
7  on this.
8       MR. ROZELSKY: Okay.
9  BY MS. MCARTHUR:
10      Q. Looking at this Number 6, is that the
11  products assignment report from March 16th, 2012?
12      A. Yes. This is our project information form,
13  yes, ma'am.
14      Q. To whom does it reflect it was assigned?
15      A. It lists Mr. Peters' name and that
16  basically controls who the billing goes to. He was
17  doing the initial leg work. If I went back in the
18  system and reprinted today, it would have my name
19  there now most likely.
20      Q. But it reflects that Mr. Rozelsky has
21  signed this to Mr. Peters on that document P-6,
22  correct?
23      MR. ROZELSKY: Object to the form.
24      THE WITNESS: At the time this was
25  printed, yes, it indicated Mr. Peters.

Page 130

1       (PLF. EXH. 7, DDEC reports, was marked
2  for identification.)
3  BY MS. MCARTHUR:
4       Q. And looking at what we will mark as
5  Plaintiff's Exhibit 7, tell us what that is.
6       A. 7 appears to be the DDEC reports as imaged
7  from the involved Freightliner.
8       Q. It's the what?
9       A. DDEC, D-D-E-C, Detroit Diesel Engine
10  Control report.
11      Q. What does it add to your knowledge about
12  this wreck?
13      A. As we talked about, one of the things that
14  was checked was the last stop records and the hard
15  brake events, which, as we discussed, are not
16  related to the accident at hand.
17      Q. Tell me what page the hard brake event is
18  on.
19      A. They're printed as sections so they restart
20  numbering. The last stop would be a three-page
21  document -- actual a four-page. Three pages of
22  data, and then restarts at Page 1 again for the
23  plot. And then for the first hard brake event, it's
24  going to start at number one again. If you're
25  looking at the page numbers at the bottom right,

Page 131

1  there's not a global case number in any of these as
2  the report is printed. It's toward the rear.
3       Q. Is it a diagnostic record?
4       A. No, ma'am. You have to keep going.
5       Q. Hard Brake 1 and Hard Brake 2.
6       A. Yes. And then it's going to go back and
7  Hard Brake 1 and 2 again for the raw data, I
8  believe.
9       Q. So when was the Hard Brake 1?
10      A. From the report, Hard Brake 1's incident
11  odometer is 50,546.3 miles. The current odometer
12  reading at the time of the imaging was 66,167.9, so
13  some almost 15 to 16,000 miles later in the
14  vehicle's life.
15      Q. Later or --
16      A. Earlier from the time of the download.
17      Q. So Hard Brake 2 had occurred when?
18      A. More than 5,000 miles prior at 60,853.
19      Q. And you know that because of the odometer
20  reading that it was not pertaining to this case?
21      A. That's one reason, yes.
22      Q. What is the other reason?
23      A. I mean, looking at the data, they don't
24  sync with the circumstances of the accident either.
25      But again, when you do these downloads, it

Page 132

1  logs the current odometer in the header up top, and
2  then it logs the incident odometer some inch
3  and-a-half below that listed on those reports, so
4  you can compare those.
5       Q. All right. And then the last stop record,
6  what does that have to do with --
7       A. The last stop is a function of -- as kind
8  of indicated by the last time the vehicle was
9  brought to a stop from some speed. It does take a
10  few miles an hour of speed to get -- turn the system
11  and reset the system. So if you move a mile an
12  hour, it may not reset. So once you get the vehicle
13  up to some appreciable speed and it automatically
14  clears and then over rights with the next last stop
15  event.
16      Q. So what was the date of the last stop
17  record in this ECM download?
18      A. The mileages obviously match up, but the
19  last stop time is March 2nd, 2012.
20      Q. So February 20th, 2012 being the date this
21  wreck occurred, you're saying that it was downloaded
22  10 days after the wreck?
23      A. No, ma'am. It was downloaded, I believe,
24  on April 4th, 2012, which is the print date at the
25  top. That would be the time the report was printed.



BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                                          133–136

Page 133

1     The incident -- the last time the vehicle
2 was moved according to the clock -- and you have to
3 sync the clocks and check the clocks. It says March
4 2nd, 2012.
5     Q. So, had it set since March 2nd, 2012?
6     A. If those are based on the same clocks, it
7 would appear that it set for a month and two days.
8     Q. So the wreck had happened on the 20th of
9 February, so 10 days after the wreck the truck was
10 parked for a period of over a month?
11    A. Something like that, yes, ma'am.
12    Q. But the ECM was not downloaded within a
13 time frame that would have picked up the data from
14 the wreck in terms what was there on the ECM at the
15 time of the wreck and for the minute or so before
16 the wreck, correct?
17    MR. ROZELSKY: Object to the form.
18    THE WITNESS: No, again as soon as the
19 vehicles pulled off the shoulder or even pulled
20 forward more than maybe a handful of feet, it
21 would have cleared that last stop, that could
22 have even occurred when they were separating
23 the two vehicles at the time of the -- you
24 know, at the scene trying to get one vehicle
25 separated off the other. They literally could

Page 134

1 have easily overwritten the last stop record at
2 that point too.
3     Q. The point is, it was -- what was the point
4 in downloading it April 2nd?
5     MR. ROZELSKY: Object to the form.
6     THE WITNESS: Recover whatever data
7 was there and preserve what's left of the data.
8 If, in fact, there had been a hard brake event,
9 it reasonably could have still captured it.
10 There was no hard brake event, however, so it
11 was not captured.
12 BY MS. MCARTHUR:
13    Q. These deposition summaries -- you have a
14 deposition summary, Lindsay Little, Lorraine Smith,
15 Officer Williams, Mr. McClure, Sean Alexander. Are
16 these deposition summaries that you did?
17    A. I did a portion of them, and my
18 administrative assistant would have done a couple of
19 the summaries for me.
20    Q. Who is your administrative assistant?
21    A. Joanie, J-O-A-N-I-E, Vischer,
22 V-I-S-C-H-E-R.
23    MS. MCARTHUR: We'll mark the
24 deposition summaries as 8. I just put a clip
25 on them.

Page 135

1     (PLF. EXH. 8, Deposition summaries, was
2 marked for identification.)
3 BY MS. MCARTHUR:
4     Q. You have a deposition of Sean Alexander --
5 not deposition, but his report and you underlined
6 reference material from the University of North
7 Florida, IPTM, Georgia Public Training Center,
8 Society of Automotive Engineers. Do you know why
9 you underlined that with green?
10    A. I don't.
11    Q. Can I have that back again?
12    A. Yes, ma'am.
13    MS. MCARTHUR: We'll mark the copy of
14 Sean Alexander's report as Exhibit Number 9.
15    (PLF. EXH. 9, Alexander Report, was
16 marked for identification.)
17 BY MS. MCARTHUR:
18    Q. Looking at that, let's go to your markings
19 on it, on Page 42.
20    A. Yes, ma'am.
21    Q. Starting at the top, you wrote a lot of
22 things on this, so could you kind of go through your
23 hand markings and explain what you wrote to me?
24    A. I'll do the best of my knowledge as I
25 recall. I would have cleaned this up into my

Page 136

1 analysis file that you also have.
2     But, initially, I'm drawing two boxes
3 side-by-side, up top presumably, talking about the
4 truck and the Honda. I started to write out some
5 equations but never finished, which is essentially
6 the distance of the truck. The velocity of the
7 truck times some time and then started to do some
8 equations.
9     Q. Okay.
10    A. Perception reaction time, I think I wrote
11 beside it less -- parenthesis, less, signal adds
12 clarity.
13    Q. What does at that mean?
14    A. He's using 1.5 seconds perception reaction.
15 It may, in fact, be less given various factors,
16 including the fact that you have a beacon. The
17 flashing light that's making it clear his intention
18 and you're not having to judge just the truck
19 changing the lane, but you're actually able to see a
20 further cue to simplify the analysis that you have
21 to do to decide what your reaction may or may not
22 be.
23    Q. So what's the perception reaction time that
24 you used in your calculations?
25    MR. ROZELSKY: Object to the form.

Page 137

1       THE WITNESS: For the purposes of most of
2   my calculation, I still used 1.5, and actually
3   increased it and did some test, which you'll see my
4   analysis file, at 2.0. I never degraded it. I was
5   simply noting to myself that probably is a high
6   number. 1.5 seconds is based on -- where it was
7   derived is, it's the 85th percentile of people had
8   reacted by 1.5, so in reality, the average is
9   considerably less.
10      Q. What else did you mark and why?
11      A. You know, I questioned the .74 g's. It
12  could be a little bit higher, especially coming up
13  the hill. Just a comment to myself, although on the
14  bridge, it's a fairly flat area. I ended up using
15  .74. I don't do anything with it. Just a note to
16  myself.
17      Let's see, distance traveled by the tractor
18  trailer. He uses 51 feet. I note a minus one,
19  because, in fact, the kingpin setback is going be
20  three feet, not two feet, on a 53-foot trailer. It
21  would be too close to the front. So he's got a
22  little -- in fact, Mr. Peters measured it at three
23  feet three inches, consistent with my experience
24  with these types of trailers. So just noting that
25  number. Twenty-three feet tractor to kingpin, I

Page 138

1   think I added the 3.5 later, because I believe
2   Mr. Alexander testifies that the rear bumper somehow
3   of the Honda is actually forward of the truck at the
4   time this all is taking place, so I noted that, I
5   think, later.
6       I put not a parallel shift. When you're
7   considering a tractor trailer making a lane change,
8   or anybody making a lane change, when you're
9   steering at the front of the vehicle, the rear of
10  the vehicle has some delay in terms of the shift.
11  So he's talking about a lane shift of the vehicle.
12      However, and you will see in my analysis
13  and in the simulations even, that the rear of the
14  trailer is going to lag in terms of its shift. It's
15  not going to come perfectly straight over. So
16  that's the point of that. I was making these
17  comments prior to the deposition, most of these
18  prior to the deposition, so I was questioning the
19  14.58 feet and why he would have added in the length
20  of the car. Post deposition, I understand that's
21  because he's putting a Honda out in front of the
22  tractor trailer despite testimony and despite the
23  other information.
24      So initially, I was looking at his
25  calculations to see if he shifted based on those

Page 139

1   numbers what would happen.
2       Some of the other notes, the two plus 3.3
3   is just calculating how he got -- I mean, supporting
4   his own numbers trying to figure where he got
5   certain things. The comment about 4.75 seconds, I
6   did a calculation to figure out that if the Honda
7   had made a lane change -- this is even outlined in
8   my report, and certainly my analysis is filed, that
9   if the Honda used its lane, whether it simply moved
10  to white edge line with its right side tires, that
11  would have added the amount of time available for
12  the 2.29 he calculates to the 4.75.
13      And then the remainder of it -- of the page
14  is simply calculating -- or recalculating those
15  things based upon the 74 feet or other numbers,
16  taking out the length of the Honda and others. This
17  is all predeposition, as I later figured out where
18  he was kind of coming up with these. But I did some
19  math to figure out essentially at -- even at 74 feet
20  by his own calculations, the 2.79 is the calculated
21  time compared to his 2.92 available just counting
22  the steer maneuver, which, even by his own math
23  would say that the Honda would have had time to get
24  out. So those were the purposes.
25      Q. All right. And then you've underlined

Page 140

1   under the Honda avoidance by steering issue, the
2   next to the last sentence, and you have emphatically
3   put B.S. under that.
4       MR. ROZELSKY: Object to the form.
5   BY MS. MCARTHUR:
6       Q. Well, had you.
7       A. I wrote those initials and circled it, yes,
8   next to that.
9       Q. It looks like you circled it about four
10  times.
11      A. Okay.
12      Q. Is that for emphasis?
13      A. No, just circled it. Again, he's talking
14  about the steering and the fact that the steering
15  would have no effect when, in fact, clearly if you
16  steer one's vehicle to the right as a vehicle is
17  merging in, the amount of time it takes to get the
18  one vehicle to you is going to obviously increase,
19  which is going to absolutely give you more time to
20  do something as opposed to just sitting there and
21  waiting for it to happen.
22      Q. So you thought is opinion was bullshit?
23      A. I don't think he's -- no. I -- it's wrong.
24  It's incorrect.
25      Q. Is that how you customarily express



Page 141

1  yourself --
2      A.  No.
3      Q.  -- about other professionals?
4      A.  I didn't say that, write that.  I wrote
5  initials.
6      Q.  Did "B.S." mean something different from
7  that?
8      A.  I don't recall what it meant.  I'm
9  presuming it probably meant something like that, but
10 I don't typically say those words.  I simply wrote
11 initials.
12     Q.  You just write initials that mean those
13 words; is that right?
14     A.  I could have.
15     Q.  It did or didn't it?
16     A.  It could have.  As I said, yes, maybe.
17     Q.  I mean, what else could it have meant?
18     A.  I don't recall.
19     Q.  Give me some options as to what it could
20 have meant besides that?
21     A.  I don't know anything else.
22         MS. MCARTHUR:  Let's mark the drawings
23 as --
24 BY MS. MCARTHUR:
25     Q.  I may have already handed this back to you

Page 142

1  because I don't have a little folder, but that may
2  be the originals of that.  I don't know if it is or
3  not.
4      A.  I don't seem to have a marked folder for --
5  is the inspection notes.  I have a drawings folder
6  that you took from there.  I think you did not pull
7  out the aerials, or maybe you did.  I have the
8  folder back for some reason while we were looking at
9  stuff.  So I have the originals in the front of me.
10         MS. MCARTHUR:  I think I've got it
11 all, but let's mark it Number 10.
12         MR. ROZELSKY:  You want to mark the
13 original?
14         MS. MCARTHUR:  Yeah, mark the original
15 Number 10.
16         (PLF. EXH. 10, Photos, was marked for
17 identification.)
18 BY MS. MCARTHUR:
19     Q.  Let's go through these.  Is Page 1 a
20 drawing that you did?
21     A.  I believe Mr. Peters grabbed these aerials
22 in front of them and then provided me the file.
23 BY MS. MCARTHUR:
24     Q.  The Page 2?
25     A.  Yes, ma'am.

Page 143

1      Q.  What is that showing?
2      A.  It's using the Google imagery.  It's the --
3  I called it the walking man's.  It's ground level
4  view taken of those vehicles when they drive
5  through.  It's off Google.  Same with the third page
6  as well.  The fourth, which is back to the aerial,
7  the side aerial off Google.
8      Q.  So these are satellite photos with these
9  cars on them.  That's real cars that were on it at
10 the time of satellite photos?
11     A.  I presume, yes.
12     Q.  And then this one, what is that?
13     A.  These next -- and I have them grouped in,
14 not all bundled together.  Actually, they are
15 numbered at the bottom.  Photo-01 through Photo-11.
16 The first number, that six-digit number, is our
17 project number.
18     Q.  Okay.
19     A.  They're photogrammetry images, so they are
20 aerial photographs taken by Mr. Peters that he
21 collected and then numbers and call outs on there
22 are using photo modeler to create CAD data based on
23 the photographs that he collected.
24     Q.  Then what were the photographs one through
25 11 used to produce?

Page 144

1      A.  The CAD drawing.
2      Q.  Where is it?
3      A.  That would be in the drawing -- actually,
4  it's in the next couple pages after.  So these
5  pictures here, the SEA logo on the bottom corner is
6  one of them.
7      Q.  I'm down to Photo Number 11, and then the
8  next thing is this drawing?
9      A.  Yes, ma'am.
10     Q.  This is the CAD drawing?
11     A.  Yes, ma'am.
12     Q.  And what is shown on this other than the
13 highway?
14     A.  The pavement transition lines, things in
15 the road are.  There's a mark.  There's a gray line
16 indicating the tire mark and it's labeled as such.
17 And then there's a gouge also noted as estimated
18 position on the bridge itself and right bottom
19 corner.  The drain is also called out, which shows
20 up in some of the police photographs.
21         I should note that of these photographs,
22 these are photos used in the photo modeler.  Looking
23 back through here, 9, 10 and 11 are actually police
24 photographs.
25     Q.  Right.



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
145–148

Page 145

1   A. As opposed to Mr. Peter's photographs
2 obviously giving vehicles from the officer's point
3 of view.
4   Q. The final one that I have, the last thing
5 in this group of pictures is this one that says
6 begin --- it has writing on it on the picture.
7   A. Yes, ma'am.
8   Q. And "begin continuous black tire mark,"
9 what does that reference?
10   A. For Mr. Peters' drawings that's showing
11 essentially the tire mark being left as a result of
12 the Honda being pulled along by the tandems of the
13 tractor trailer.
14   Q. And what is -- right below the "begin
15 continuous black tire mark," there's a light yellow
16 line there.
17   A. I'm sorry where are you pointing?
18   Q. (Indicating).
19   A. With the dots above them?
20   Q. Yes.
21   A. That is the guardrail, the bridge guardrail
22 plus -- the metallic guardrail that tapers off
23 toward the top.
24   Q. So where is the bridge side on this?  It
25 says, begin continuous white marks on bridge

Page 146

1 curbing --
2   A. Yes, ma'am.
3   Q. -- here on the very first, first block --
4 the beginning of the truck.  And it shows at the
5 spot where the truck is impacting the car.
6   A. Yes, ma'am.
7   Q. So, does it show the bridge on this
8 picture?
9   A. The surfaces of the lanes on the bridge,
10 yes.  He has not continued, apparently, in this
11 version of drawing or the drawing period, I guess,
12 the railing of the bridge.
13   Q. So he doesn't -- it more or less shows her
14 off the side of the road at the point that the truck
15 is impacting her in this picture down at the bottom
16 right-hand corner, does it not?
17   A. It's showing her -- and he's noting that
18 the white marks on the bridge curbing begin there,
19 which, obliviously, puts the Honda against such the
20 cause of those marks.  So that's where the white
21 marks necessarily are.
22   Q. All right.  So, he does not reflect her
23 being hit before then, correct?
24   A. Well, it's cut off.  I mean, it's --
25   Q. Where's the rest of it?

Page 147

1   A. I don't think he's shown points prior,
2 because there's not going to be roadway evidence to
3 show the full paths.  It's simply showing the Honda
4 against the curbing in that location necessarily.
5 It's a curbing location to cause those marks.
6   Q. Do you disagree with this depiction in this
7 picture as by Mr. Peters or do you agree with it?
8   A. I would probably -- I may do things
9 slightly different.  I haven't tried to place them
10 throughout, you know.  But, again, we know the Honda
11 is here.  We don't know the exact truck's position
12 at that point.  He's showing it against it, but
13 there's not -- these truck positions are not.
14 There's no evidence to say -- the roadway evidence
15 to exactly place it.  He simply just showing the
16 truck against it.
17   Q. What is it showing?  It's showing the car
18 against -- or the truck against the car, correct?
19   A. He does have them engaged, yes.
20   Q. He's got the car halfway off the road at
21 that time, correct?
22   A. At that point, yes.
23   Q. Yes.  And --
24   A. It would have to be to contact the curbing
25 and rub the curbing.

Page 148

1   Q. Right.  So, Mr. Peters got it right here,
2 didn't he, on this drawing?
3     MR. ROZELSKY:  Object to the form.
4     THE WITNESS:  No.  I mean, the Honda
5 has to be over there to rub the curb.  The
6 truck position at that point I wouldn't show,
7 because it's unknown or I don't believe he's
8 articulated correctly at that point.
9 BY MS. MCARTHUR:
10   Q. But at any rate, Mr. Peters who is an
11 accident reconstructionist with SEA is who made this
12 drawing and it's in your file, correct?
13   A. It is.  He made it.  I didn't -- you know,
14 I didn't throw it away.  I looked at it and
15 considered it, but -- and we even talked about that.
16 He said that he had just kind of approximated the
17 truck positions and there's certain points he got
18 together between the two vehicles, but he has not --
19 I think if he had to do it over again, he'd leave
20 the truck off there as well.
21   Q. Well, let's take these last two sheets --
22 or actually the last one sheet and we'll mark it as
23 11.
24     (PLF. EXH. 11, Diagram, was marked for
25 identification.)



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 38 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                                           149–152

Page 149

1    MR. ROZELSKY: Let the record reflect
2 that it was part of 10. It's now been removed
3 and made 11.
4    MS. MCARTHUR: It will be 11 by
5 itself.
6    THE WITNESS: Again, I should point
7 out on this drawing that Mr. Peters would have
8 done this probably, I think, April of 2012
9 before there's one ounce of testimony or
10 otherwise to support it. He has not updated it
11 since.
12 BY MS. MCARTHUR:
13    Q. Have you done your own drawing similar to
14 this, Mr. Boggess?
15    A. For my purposes, no, I have not.
16    Q. And you have nothing in your record to
17 reflect that you disagreed with this drawing in
18 terms of anything written, do you?
19    MR. ROZELSKY: Object to the form.
20    THE WITNESS: I mean, I didn't write
21 notes that say, this document is -- I disagree
22 for the following reasons. I simply took his
23 document and printed it as it was provided to
24 me.
25 BY MS. MCARTHUR:

Page 150

1    Q. Tell me about 3A, B, C and D, if we haven't
2 already talked about those.
3    A. Just to make sure, 3A -- I don't have a
4 copy of 3A is -- I don't have a copy of 3A. I have
5 these images. I'm not sure -- 3 --
6    MR. ROZELSKY: Do you want to hand him
7 the originals and have him give you a copy
8 back? Here I got a copy we can use. I thought
9 we made three copies.
10    MS. MCARTHUR: I'm sure we probably
11 did.
12 BY MS. MCARTHUR:
13    Q. Here's D.
14    A. Is this B, just to be sure? Is that --
15    Q. That's A.
16    MR. ROZELSKY: No, that's A.
17    THE WITNESS: That's A.
18    MR. ROZELSKY: A.
19    THE WITNESS: We called the single page.
20 I'm sorry. Do you want this copy to look at.
21    MR. ROZELSKY: Yes.
22    THE WITNESS: So 3A is a set of
23 calculations that were done.
24 BY MS. MCARTHUR:
25    Q. Just a minute. Okay?

Page 151

1    A. Everybody got a copy.
2    Q. Right. 3A is what?
3    A. Yes. 3A are some calculations that I
4 performed. It's based on Alexander's calculations.
5 That would be Sean Alexander. I ran through the
6 math to show the math and get same basic answers
7 that he did. So he has the length of the cab at 23
8 feet, length of the trailer, 51 feet. That's
9 kingpin to the rear.
10    So his length of the truck that he
11 calculated was 74 feet. He then places the length
12 of the Honda at 14.58 feet, based upon all the
13 stats. Then he uses the perceptionary reaction of
14 1.5 seconds, drag factor of .74.
15    And he then, based upon his references,
16 said that the average lane change is 6.06 seconds
17 for a 11-foot lane change.
18    Q. Okay.
19    A. So by -- I guess the next things are givens
20 as well, based on his calculations. Width of lane
21 two or middle lane 12 feet, width of lane three is
22 12.2 feet. And then the width of the vehicles are
23 over to the right, eight feet and 5.5 feet
24 respectively.
25    So he says that the distance of the point

Page 152

1 of contact between two vehicles centered in their
2 lane is going to 5.31 feet. Just again, how much
3 width is available between them if the vehicle is
4 centered.
5    So based upon a linear move, he calculates
6 that the time to make the lane change, he said 2.92.
7 If you plug into raw form, I think 2.925. An extra
8 decimal place.
9    He then uses a velocity for the Honda,
10 initially, 50 miles per hour. He shows this
11 equation to calculate that braking -- his braking
12 calculation reduces the vehicle to 23.2 miles an
13 hour over the distance of the truck plus the Honda,
14 which is at 88.58 feet in his calculations. He says
15 that the braking time that that consumes, based on
16 his -calculations, is 1.65 seconds. And then he
17 basically -- I get the impression that he's
18 basically saying, 1.65 plus 1.5, which is
19 perceptionary reaction greater than the 2.92.
20 That's comparing 3.15 and 2.92. Therefore, the
21 accident is unavoidable.
22    Q. So you're checking his math and making sure
23 you were doing it as he did it to be sure --
24    A. Just setting up the equations the same way
25 he has them and making sure that if I play with



Page 153

1  it -- you know, my next step is I'm going to change
2  variables based --
3      Q.  Okay.
4      A.  -- on the some of the conversations we had
5  earlier.  But starting with his math.
6          So as we talked about at length earlier,
7  you know, putting the vehicles abreast of one
8  another, side by side as one another, the following
9  modifications are made.
10         So first I take them nose to nose, so
11  instead of -- that would be just be the length of
12  the tractor trailer.  So 74 feet by his numbers,
13  that same calculation, the braking comes out -- he's
14  reduced from the 50 to 29.36, that occupies 1.27
15  seconds.  So 1.27 plus 1.5 is 2.77, getting to a
16  value that's less than the time available.  So
17  presuming his calculations and my understanding of
18  them, that would say the Honda had time to brake and
19  get out from underneath the tractor trailer from a
20  position nose to nose with one another.
21         Now, the next page considers the effect of
22  the tractor trailer moving slightly faster.  As we
23  were talking about in the -- if the Honda is moving
24  or the truck is moving faster, it's going to be
25  easier for a vehicle that's moving slower, since

Page 154

1  it's inside, to move out from underneath it, because
2  they're going to be moving simultaneously.  You
3  know, regardless of the move, obviously over that
4  time frame, the truck has slipped forward of it.
5          Running those numbers, we get to 2.71
6  seconds of time, which, again, is less than that
7  2.92 seconds available per Alexander's calculations.
8  So, again, even with only a mile and-a-half
9  differential in speed, then you should -- the Honda
10  should be able to get out from underneath the
11  tractor trailer and avoid contact altogether.
12         From a steering standpoint, Ms. Little is
13  centered in her lane, as she testified, and given
14  the lane widths as reported by Mr. Alexander, the
15  Honda would have had another 3.3 feet or so to the
16  white edge line.  Adding that in, if she shifts over
17  the same time the truck is coming over and is
18  braking -- well, actually, regardless of braking, it
19  would require the truck a time of 4.75 seconds to
20  get over, based on Mr. Alexander's numbers.
21         So again, taking that 2.92 up to 4.75
22  seconds.
23         Now, from Mr. Peters' calculations or
24  measurements, he says that the nose of the truck to
25  the king -- or the fifth wheel is 21.42 feet and the

Page 155

1  length of the trailer back from the kingpin is
2  49.75, so a couple of feet shorter for the overall
3  vehicle.  Obviously, a little bit shorter vehicle,
4  it's easier to get out from underneath.  And that's
5  kinds of the various calculations you see there.
6          The other thing there I guess I get into
7  is, where's the position of the turn marker?  How
8  far forward is it from the rear of the vehicle?  So
9  she is kind of eye to eye with that marker to her
10  left.  How far does she have to brake to get out
11  from underneath the vehicle.
12         That would place her 32.3 feet away from
13  the rear of the vehicle in terms of being able to
14  break out.  So you don't have to brake the 74 feet
15  or 72 feet of the vehicle, you only have to go 32
16  feet.
17     Q.  So what is 3B?
18     A.  3B is the relative difference between two
19  objects.  If they started off at 50, 50 or 55, 50,
20  so a five mile an hour differential.  How long it
21  takes to shift a fixed amount of distance.  So
22  basically, the longer the time is, the more distance
23  they shift.  So what are the relative positions of
24  the two vehicles?  This is a plot from Excel that I
25  set the calculations for.

Page 156

1      Q.  3C is the --
2      A.  3C and 3D go together.  3D are the inputs
3  and controls that are driving what you see in 3C.
4  And we can go through 3D if we need to, but what
5  I'll hopefully do with these images is describe them
6  and understand what -- and basically describe what's
7  all in 3D.
8          So the first image in 3C is the two
9  vehicles, the tractor trailer and the Honda side by
10  side.  The Honda's position is such that the side
11  glass gf the Hgnda's pgsition adjacent to the turn
12  signad on the trailer$ there's some 30 some odd feet
13  differential between them.
14         If you look in the --
15     THE WITNESS:  Are yours in color?
16     MR. ROZELSKY:  Yes.
17     THE WITNESS:  Okay, good.  The blue
18  table box, that is the data for the
19  Freightliner cab itself.  To the right of that
20  in the gray box is the data for the trailer.
21  The log data.  And the green box is for the
22  Honda itself.
23         If you're looking at the little block
24  up here at the top line, the 0.000 is time.
25         So basically time zero, they're side



**Page 157**

1　by side. The -- at least in this setup, the
2　Honda and the Freightliner both set at 50 miles
3　an hour, and the Z -- or I'm sorry -- the Y
4　position of the tractor is zero. The Y
5　position of the Honda, which is the lateral
6　position is 12.08 feet to the right.
7　　　　So again, one lane over, centered in
8　its lane, same as Mr. Alexander has talked
9　about.
10　　　　The next page is simply showing that,
11　given a steer maneuver controlled by this table
12　up here -- what I did is I looked and said,
13　okay, I'm going take this tractor trailer
14　through a right turn back to a straight --
15　basically straighten it back out. It's going
16　to make an 11 -- I believe an 11-foot shift
17　over to 6.06 seconds roughly, based on
18　Mr. Alexander's numbers.
19　　　　But what I'm showing here is 2.95
20　seconds. It has shifted. The tractor has
21　shifted 5.35 feet to the right, which is
22　basically the same thing Mr. Alexander is
23　showing. So that's what the tractor trailer
24　would look like at the end of the time in its
25　lane shift.

**Page 158**

1　　　　One thing to point out here is that in
2　the -- for the trailer, its Y position is
3　almost two feet less than the tractor position.
4　So it's not coming, as we were talking about
5　earlier, parallel shift, it's an angled
6　approach so that someone breaking out from
7　underneath actually has more time and more
8　margin to the vehicle.
9　　　　Now, the next -- third page, instead
10　of just bringing the -- running just the
11　tractor and the trailer together, I basically
12　advanced it to a point where the Honda has gone
13　straight. It's maintained 50 miles an hour of
14　speed -- I'm sorry, no, it hasn't. It's
15　braking. Excuse me. It's braking. It's
16　braking. If you look at the last line down
17　there to the green it's .74 g's in the green
18　box. It's braked under that average
19　acceleration. The brakes are turned on at 1.5
20　seconds after and the truck immediately starts
21　to turn in this scenario.
22　　　　So 1.5 second for perception reaction.
23　Brakes come on, .74 g's. That's what this
24　looks like, essentially, at 3.15 seconds.
25　　　　The nose of the Honda has couple feet

**Page 159**

1　of margin left -- right to left of the rear of
2　the trailer, and it slides out from behind the
3　truck and no contact occurs. And that's for
4　two vehicles starting at 50 miles an hour.
5　　　　The next is if the truck, instead is
6　going 55 miles an hour, and as I said -- and
7　the car started off at 50, obviously the --
8　that's going to be easier to miss. I'm simply
9　showing that it would be more likely to miss
10　with more margin if it braked in the same
11　manner.
12　　　　The next page is, if I slide the Honda
13　up to the side so that the wheel is adjacent to
14　the step, on the passenger cab of the truck.
15　Two vehicles going 50 miles an hour, running
16　the exact same way. Same steering maneuver,
17　same braking maneuver, 1.5 seconds. And what
18　happens is on the next page, as you can see the
19　truck basically reaches roughly the same point,
20　and the Honda, again, is missing the tractor
21　trailer.
22　　　　Now, the -- actually, that was at 55 and a
23　50 mile an hour split.
24　　　　So, if they're both doing exactly the
25　same speed, 50/50, with one and-a-half seconds

**Page 160**

1　perception, and you're starting from the front
2　of the cab there, this does predict that the
3　rear edge of the trailer would just scrape the
4　left front corner of the Honda. So there would
5　be a slight contact before the Honda escapes
6　out the back. It certainly would be behind the
7　tandem wheels, and you would get scrape on the
8　Honda.
9　　　　Again, that assumes that the Honda
10　maintains a straight path and realistically
11　really doesn't do anything other than brake --
12　a straight line braking.
13　　　　Now, the next page gets into the steer
14　maneuver, so what I do is I say it's one
15　and-a-half seconds, which realistically it
16　actually ought to be sooner, because if your
17　hands are on the steering wheel, you can steer
18　earlier. But if it steers three feet to the
19　right, this is -- again, I left the truck
20　stationary initially but just moved the Honda
21　out and run it -- you know, it's three feet
22　over in that scenario, and I was playing with
23　how to get the steering maneuver correct to get
24　a three foot lane divergence.
25　　　　I go back to that 50/50 case where the

BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
161–164

Page 161

1  Honda starts up parallel to the side -- or
2  adjacent to the side of the cab. They're both
3  doing 50. If the Honda brakes -- and that's at
4  a slightly less acceleration. It's not even
5  maximum braking, slightly reduced braking and
6  steers to the right those three feet, they
7  missed by several feet in terms of contact.
8       And the last two pages, I go back to
9  the original scenario where the Honda is
10  abreast of the turn signal on the trailer. If
11  we assume that the perception reaction is even
12  slower, instead of saying one and-a-half
13  seconds, lets give her two seconds to react and
14  hit the brakes. Under both scenarios of the
15  50/50 speed and a 55 by the truck, 50 by the
16  Honda, we get a missed condition.
17      So there would be no contact between
18  the two vehicles.
19      Q. Okay. Going back to 4B?
20      A. That's the billings?
21      Q. Yes. You have billed, it looks like only
22  through December 26th of 2012?
23      A. Those are for billings generated. There's
24  obviously -- over the last two weeks here, there's
25  going to be time on time sheets that have not made

Page 162

1  the system and/or been billed. So I don't have any
2  bills to be able to produce at this time. I, you
3  know, down the road certainly can get those once
4  they're generated.
5       Q. I mean, all the reading of depositions and
6  all that's been done since then, hasn't it?
7       A. Yes, ma'am.
8       Q. So the majority of your time -- you don't
9  have your bill here for it?
10      A. No, because no billing has been generated.
11  We bill on a 30-day cycle, and most of it has been
12  done in the last 30 days.
13      Q. Do you have a record of the hours?
14      A. I don't, no.
15      Q. Have you compiled the hours yourself?
16      A. I don't. We basically -- we turn in a kind
17  of Excel generated spreadsheet to accounting and
18  they have an accounting system that maintains all
19  that. Until billing is generated, I don't have any
20  way to, I guess, access that other than I guess go
21  through time sheets and pull line items of my
22  time.
23      Q. You don't have any idea how much time
24  you've put in on this?
25      A. I mean, I can guess, but I don't have an

Page 163

1  exact number. I mean, obviously I've read all these
2  depositions, gone through Mr. Alexander's file and
3  created these analysis files, so certainly a number
4  of hours have been done. I don't know if it's 10 or
5  20 or more.
6       Q. It's a lot more than what's on these bills;
7  isn't it?
8       A. Yes, ma'am. Certainly for my time.
9       Q. Effectively, I don't really have your bill
10  here because --
11      A. Well, I don't have a bill. I mean, I
12  haven't generated a bill so I don't have one to give
13  you.
14      MR. ROZELSKY: Since tomorrow is the
15  1st, I'll probably get it tomorrow afternoon.
16      MS. MCARTHUR: Can you attach when you
17  read and sign the deposition?
18      MR. ROZELSKY: Yeah, I'll supplement
19  however you want to do it. I mean, since it's
20  not here and not part of the deposition, I'd
21  rather supplement it to you outside of the
22  deposition.
23      MS. MCARTHUR: Well, to whatever
24  extent it can find its way to get with the
25  others, I would appreciate it.

Page 164

1      MR. ROZELSKY: No problem. As soon as
2  I get it, you will get a copy.
3  BY MS. MCARTHUR:
4       Q. Look at Page 4 of your report, please.
5       A. I'm there.
6       Q. It's got the accident report diagram there.
7       A. Yes, ma'am.
8       Q. Do you believe that diagram is not
9  correct?
10      MR. ROZELSKY: Object to the form.
11      THE WITNESS: I mean, it's not a
12  scaled diagram. There are certainly issues
13  with it because of that. I mean, it's for an
14  illustrated general purposes. That's what I
15  take it for.
16      Q. Can you point to anything that you say is
17  just wrong?
18      A. Well, we know when the vehicles get in
19  contact with one another that the -- I mean, it
20  looks like there's a full lane width between the
21  right edge line and the white fog line and what
22  looks like their impression of the guardrail.
23  Clearly that is not accurate.
24      I mean, I take away from this simply that
25  the truck is merging into -- has merged into the



Page 165
1 Honda, and the two vehicles tracked up to rest on
2 the shoulder some distance up the road.
3         MS. MCARTHUR: My understanding is
4 you're not producing him for opinions
5 concerning injuries.
6         MR. ROZELSKY: Correct.
7 BY MS. MCARTHUR:
8     Q. Look at Page 8, Figure 8.
9     A. Yes, ma'am.
10     Q. Is that Mr. Peters in the black?
11     A. I believe Mr. Peters is taking photographs.
12 It looks like Mr. Rozelsky. I may be incorrect.
13     Q. That Kurt. Kurt, Laura and Sean, I
14 believe. Okay.
15         On Page 13, we've already agreed, have we
16 not, that the initial impact between the truck and
17 the car occurred back on the bridge, correct?
18     A. Yes.
19     Q. And how far back on the bridge was the
20 initial impact? I think you told me already it
21 was --
22     A. You know where the gouge mark is? I think
23 we talked about that. I think about 150 feet, but I
24 didn't have an exact number.
25         As far as the initial contact, it would be

Page 166
1 obviously somewhere before that.
2     Q. Somewhere before 150 feet from the end of
3 the bridge?
4     A. Yes.
5     Q. So where you say here that the impact
6 between the Freightliner and its semi-trailer and
7 the Honda occurring in the right lane of I-16 west
8 just prior to the gore point of I-75, that's not
9 right, is it?
10         MR. ROZELSKY: Object to the form.
11         THE WITNESS: I mean, I don't give a
12 dimension. I say just prior. Retaliative to
13 what, it's prior to the gore point.
14 BY MS. MCARTHUR:
15     Q. How far is the bridge from the gore point,
16 the end of the bridge?
17     A. It looks like maybe two dash lines, so 80
18 feet. Again, I'm looking at a photograph. I don't
19 know. I'd have to go back to the CAD file to
20 measure that.
21     Q. So you don't have a scaled diagram here
22 today, do you?
23     A. Aside from what Mr. Peters provided, no. I
24 mean -- well, I do. I mean, Mr. Peters' drawing
25 that we looked at.

Page 167
1     Q. Okay. Other than Mr. Peters' drawing that
2 I made Exhibit Number 11, you don't have a scaled
3 diagram?
4         MR. ROZELSKY: Object to the form.
5         THE WITNESS: Well, Number 10, the
6 last two pages are diagrams. This within 10 is
7 a scaled diagram of the scene.
8 BY MS. MCARTHUR:
9     Q. But you don't have any drawing done by
10 either Mr. Peters or by yourself that have the
11 measurements of how wide the bridge is, how -- you
12 know, the length of the bridge, the point where the
13 first contact was made, the -- basically, the
14 measurements of all the significant features as far
15 as where it was, where the car was captured by the
16 trailer, you don't have any of that noted?
17         MR. ROZELSKY: Object to the form.
18         THE WITNESS: The data is in here.
19 But, again, this is a CAD file. Every one of
20 these points is X, Y, Z data. So, I mean, I've
21 gone into the CAD file, I have looked at
22 Mr. Peters' notes from the scene as well as the
23 CAD file for comparison.
24         And from my work, I have not -- or as
25 part of my work, I have generated or needed to

Page 168
1 generate the exact measurement of the tire
2 mark, for example. It's not been important for
3 my purposes as asked to do in this case.
4 BY MS. MCARTHUR:
5     Q. So, you've not made a drawings that has
6 those measurements on it?
7     A. Not called out, no. I mean; again, all you
8 do, you open that file and you click on the two
9 points and have it put the measurement.
10     Q. So when I ask you those questions today,
11 though, you can't give me the answers because you
12 don't have a computer in front of you?
13     A. That would correct.
14     Q. So I can't get the answers from you to know
15 what they are in this deposition?
16     A. If you need those numbers from me, no. I
17 can't give you those numbers. Again, for my
18 purposes, it has not been critical to call those out
19 and discuss those.
20     Q. Okay. I'm on Page 13 now. Are you --
21 okay. The first sentence: "Based on the accident
22 report and testimony, the two drivers involved in
23 this incident -- in the incident are in contention
24 regarding who struck whom first."
25         That's not really in question, is it,



Page 169
1  Mr. Boggess? Mr. McClure struck Ms. Little, didn't
2  he?
3         MR. ROZELSKY: Object to the form.
4         THE WITNESS: This sentence is not
5  incorrect. I mean, the two drivers are in
6  contention. Obviously, Mr. McClure adamantly
7  disagrees.
8         Now, do we both -- in my opinion and
9  my belief here, obviously Mr. McClure did make
10  a left to right lane change and contacted the
11  Civic.
12  BY MS. MCARTHUR:
13     Q. It's not true that Ms. Little ran up and
14  his Mr. McClure after he had already started his
15  lane change.
16         MR. ROZELSKY: Object to the form.
17  BY MS. MCARTHUR:
18     Q. Is it?
19     A. No, I don't see evidence of that.
20     Q. You had understood that Miss Smith said
21  that Mr. Hunter had a much better advantage point
22  than did she to testify about what happened in this
23  case, didn't she?
24     A. Something to that effect, yes.
25     Q. So, then you say: "Assuming that the

Page 170
1  tractor trailer did merge into the Honda as has been
2  alleged." Well, the tractor trailer did merge into
3  the Honda, didn't it?
4     A. Yeah, I'm accepting that. That's why,
5  again, I'm not --
6     Q. "The question remains as to whether
7  Ms. Little, the driver of the Honda, contributed to
8  the accident." And that's really what you were
9  asked to determine, wasn't it?
10     A. Certainly the main thing, yes.
11     Q. That was the main thing?
12     A. It seems that way based on my opinions and
13  report, yes.
14     Q. And whether Ms. Little had the last
15  reasonable opportunity to avoid the subject
16  accident. That's what you were asked to determine
17  is -- you were asked to find fault on Ms. Little if
18  there was any to be found?
19     A. I mean, the first opinion is, how did the
20  vehicles get together, and we talked about
21  positions, and speeds and other things. But
22  secondarily, certainly, yes, the question was
23  whether Ms. Little had the opportunity to do
24  something about the accident and avoid it. That's
25  what the majority of the remainder of this report

Page 171
1  discusses.
2     Q. Are you familiar with the theory where
3  there is an emergency situation that drivers are not
4  held to the same level of care where there is not an
5  emergency situation?
6         MR. ROZELSKY: Object to the form.
7         THE WITNESS: I'm not sure what standard
8  you're speaking of.
9  BY MS. MCARTHUR:
10     Q. Well, that in an emergency situation, such
11  as -- which I'm going ask you to assume this was an
12  emergency as far as Miss Little was concerned. I
13  mean, she could have sped up, she could have slowed
14  down, she could have steered right, she could have
15  done anything of those things potentially,
16  correct?
17     A. Those were available to her, yes.
18     Q. And sometimes people make the wrong choice
19  in an emergency; isn't that true?
20         MR. ROZELSKY: Object to the form.
21         THE WITNESS: Some people do, yes.
22  BY MS. MCARTHUR:
23     Q. And she could have actually hit the gas as
24  hard as she could to try to get out of the way. Is
25  it -- you didn't include that scenario?

Page 172
1         MR. ROZELSKY: Object to the form.
2  BY MS. MCARTHUR:
3     Q. Did you?
4     A. Based on the positioning and the -- what is
5  in my report is what I considered at this point. I
6  can consider other scenarios, but --
7     Q. Well, I mean, if she was back at the center
8  of the trailer and he's merging over and she decided
9  to hit the gas and try to go around the front, she
10  wouldn't have made it, would she?
11         MR. ROZELSKY: Object to the form.
12         THE WITNESS: I'd have to run that
13  calculation.
14  BY MS. MCARTHUR:
15     Q. That's why you hadn't made it, isn't it,
16  because he was coming over and she would have ended
17  up not making it around him, correct?
18         MR. ROZELSKY: Object to the form.
19         THE WITNESS: Well, she said she did
20  nothing in the incident in the terms of
21  reaction. She didn't accelerate. She didn't
22  decelerate.
23         But, ultimately, she's put herself
24  next to the trailer. She ends up contacting up
25  front. So without doing anything, she's



BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                                        173–176

Page 173

1  already made it that far.
2       There may be the opportunity to final
3  analyze it, if she accelerates she could miss.
4  BY MS. MCARTHUR:
5       Q. So you're saying she put herself there.
6  You're saying that in her testimony or --
7       A. She places herself next to the trailer,
8  meaning that she's looking -- as we talked about,
9  she's looking at the turn signal. So she
10  articulates where she was relative to the trailer
11  when this starts.
12      Q. You're not meaning to say that she drove up
13  beside him. You're meaning to say that when she's
14  talking about it, she says I was here.
15          MR. ROZELSKY: Object to the form.
16          THE WITNESS: Correct.
17  BY MS. MCARTHUR:
18      Q. You understood, did you not, Mr. Boggess
19  that Ms. Little, once she realized that her car was
20  captured and she had no steering capability anymore,
21  that's when she left the driver's seat?
22          MR. ROZELSKY: Object to the form.
23          THE WITNESS: Certainly the point of
24  capture occurred on the bridge as we talked
25  about. And obviously, until the bridge --

Page 174

1  until the guardrail shifts over, she doesn't
2  have the space to jump out.
3       Once she's made that decision, it
4  would have been obviously sometime before, and
5  it's going to take her some time to get out of
6  the driver's seat, across the vehicle and get
7  the door open.
8  BY MS. MCARTHUR:
9       Q. Well, at the point that her car is being
10  controlled by the truck, it doesn't really matter
11  though, does it?
12          MR. ROZELSKY: Object to the form.
13  BY MS. MCARTHUR:
14      Q. It's not a function -- you're not saying
15  that her car was loose from the truck and that she
16  then left the driver's seat, are you, in your
17  testimony -- or in your report here?
18      A. I don't believe I've said that in this
19  report, no.
20      Q. Are you making the assumption that she left
21  the driver's seat before she was actually captured
22  by the back trailer wheels?
23      A. I haven't tried to determine that at this
24  point. I just simply know that she did leave the
25  driver's seat and make the decision. I have not

Page 175

1  tried to figure out the timing at this point.
2       Q. That's a reaction -- that's perception on
3  reaction, isn't it?
4       A. An eventual one, after -- as you're asking
5  me to assume, after she's already been captured,
6  trapped by the truck.
7       Q. By the way, how fearful or how scared for
8  their life does a person have to be to leap out of a
9  moving vehicle being dragged by a truck, in your
10  opinion?
11          MR. ROZELSKY: Object to the form.
12          THE WITNESS: I don't have an opinion
13  to that.
14  BY MS. MCARTHUR:
15      Q. You agree me, don't you, that she had to
16  have thought she was going to die or she would not
17  have not jumped out of that car?
18          MR. ROZELSKY: Object to the form.
19          THE WITNESS: She has to, obviously,
20  have some amount of fear, but I don't have any
21  way to quantify that.
22  BY MS. MCARTHUR:
23      Q. And it was a judgment call on her part
24  whether to do anything or nothing to try to avoid
25  the truck, wasn't it? She didn't know what to do is

Page 176

1  what she testified, correct?
2       A. At some point, she comes to that
3  realization, or she makes that assumption.
4       Q. Right.
5       A. Again, we're talking about two different
6  things; the decision to jump from the vehicle after
7  becoming entrapped versus the decision or lack of
8  decision to do anything when this truck starts to
9  merge over at you. So, I mean, there's two separate
10  events almost.
11      Q. Both are a judgments made in the height of
12  an emergency, aren't they?
13          MR. ROZELSKY: Object to the form.
14  BY MS. MCARTHUR:
15      Q. From her perspective.
16      A. They're two separate decisions, yes.
17      Q. But you're not saying that -- you know, she
18  actually testified in her deposition as soon as her
19  vehicle was under the control of the truck back at
20  the trailer tires, that's when it was captured
21  there, that's when she left the seat?
22          MR. ROZELSKY: Object to the form.
23  BY MS. MCARTHUR:
24      Q. Didn't she?
25      A. I'd have to look back at that. I don't --



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
177–180

Page 177
1  I'd have to look at when she made the decision to --
2  she says: "As soon as he hit me, my phone flew out
3  of my hand into the windshield.  He hit me so hard
4  he had control of my wheel.  And once I noticed
5  that, I looked right and there was three to four
6  feet between my passenger door and the guardrail.  I
7  climbed over and jumped."
8     Q.  Look at Page 45, Line 22, okay?  The
9  question:  "How do you know it had control -- the
10  tractor trailer impact had control of your wheel?"
11  "Because my car was doing exactly what his truck was
12  doing?"  That's what --
13     A.  Where are you reading that from, sorry?
14     Q.  The bottom of Page 45.
15     A.  Okay.
16        MR. ROZELSKY:  Was there a question
17  for me to object to or were you just reading?
18        MS. MCARTHUR:  I'm trying find where
19  she said control.
20  BY MS. MCARTHUR:
21     Q.  Okay.  Here it is.  So she defines -- Page
22  45, Line 22: "How do you know it had control?  The
23  tractor trailer impact had control of you?"
24  "Because my car was doing exactly what his truck was
25  doing."  Okay.  You saw that?

Page 178
1     A.  Yes.
2     Q.  Going back to Page 44 at the bottom of the
3  page, the last -- Line 19:  "And when he hit me, he
4  hit me so hard he had control of my wheel.  As soon
5  as I noticed that he had control of my wheel, I
6  looked over to my right and there was about three or
7  four feet between my passenger door and the
8  guardrail, because right passed the bridge comes the
9  guardrail and, like, extends to the right.  And when
10  he hit me hard enough to where or -- when I jumped
11  out -- let me says this.  Okay?  Right before I
12  jumped out, I looked over and there were three or
13  four feet between the passenger door and the
14  guardrail.  Well, when I -- when he get me, I
15  climbed over, I looked over, okay -- let me start
16  over."
17        She goes again.  But what she's saying is
18  once the truck had control of her car, that's when
19  she decided to jump out, correct?
20        MR. ROZELSKY:  Object to the form.
21        THE WITNESS:  Yeah, her testimony
22  speaks for itself.  She thinks it has control.
23  You know, Page 46, the question:  "Did you at
24  any point try to steer to the right to pull
25  free from the truck?"  "No."

Page 179
1  BY MS. MCARTHUR:
2     Q.  And that's --
3     A.  It has control, but she's not seeing if she
4  can do anything about it.
5     Q.  At any rate, the point where the truck has
6  control of her vehicle is when it's resting against
7  the trailer tires at the back, correct?
8     A.  From her testimony, she indicates that the
9  guardrail space is opened up and that's when she
10  makes the decision.  So that would be after the
11  bridge and after entrapment at the back of the
12  wheels.
13     Q.  We've already agreed that she was against
14  the trailer wheels still on the bridge there.
15     A.  Which is what I hopefully just articulated,
16  but, yes.  She was entrapped before she left the
17  bridge.
18     Q.  And that's when she left the driver's seat
19  to jump out?
20     A.  That's what she testifies to, yes.
21     Q.  So it's not a function of her car becoming
22  loose and the truck hitting her back and forth, and
23  while her car is still loose she jumps into the
24  passenger seat to open the car and jump out,
25  correct?

Page 180
1        MR. ROZELSKY:  Object to the form.
2        THE WITNESS:  Obviously, that's not
3  her testimony, no.
4  BY MS. MCARTHUR:
5     Q.  So you didn't mean to describe a situation
6  where she leaves the driver's seat and her vehicle
7  is still in the process of moving backward to hit
8  the trailer wheels, did you?
9     A.  I don't think I said that, no.
10     Q.  Okay.
11     A.  Maybe -- again, the reactions that I'm
12  talking about are all before the first point of
13  contact even.  I mean, it's the -- generally
14  speaking, it's the -- you know, while the truck --
15  the amount of time the truck takes to make a lane
16  change and her lack of reaction to that.
17     Q.  Why do you think that Mr. McClure didn't
18  see her?
19        MR. ROZELSKY:  Object to the form.
20        THE WITNESS:  Blind spot, watching
21  traffic, you know, missed him.
22  BY MS. MCARTHUR:
23     Q.  You don't know?
24     A.  I don't know.  It happens every day to
25  people.  You start merging over, and people miss



Page 181

1  seeing them in their blind spot. I can only imagine
2  on a tractor trailer.
3      Q. As far as use of the cell phone, do you
4  know that that's against the North Carolina
5  Driver's -- Commercial Driver's Manual?
6      MR. ROZELSKY: Object to the form.
7      THE WITNESS: I haven't looked that up
8  specifically.
9  BY MS. MCARTHUR:
10     Q. Are you any kind of authority or expert on
11 trucking regulations?
12     A. I have certainly researched and probably
13 testified to some of them at one point or another
14 when asked.
15     Q. It's true that Mr. McClure was supposed to
16 be drug and alcohol tested within a short period of
17 time after this wreck, isn't it?
18     MR. ROZELSKY: Object to the form.
19 And again, it goes beyond the scope of what
20 we've identified him for.
21     THE WITNESS: I have not
22 re-researched. I've looked into that in the
23 past on other cases, but I've not -- I don't
24 know the rule of thumb on that as we sit here.
25 I'd have to look that up.

Page 182

1  BY MS. MCARTHUR:
2      Q. You don't know how long the person -- how
3  long it is after the wreck that a person with
4  injuries and a person is supposed to -- or a truck
5  driver is supposed to be tested?
6      MR. ROZELSKY: Object to the form.
7      THE WITNESS: Not as we sit here. I
8  mean, I know there's different -- I recall
9  different rules for fatalities versus no injury
10 versus some injury, but, again, I'd have to
11 look at the rules to know for sure. I haven't
12 been asked to do that in this case, so I'm not
13 offering opinions as to that.
14 BY MS. MCARTHUR:
15     Q. Well, without even being asked, you know
16 that truck drivers, where serious injuries occur,
17 are supposed to be drug and alcohol tested, don't
18 you?
19     MR. ROZELSKY: Object to the form.
20     THE WITNESS: Again, I'd have to look
21 it up.
22 BY MS. MCARTHUR:
23     Q. You don't know?
24     A. In some cases, yes. I'd have to it look up
25 the circumstance and look at -- I have to go over

Page 183

1  the regulation.
2      Q. You understand he was not tested within
3  eight hours, don't you, for alcohol?
4      A. From his deposition, I believe he testified
5  as that, so that's the extent of my knowledge of
6  that.
7      Q. At the -- on Page 16 of your report, you go
8  into saying that you're going to be reviewing the
9  deposition transcript of David Strayer, and that you
10 may do all sorts of things. And this is my time to
11 depose you and to see and know what you're going to
12 testify to, and what you're going to prepare or what
13 you have prepared. And have you produced to me all
14 of your opinions and what you have prepared in this
15 case?
16     A. Today, yes, ma'am. I mean, I don't -- my
17 entire file is before you here. And as we sit here,
18 I don't know of any necessarily additional work
19 beyond possibly outputting those video files that
20 you've asked for from the simulation.
21     So if we leave here and Mr. Rozelsky asks
22 for something else, I may do that.
23     Q. It say you may prepare demonstrative
24 exhibits. Have you prepared any demonstrative
25 exhibits?

Page 184

1      A. Not outside of what's in my file here, no.
2      Q. Have you reviewed this David Strayer
3  deposition?
4      A. My understanding is that transcript is not
5  available yet, so, no.
6      Q. Do you feel you need to do additional work
7  in this case?
8      A. Not at this time.
9      MS. MCARTHUR: I think that's
10 everything.
11     MR. ROZELSKY: I have no questions.
12     THE COURT REPORTER: Would you like a
13 copy, Mr. Rozelsky?
14     MR. ROZELSKY: Yes, ma'am.
15     MS. MCARTHUR: Let me do one thing.
16 BY MS. MCARTHUR:
17     Q. You have reviewed Sean Alexander's
18 deposition, Officer Williams, Lorraine Smith, Alonzo
19 McClure, the complaint, you've got some references
20 which are in your report. You've got the SEA
21 photos. You've got the Hunter affidavit, you have
22 the Lindsey Little deposition, the police photos,
23 the accident report, your report, you have
24 deposition summaries, you have the drawings, you
25 have the ECM report, you have the -- some papers



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 47 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                                           185–188

Page 185

1    about setting up this deposition with me, you have
2    the Sean Alexander report, you have the inspection
3    notes from Mr. Peters, and you have the vehicle
4    specs. Is that everything that you've reviewed?
5        A. You have Sean Alexander's report?
6        Q. All the things that were marked as
7    exhibits, and you have the complete Sean Alexander
8    file.
9        A. Yes, ma'am.
10       Q. What is this analysis file?
11       A. That is what you pulled the other analysis
12   materials out of for the -- 3A, B, C, D, I believe
13   all came out was there. There's three -- there's
14   two PowerPoints at the end and crush profiles that
15   we were talking about that Mr. Peters did based on
16   photo modeling.
17           And then the first packet is excerpts from
18   the police reports, the vehicle specs, and then some
19   crush analysis calculations that don't end up
20   getting used ever based on my report, the initial
21   crush analysis.
22       Q. Well, I'd like to have these marked?
23       A. You want to mark that as 3E to keep them
24   with the analqsis.
25   BY ES. MCARTHUR:

Page 186

1        Q. 3E. Okay.
2        A. Because that all came out of the analysis.
3        MR. ROZELSKY: Is that everything?
4        THE WITNESS: Yes.
5        MS. MCARTHUR: I hope so.
6        (PLF. EXH. 3E, Definition of
7    vehicles, was marked for identification.)
8        MR. ROZELSKY: I just want to put one
9    thing on the record, and that is the one
10   original, which is I believe Exhibit 2, the
11   handwritten notes on it are handwritten notes
12   of counsel and were not out of the original
13   file. I just want to make sure we're clear.
14       MS. MCARTHUR: Do you want to
15   substitute one that doesn't have it?
16       MR. ROZELSKY: Oh, we can do that.
17   Yeah, that's easier.
18       MS. MCARTHUR: Why don't we substitute
19   one that doesn't have my notes on it.
20       THE WITNESS: Make that 3?
21       MR. ROZELSKY: You want to make that 3
22   and we'll -- have her mark that as -- isn't
23   that 2?
24       THE WITNESS: That's 2.
25       MS. MCARTHUR: That's Number 2.

Page 187

1        MR. ROZELSKY: Let's do a clean
2    version of 2.
3        (The deposition was concluded at 2:45 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 188

1             E R R A T A   S H E E T
2        Pursuant to the Rules of Civil Procedure, any
3    changes in form of substance which you desire to
4    make to your deposition testimony shall be entered
5    upon the deposition with a statement of the reasons
6    given for making them.
7        To assist you in making any such corrections,
8    please use the form below. If supplemental or
9    additional pages are necessary, please furnish same
10   and attach them to this errata sheet.
11
12   ---
13
14       I, BRIAN BOGGESS, SEA do hereby certify that I
15   have read the foregoing deposition and that to the
16   best of my knowledge said deposition is true and
17   accurate (with the exception of the following
18   corrections lest below.)
19
20
21
22
23
24
25



Page 189

1  Page No. _____ Line No. _____ Change to:
2  _____
3  Reason for Change: _____
4  Page No. _____ Line No. _____ Change to:
5  _____
6  Reason for Change: _____
7  Page No. _____ Line No. _____ Change to:
8  _____
9  Reason for Change: _____
10 Page No. _____ Line No. _____ Change to:
11 _____
12 Reason for Change: _____
13 Page No. _____ Line No. _____ Change to:
14 _____
15 Reason for Change:
16 _____
17 _____
18
19
20
21
22
23
24
25

Page 190

1  Page No. _____ Line No. _____ Change to:
2  _____
3  Reason for Change:
4  _____
5  Page No. _____ Line No. _____ Change to:
6  _____
7  Reason for Change:
8  _____
9
10 Page No. _____ Line No. _____ Change to:
11 _____
12 Reason for Change:
13 _____
14 Page No. _____ Line No. _____ Change to:
15 _____
16 Reason for Change:
17 _____
18
19 SIGNATURE: _____
20 Sworn to and Subscribed before me
21 _____, Notary Public.
22 This_____ day of _____, 2013.
23 My Commission Expires:
24
25

Page 191

1              CERTIFICATE OF REPORTER
2  SOUTH CAROLINA:
3  GREENVILLE COUNTY:
4
5       I hereby certify that the foregoing deposition
6  was reported, as stated in the caption, and the
7  questions and answers thereto were reduced to the
8  written page under my direction; that the foregoing
9  pages represent a true and correct transcript of the
10 evidence given.  I further certify that I am not in
11 any way financially interested in the result of said
12 case.
13      Pursuant to Rules and Regulations, I make the
14 following disclosure:
15      I am a South Carolina Certified Court Reporter.
16 I am here as an independent contractor for Huseby,
17 Inc.
18      I was contracted by the offices of Huseby, Inc.
19 to provide court reporting services for this
20 deposition.  I will not be taking this deposition
21 under any contract.
22      I have no written contract to provide reporting
23 services with any party to the case, any counsel in
24 the case, or any reporter or reporting agency from
25 whom a referral might have been made to cover this

Page 192

1  deposition.  I will charge my usual and customary
2  rates to all parties in the case.
3       This, the 15th day of November 2011.
4
5
6
7
8       Sharon G. Hardoon
        Court Reporter, Notary Public
9       My commission expires:
        April 7, 2018
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**$**

$4,580.45
  125:8

**-**

-
calculation
s  152:16

**0**

0.000
  156:24

01  6:2,3,5

07  6:5
  116:8,23

08  117:8,9

09  115:25
  116:1,3,
  25 117:1

**1**

1  4:24 5:2
  41:13,16
  130:22
  131:5,7,9
  142:19

1's 131:10

1.27
  153:14,15

1.5  136:14
  137:2,6,8
  151:14
  152:18
  153:15
  158:19,22

159:17

1.65
  152:16,18

1/16/13
  82:22

1/3/13
  83:15

1/31/13
  82:11

10  83:23
  112:8
  132:22
  133:9
  142:11,
  15,16
  144:23
  149:2
  163:4
  167:5,6

10/17/12
  84:20

100  56:7
  58:8,14,
  24 59:1,
  4,7,20,23
  63:13

10:28  99:3

10:57:54
  98:15
  99:12
  100:14
  103:7

10:58
  103:5

10:59  99:4

11  143:25
  144:7,
  148:23,24
  149:3,4
  157:16
  167:2

11-foot
  151:17
  157:16

11/27/2012
  84:8

11:01
  101:16
  102:4,19

11:05
  101:15
  102:20

11:07
  101:17
  102:5

11:35
  54:11

11:39
  54:11

11:50
  101:23

12  122:19
  151:21
  156:12

12.08
  157:6

12.2
  151:22

12/19/12
  122:15
  124:25
  125:2

12th
  128:14

13  165:15
  168:20

14.58
  138:19
  151:12

15  22:4
  125:23

131:13

150  55:20
  165:23
  166:2

15th
  125:25

16  183:7

16,000
  131:13

16th
  129:11

17  78:16

18  112:8

19  178:3

1:02
  119:24

1:08
  119:25

1st 37:11
  163:15

**2**

2  13:3
  37:10
  83:13
  131:5,7,
  17 142:24
  187:2

2.0  137:4

2.29
  139:12

2.71  154:5

2.77
  153:15

2.79
  139:20

2.92

139:21
  152:6,19,
  20 154:7,
  21

2.925
  152:7

2.95
  157:19

2/14/13
  82:2

20  22:4
  163:5

2000  25:7,
  14

2001  24:21
  25:19
  28:25

2007  116:5

2008  5:11,
  18 13:4
  31:18

2009  30:2
  115:24

2011  88:13

2012  83:23
  125:20,
  23,25
  128:13
  129:11
  132:19,
  20,24
  133:4,5
  149:8
  161:22

2013  37:11
  41:18
  42:11
  43:10
  78:16

20th
  132:20



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 50 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                                    Index: 21.42..8

133:8          3.5  138:1       3D  15:13,      127:1,2,3      128:21,22
                                     16,23         142:5          129:10
21.42          3/15/13             16:2
  154:25         80:21            22:21,22       5,000          6.06
                                  156:2,4,7       131:18          151:16
219651         3/16/12                                            157:17
  15:17          128:23          3E  185:23      5.31  152:2
                                                                 60  76:11,
22  177:8,     3/28/12           ─────────────   5.35             12,25
  22             126:20                4           157:21          77:9

22nd           3/4/13            ─────────────   5.5  151:23     60,853
  122:19         81:21                                            131:18
                                 4  164:4        5/22/12
23  151:7      3/7  82:18                         122:13         65  76:11,
                                 4-A  122:13                      13,25
23.2           3/7/13              125:5,18      50  27:4         77:9
  152:12         81:6                             65:19
                                 4-B  122:15      76:5           66,167.9
2300-pound     30  105:1          124:24         152:10          131:12
  111:17         162:12           125:16         153:14
                                                 155:19         6:00  82:25
2388  111:3    30-day            4.75            157:2
                 162:11           139:5,12       158:13         ─────────────
26-foot                           154:19,21      159:4,7,             7
  41:19        30-minute                         15,23         ─────────────
                 94:4            4/16            161:3,15
26A  104:5                        122:19                        7  130:1,5,
               31  99:3                          50,546.3        6
26th  43:10                      4/5/2013        131:11
  161:22       32  155:15         79:25                         7/16/13
                                                 50/50           43:21
28  125:19     32.3             40  90:22         160:25
                 155:12                           161:15        72  155:15
29.36                           42  135:19
  153:14       35  7:15,17                       51  137:18     735  75:12
                                44  178:2         151:8          109:17,21
2:45  187:3    36  80:18                                         110:8
                                45  90:22        5280  110:9     112:9
2nd  132:19    3A  15:15,         177:8,14,
  133:4,5        17,25            22             53-foot        74  137:11,
  134:4          150:1,3,                         137:20         139:15,19
                 4,22           46  178:23                       151:11,14
─────────────    151:2,3                         55  65:20       153:12
       3         185:12         49.75             76:5           155:14
─────────────                     155:2          155:19         158:17,23
               3B  15:15,                         159:6,22
3  14:23         19 16:1        4A  122:18        161:15        75/25
  150:5          155:17,18                                       115:20
                                4B  161:19      ─────────────
3.15           3C  15:2,                              6        ─────────────
  152:20         15,21          4th  132:24     ─────────────         8
  158:24         16:1,18                                       ─────────────
                 156:1,2,       ─────────────   6  28:15
3.3  139:2       3,8                  5                         8  134:24
  154:15                        ─────────────

                                5  29:15



135:1
165:8

8/1  42:11

8/19/13
40:6

80  166:17

80/20
115:21

85th  137:7

88.58
152:14

_____

9

_____

9  135:14,
15  144:23

9/10/13
39:15

9/16/13
38:20

90  114:18

911  93:10
98:5,14,
22  99:1,
10,20,24
103:7

95  114:18

99  6:2,3
24:21
25:7,14,
18  28:25

9th  41:17

_____

A

_____

a.m.  82:25
99:3

abide  49:2

ability
96:17

abrasions
51:22

abreast
73:23
78:3
153:7
161:10

absolutely
140:19

accelerate
72:16
172:21

accelerates
173:3

acceleratin
g  45:6
65:10
69:8
73:18

acceleratio
n  158:19
161:4

acceleratio
ns  38:18

acceptable
109:16,
23,25
110:2

accepting
170:4

access
162:20

Accessing
14:8

accident
5:9,13,
15,17,24
14:6
18:17

22:2 24:4
25:16
26:12,13,
15 28:20
29:9,12
30:2,9,23
31:1,23
34:11,15
35:25
36:15
37:1,13,
16,18
38:21
40:7,8,
10,11,12,
13,16
42:4
43:16
53:13
56:22
57:8
78:1,21
79:13
80:2,23
81:2,23
82:6
83:1,11,
16,20
84:9
85:10,21
87:24
88:3
89:23
90:19,24
92:19
93:9
99:23
100:2,3
101:6,10,
22,23
102:18,20
106:13
113:6,14,
15 114:2
115:9
116:7
117:13

122:20
123:21
127:11
130:16
131:24
148:11
152:21
164:6
168:21
170:8,16,
24 184:23

accidents
5:22
14:16
23:25
25:3,5,24
26:14
29:20,21
33:9
36:5,15,
21

accordance
4:3

account
92:22

accounting
111:3
162:17,18

accurate
102:21
103:18,19
164:23

Acre  90:3,
5,6

act  47:6
50:17

ACTAR  22:8

action
40:12
41:4 42:5

activated
70:8

actively
5:21

actual
13:18
93:8
127:15
130:21

ADA  33:19

adamant
49:21

adamantly
169:6

add  115:21
130:11

added
36:24
37:2
115:15
138:1,19
139:11

Adding
154:16

addition
5:6

additional
183:18
184:6

adds
136:11

adjacent
84:12
156:11
159:13
161:2

adjusters
8:24
12:10
31:9
32:2,8,22
33:7
34:2,6,23



administrative
134:18,20

admitted
98:1

admittedly
106:12

admitting
44:12

advanced
82:4
158:12

advancing
9:15

advantage
169:21

aerial
143:6,7,
20

aerials
142:7,21

aerospace
36:10

affect
43:4
79:15

affected
42:21

affects
14:1
21:10

affidavit
60:13,14
63:13,25
66:3
76:16
184:21

affiliations  35:15

affirmatively  106:3

afternoon
163:15

aggressive
76:9

agree
45:13
46:16,20
47:3,15
48:9
50:2,
51:6
61:13
66:24
67:3
94:8,9
108:24
120:9
147:7
175:15

agreed
165:15
179:13

ahead
61:14,18
66:15
97:10

aiding
85:22

aimed
108:1

air  23:22
39:21

airbag
28:3,19

al.s  81:19

alcohol
44:13
80:14,15
181:16
182:17

183:3

Alexander
119:18
120:19
134:15
135:4,15
138:2
151:5
154:14
157:8,22
185:2,7

Alexander's
135:14
151:4
154:7,20
157:18
163:2
184:17
185:5

allegations
42:19
91:25
118:22

alleged
38:1
39:3,9,20
43:7
81:3,24
82:7
83:21
90:1
170:2

Alliance
8:22 9:5,
10:11
11:10
12:4

allowed
11:20
49:5,9
74:23
75:4
121:18

allowing
99:23
122:24

alongside
55:25
69:11
74:7
105:10

Alonzo
184:18

altogether
154:11

Aluminum
85:19

American
23:16

amount
44:13
47:1
69:14
90:9
139:11
140:17
155:21
175:20
180:15

ample
87:24

analqsis
185:24

analysis
14:23
15:5
28:18,21
30:2
32:17
33:3 84:6
118:21
126:6,
127:10
136:1,20
137:4
138:12

139:8
163:3
185:10,
11,19,21

analyze
30:15
173:3

and-a-half
18:1 93:8
113:19
132:3
154:8
159:25
160:15
161:12

and/or
32:2 39:1
66:11
162:1

Anderson
86:14

Andy
42:14,25

angled
158:5

answering
78:12

answers
151:6
168:11,14

anymore
52:24
173:20

apparently
92:17
116:2
124:16
146:10

appears
56:7
125:22
130:6



appliance
  36:14

applicabili
ty  91:2

applicable
  30:17

application
  12:2
  30:11

applied
  11:20
  21:6
  24:25

applies
  46:18

apply
  11:25

appreciable
  132:13

approach
  158:6

approaches
  41:22

approaching
  43:24
  60:9
  66:25
  67:5

appropriate
ness  86:7
  91:2

approved
  12:2

approximate
d  148:16

April
  132:24
  134:4
  149:8

Arch  85:19

area  45:7,
8 51:19
  56:13
  60:10
  64:14
  92:24
  94:12
  121:17
  137:14

arm  39:18

articles
  28:6,23

articulate
  74:8
  92:21

articulated
  63:12
  65:17
  148:8
  179:15

articulates
  173:10

articulatio
n  38:7

ascribes
  96:6

asks
  183:21

aspect
  27:16,17
  41:9
  44:23
  89:9

aspects
  25:6
  45:11
  104:22

assess
  47:25
  79:14
  107:23
  109:5

assessing
  40:11
  83:10
  96:25

assessment
  25:12
  26:19

assigned
  129:14

assignment
  121:10
  128:22
  129:11

assist
  36:4

assistant
  24:24
  134:18,20

associate
  37:17

Association
  33:22

assume
  49:22,24
  50:4
  60:5,17
  76:24
  77:2
  97:13
  100:24,25
  101:5
  103:19,21
  171:11
  175:5

assumes
  99:18
  160:9

assuming
  53:3 63:4
  76:11
  77:24
  95:8

99:1,2,13
  103:10,25
  104:23
  105:4,7,
  15 106:14
  169:25

assumption
  77:23
  95:13
  174:20
  176:3

astronomica
l  112:11

Atlanta
  33:6
  121:17

attach
  163:16

attached
  15:5
  76:12
  93:16

attempted
  75:14
  88:1
  111:9

attempting
  83:18

attended
  21:14
  36:1,2

attention
  80:19
  94:22,25
  95:2
  108:10

attorney
  34:23

attorneys
  8:25 9:21
  12:11,22
  33:14,22

35:7

audiences
  34:13

audio
  99:10

August
  41:17

Austin
  124:19
  125:7

authority
  181:10

automatic
  39:17

automatical
ly  132:13

automobile
  5:21
  28:24
  36:5,20

automotive
  6:1,6
  21:7
  27:10,11,
  24 35:16,
  21 135:8

average
  137:8
  151:16
  158:18

avoid
  74:17
  107:14
  119:20
  154:11
  170:15,
  175:24

avoidance
  140:1

avoided
  44:8



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 54 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                          Index: aware..biomechanics

aware  9:7
  12:13
  18:15
  20:25
  23:14
  96:21

Axial
  28:12

axle  56:21

_____

B

_____

B.S.  140:3
  141:6

back  5:25
  29:14
  52:22
  53:24
  54:15
  56:8
  58:5,23
  59:1,5
  61:25
  64:14
  66:20
  76:16
  82:12,
  83:18
  91:17
  107:14
  121:5,8
  125:22
  126:3
  129:17
  131:6
  135:11
  141:25
  142:8
  143:6
  144:23
  150:8
  155:1
  157:14,15
  160:6,25

  161:8,19
  165:17,
  166:19
  172:7
  174:22
  176:19,25
  178:2
  179:7,11,
  22

background
  18:18
  22:15

Backing
  90:13

backward
  180:7

bags  23:22
  42:14,21

bails
  43:23

ballistic
  26:20
  27:24

bar  44:12

barrier
  40:20

Barton
  39:17

based
  17:17
  26:19
  38:7
  77:10
  98:23
  111:25
  114:20,22
  119:1,7
  125:4
  137:6
  138:25
  139:15
  143:22

151:4,12,
  15,20
  152:5,15
  153:2
  154:20
  157:17
  168:21
  170:12
  172:4
  185:15,20

basic
  22:13
  55:8
  151:6

basically
  21:8
  22:9,22
  30:14
  38:10
  39:11
  40:10
  41:23
  42:16
  43:5 58:1
  64:2
  80:10,17
  129:16
  152:17,18
  155:22
  156:6,25
  157:15,22
  158:11
  159:19
  162:16
  167:13

basing
  19:3

basis  8:16

beacon
  71:20
  136:16

began  44:2
  60:16,23
  61:5

119:12

begin
  145:6,8,
  14,25
  146:18

beginning
  17:6
  146:4

begins
  70:4

begun  99:3

behalf
  81:16
  88:18
  115:13

behavior
  42:6
  72:15
  94:14

belief
  50:3
  124:2
  169:9

believes
  50:1 96:7

belive
  107:25

belt  88:3

belts
  23:22

bicyclist
  80:2,9
  84:2,5

big  70:23
  71:19

biggest
  88:4

biker
  44:12

bill
  122:1,5,
  13,15
  125:7,16
  162:9,11
  163:9,11,
  12

billed
  122:20
  161:21
  162:1

billing
  129:16
  162:10,19

billings
  125:21
  126:5
  161:20,23

bills  9:25
  162:2
  163:6

Biltmore
  83:24

bio  10:13

biography
  10:8,10,
  16

biomechanic
al  32:17
  33:3,8
  34:16
  37:17
  43:6,14

biomechanic
s  24:25
  25:11
  27:21
  33:23
  36:1
  81:3,23
  82:7
  83:6,21
  90:25



113:15

**bit** 96:23
  137:12
  155:3

**black**
  145:8,15
  165:10

**Blakemore**
  85:6,8

**blew** 91:9

**blind**
  48:15
  63:10
  96:4
  180:20
  181:1

**blinding**
  88:6

**blindness**
  95:17,23
  97:4,8

**block**
  146:3
  156:23

**blue** 39:1,
  5 156:17

**Blythe**
  38:25

**boat**
  89:17,21,
  23 90:2

**boats**
  89:22

**body**
  27:23,25

**Boggess**
  4:10,15,
  16, 10:24
  36:9 46:2
  47:17

54:13
63:19
72:8
74:11
97:3
100:10
103:24
105:19
109:17
120:2
127:20
149:14
169:1
173:18

**bottom**
  29:4 30:3
  130:25
  143:15
  144:5,18
  146:15
  177:14
  178:2

**bounced**
  58:18

**bouncing**
  57:16,19
  58:3

**bounds**
  .111:24

**Bowerman**
  91:14,15,
  18 92:2

**box**
  156:18,
  20,21
  158:18

**boxes**
  136:2

**Boyd** 83:1,
  4,6

**Brabham**
  83:17,19

**brain** 96:9

**brake** 53:5
  72:16
  112:8
  130:15,
  17,23
  131:5,7,
  9,10,17
  134:8,10
  153:18
  155:10,14
  160:11

**braked**
  89:7
  158:18
  159:10

**brakes**
  123:12,
  158:19,23
  161:3,14

**braking**
  17:3
  29:19
  30:8,13,
  24 31:2
  32:14
  45:5
  73:13
  89:5,6
  111:10
  112:15,17
  152:11,15
  153:13
  154:18
  158:15,16
  159:17
  160:12
  161:5

**break**
  54:8,11
  102:8,13
  118:10
  119:23,24
  123:21

155:14

**breakdown**
  115:17

**breaking**
  158:6

**Brent**
  12:23

**Brian**
  4:10,15

**bridge**
  51:24
  53:18,19,
  20,22
  54:16,20,
  22,23
  55:3,24
  56:1,4,16
  58:8,10,
  13,14,19,
  25 59:8,
  18,21,22
  60:9
  68:21
  94:12
  110:4
  137:14
  144:18
  145:21,
  24,25
  146:7,9,
  12,18
  165:17,19
  166:3,15,
  16
  167:11,12
  173:24,25
  178:8
  179:11,
  14,17

**bringing**
  158:10

**broken**
  53:4

**brokers**
  12:11

**brought**
  79:8
  88:15
  132:9

**brush**
  39:18

**bullshit**
  140:22

**bumped**
  57:24

**bumper**
  138:2

**bundled**
  143:14

**business**
  37:24
  107:5

**Butler**
  90:12,17,
  19

**button**
  103:2

---------------------------
            C
---------------------------

**C-i-r-e-n**
  26:9

**cab** 50:12
  71:23
  88:6
  151:7
  156:19
  159:14
  161:2

**CAD** 143:22
  144:1,10
  167:19,
  21,23



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 56 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                               Index: calculate..cell

calculate
  111:8
  152:11

calculated
  139:20
  151:11

calculates
  139:12
  152:5

calculating
  139:3,14

calculation
  137:2
  139:6
  152:12
  172:13

calculations
  15:25
  127:16
  136:24
  138:25
  139:20
  150:23
  151:3,4,
  20 152:14
  153:17
  154:7,23
  155:5,25
  185:19

call  55:11
  94:4
  98:5,14,
  23 99:2,
  3,24,25
  102:4
  103:7,17
  126:3,17
  143:21
  168:18
  175:23

called
  19:15
  26:8
  55:2,9

99:12
120:24
143:3
150:19
168:7

calls
  100:18
  102:17

Campbell
  85:19,21
  86:9

capabilities  29:19
  30:13

capability
  173:20

capacity
  104:19

capture
  173:24

captured
  52:17,
  53:22
  54:14
  58:23
  134:9,11
  167:15
  173:20
  174:21
  175:5
  176:20

car  39:17
  40:3
  42:15
  48:22
  50:12,20
  51:3,6,9,
  20 52:2,
  21 55:24,
  25 58:12
  59:17,21
  61:18
  74:24

107:7,10
108:3
110:20
111:2,17
114:7
115:12
138:20
146:5
147:17,
18,20
159:7
165:17
167:15
173:19
174:9,15
175:17
177:11,24
178:18
179:21,
23,24

card
  124:22

care  171:4

Carolina
  4:4
  33:14,21
  101:16
  181:4

carrier
  37:20
  49:3

cars  94:22
  95:2
  143:9

cart
  85:23,24
  86:7

carts  86:4

case  14:18
  17:19,21
  19:6,14,
  16 20:14,
  17,21

29:10
30:11,
37:15
38:12,21
39:6,13,
16 40:4,
11,17,25
41:6
42:12,24
47:20
70:9
82:13,15,
16,19
83:4
84:3,18,
21 85:2,
11 86:21,
22 87:12,
14 88:12,
15 89:8
90:4,10
91:5,14,
15 92:8,
12 93:24
98:18
99:15
112:22,23
114:8,9
115:3
116:18
118:8,23
119:22
120:18
124:4
131:1,20
160:25
168:3
169:23
182:12
183:15
184:7

cases
  9:18,25
  10:1,2
  17:12
  25:3

36:12,22
41:14
112:21
114:25
115:1,12,
18 116:7
120:11,13
181:23
182:24

catch
  69:16,18
  70:12

caught
  52:5,16,
  19 53:5,
  13 65:11
  76:1

caused
  17:16
  25:8
  38:13
  42:22
  45:14
  74:19
  81:13
  82:9
  85:25
  87:17
  90:8
  95:17,23
  104:17

causing
  39:19

CDS  124:23

cell  91:25
  92:7,12
  93:6,13,
  21 94:2
  95:9,11,
  17,24
  96:8,10,
  16,20,25
  97:3,14,
  18 99:3,



10,11,14,
19 100:8
103:11,25
104:6,9,
17,24
105:3,8,
18,20
118:1
181:3

**center**
24:24
26:10
79:18
172:7

**centered**
152:1,4
154:13
157:7

**Centers**
26:9

**certificati
on** 22:9

**chain**
80:22

**chambers**
112:9

**change**
40:18
45:19
48:8
72:15
94:11,17,
19,23
95:3
101:7
103:23
105:1,25
138:7,8
139:7
151:16,17
152:6
153:1
169:10,15
180:16

**changed**
83:11

**changing**
105:18
136:19

**characteris
tics** 30:25

**Characteriz
ation**
28:20

**characteriz
e** 46:4

**Charger**
63:8,16
65:9 73:1

**charges**
91:6

**Charles**
7:10
12:24

**Charlotte**
12:24

**chart**
15:19

**check**
133:3

**checked**
107:24
130:14

**checking**
152:22

**chief** 6:21

**choice**
171:18

**Chrisco**
91:7,11,
13

**circled**
140:7,9,
13

**circumstanc
e** 182:25

**circumstanc
es** 131:24

**Ciren** 26:8

**Civic** 57:2
60:25
62:23
63:16
65:8,18,
21,24
67:9,14
69:16
70:1
73:2,11
74:6
75:10,21
77:16
105:10
106:1
128:16
169:11

**Civil** 4:4

**claim** 9:10
38:22,24

**claimed**
38:13
39:25
43:15
88:19

**claiming**
43:9

**claims**
8:21,23
9:4,20
10:10,18
11:1,9,11
12:4,9
32:10,22
33:24
34:23
35:6
92:18

**clarificati
on** 68:14

**clarifies**
70:23

**clarifying**
68:3

**clarity**
136:12

**class**
14:16
22:2,4

**classes**
5:12 21:6
31:9

**clean**
187:1

**cleaned**
135:25

**clear**
63:13
64:18
69:1
70:5,22
71:2,18,
21 87:20
136:17

**cleared**
133:21

**clears**
132:14

**click**
168:8

**client**
77:25

**climbed**
177:7
178:15

**clip**
134:24

**clips**

84:14

**CLM** 9:2
10:24

**CLM'S**
10:17

**clock**
133:2

**clocks**
98:21
100:15
103:14
133:3,6

**close**
103:9
137:21

**closer**
69:13
121:17

**Cloud**
42:13

**Cloud's**
43:4

**Club** 83:25

**CMLA** 9:2

**co-
defendant**
86:23

**co-workers**
7:14
85:22

**Coast**
112:24

**coded**
122:22

**cognitive**
96:2

**colleagues**
18:9

**collected**



19:24
143:21,23

college
35:18

collision
44:8

Collum's
83:16,17,
20

color
156:15

combination
70:15

comment
105:2
137:13
139:5

commentary
103:24

comments
138:17

commercial
29:18,19
85:9
86:25
181:5

communicati
on   12:8

communicati
ons
126:15,16

company
12:10
18:13
86:6,8,11
88:9
99:20
103:22
104:25
117:15

compare

132:4

compared
111:4
139:21

comparing
152:20

comparison
100:5
167:23

compilation
s   127:15

compiled
19:22
124:17
162:15

complaint
184:19

complete
118:20
185:7

complex
94:10,20

component
50:25

compressing
59:17

computer
13:15
14:17
16:6,10,
22,25
98:18,19
102:24
103:4,13
168:12

computers
99:19

concerned
56:14
171:12

conclude
78:6

concluded
187:3

concrete
42:14,21
60:3

condition
161:16

conference
8:16 9:9

conferences
21:13
35:25

connection
96:9

considerabl
y   137:9

considered
148:15
172:5

considers
153:21

consistent
39:25
102:19
103:7
123:13,14
137:23

conspicuity
44:22,24

constructed
79:17

constructio
n   39:1,24
91:11

consult
36:18

consultants
35:23

consulted
36:11

consulting
8:25

consumes
152:15

consuming
44:13
80:14

contact
37:25
38:11
40:18
50:22
52:12
56:18,20,
21 57:5,
23 69:13
70:10
71:12
73:24
77:16,18
82:5
83:19
128:18
147:24
152:1
154:11
159:3
160:5
161:7,17
164:19
165:25
180:13

contacted
17:20
75:18
80:25
126:9
169:10

contacting
126:13
172:24

contacts
47:8
50:15
57:2

contends
80:6,9

contention
168:23
169:6

continually
65:18
73:12

continue
76:3
96:17

continued
75:11
146:10

continues
57:25

continuing
31:8
59:14
61:10
73:7

continuous
145:8,15,
25

continuousl
y   4:21
73:18

Contracting
112:25

contractor
78:23
81:17

contributed
170:7

contributio
n   83:4



Case 5:12-cv-00147-MTT     Document 61     Filed 07/30/14     Page 59 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                          Index: contributory..crossed

contributor
y  89:12

control
   34:4
   79:5,16
   86:6
   106:20
   130:10
   176:19
   177:4,9,
   10,19,22,
   23  178:4,
   5,18,22
   179:3,6

controlled
   64:23
   157:11
   174:10

controls
   13:13
   129:16
   156:3

conversatio
n  96:10

conversatio
ns  153:4

conveyors
   36:15

convinced
   50:22

Cook  78:20
   79:21,22

Cook's
   79:1

Cool  78:24

cooling
   90:7

copied
   17:23
   20:9

copies

15:12
129:3
150:9

copy
   135:13
   150:4,7,
   8,20
   151:1
   164:2
   184:13

corner
   144:5,19
   146:16
   160:4

corporate
   10:19

correct
   5:7,18
   9:5  11:2,
   23  13:16,
   21  14:4
   20:6,7
   28:4,7,
   21,25
   29:6
   34:25
   35:7  47:6
   49:11,13
   50:25
   51:3,17,
   18  52:24
   58:15
   59:2,9
   60:23
   61:6
   62:9,11,
   25  64:6
   65:3,7
   70:18
   73:8,9
   74:21
   77:19,21
   95:4,
   99:11,13
   101:2

103:12
112:5
114:10
115:24
117:8,20
123:2,17
129:22
133:16
146:23
147:18,21
148:12
160:23
164:9
165:6,17
168:13
171:16
172:17
173:16
176:1
178:19
179:7,25

correctly
   148:8

correspond
   58:13

cost  9:20

counsel
   4:2  9:21
   10:19
   12:10
   32:2
   37:20
   39:5
   40:3,8,9
   42:25
   43:18
   44:1
   78:24
   82:5,15,
   23  83:20,
   24  84:13,
   25  85:4,7
   86:21
   88:18,23
   89:18

90:6,18
91:13
92:6
101:13
112:24
113:3,7,
13  114:2

counter
   113:24
   114:5

counting
   139:21

couple
   10:15
   11:17
   13:2  29:1
   33:12
   114:25
   128:3
   134:18
   144:4
   155:2
   158:25

courses
   5:10,14,
   22  13:4,
   6,11
   21:1,13,
   23  22:7,.
   20  31:1

Coursey
   40:8,21
   41:2,7

court
   18:20
   37:9
   184:12

Courtney
   38:22

covered
   34:7
   120:25

covering
   58:25

crash  6:7
   13:11
   14:3,15
   23:1
   24:11,14,
   15  28:2
   30:6,20

crashed
   6:11

crashes
   6:10  7:24
   25:2
   32:18
   33:4

crashing
   6:6  24:11

crate
   85:22

Crawford
   91:21
   92:3,14

create
   143:22

created
   47:10
   126:7
   163:3

creating
   52:9

crest  44:3

criteria
   26:11

critical
   168:18

cross  83:2

crossed
   79:5  80:9
   82:21



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 60 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                           Index: crossing..department

crossing
  91:16
  94:12

crush  30:1
  122:24
  125:3
  128:5,16,
  17
  185:14,
  19,21

crushing
  85:25

cue  136:20

curb  60:4
  148:5

curbing
  146:1,18
  147:4,5,
  24,25

current
  131:11
  132:1

custom
  86:8

customarily
  140:25

cut  146:24

cutting
  9:25

CV  4:24
  24:2
  26:17

cycle
  162:11

_____
        D
_____

D-d-e-c
  130:9

damage

39:19
52:9,11
56:21
81:13
90:8,10,
15 128:16

dark  83:2

dash
  166:17

data
  13:11,12,
  14,19,21,
  24,25
  14:3,9,
  12,13,14,
  24,25
  15:2,4,23
  16:3,4,12
  29:15,16,
  23,24
  34:4,
  83:9
  100:5,6,
  20 123:1,
  8 124:2,8
  130:22
  131:7,23
  133:13
  134:6,7
  143:22
  156:18,
  20,21
  167:18,20

date  5:4
  125:1
  132:16,
  20,24

dated
  122:18,19

dating
  5:25

daughter
  91:22
  92:3,13

David
  183:9
  184:2

day  180:24

days
  132:22
  133:7,9
  162:12

DDEC
  130:1,6,9

dead  111:7

deal  21:14
  30:23
  34:7

Dean's
  84:9,12,
  16

death
  47:13,16,
  25 48:5

debris
  108:9

decelerate
  172:22

December
  83:23
  115:24
  125:23,25
  126:9,13
  128:6,12,
  14 161:22

decide
  136:21

decided
  87:5
  111:20
  172:8
  178:19

decimal
  152:8

decision
  72:2
  174:3,25
  176:6,7,8
  177:1
  179:10

decisions
  176:16

dedicated
  27:11

Deere
  43:23

defects
  91:10

defend
  88:11

defendant
  42:9
  87:13
  114:10

defendants
  114:19
  115:14

defending
  11:11
  79:22
  86:11

defense
  9:15,21
  11:4,10
  33:22
  34:23
  35:7
  39:13
  40:4
  43:18,20
  44:1
  81:19,23
  86:1 92:6
  113:10
  114:19
  115:4

defines
  177:21

definition
  46:4,8,9,
  11,21,22

deformation
  26:19

degraded
  137:4

degree
  8:13 9:12
  12:6 19:8
  30:19
  59:16
  65:18
  69:17
  92:9
  111:10

degrees
  36:10

Del  78:20,
  24 79:21,
  22

delay
  138:10

delayed
  44:6,9

delivered
  86:2,5,12

delivering
  86:6

delivery
  86:8

demonstrate
  14:21

demonstrati
ve  183:23,
  24

department
  7:12,18



Case 5:12-cv-00147-MTT · Document 61 Filed 07/30/14 Page 61 of 94

BRIAN BOGGESS, SEA                    October 31, 2013
LITTLE vs. McCLURE              Index: depends..Divide

depends           184:3,18,      developing      55:9,          98:14,24
  47:14            22,24           23:15,19        166:12       distance
  61:22           185:1          development     direct          15:19
  118:4           187:3           7:21 23:1       88:4           16:1 44:7
  120:17         depositions      24:10           100:5          54:22,25
depiction         78:14           26:18         direction        56:6
  147:6           115:23         develops         43:25          58:8,11
deployments       116:7           47:14           78:22          63:17
  28:3            117:13,        device          79:1           65:20
deponent          18,19           106:11         128:6          71:10
  4:8             162:5          devices        directly         75:13
depose            163:2           13:15           14:1           92:21
  183:11         derived         devoted          21:10         111:25
deposed           137:7           11:11           61:14         136:6
  114:16         descent         diagnostic     disabled        137:17
deposition        55:17           131:3           40:22         151:25
  4:3,5,9,       describe         diagram        disagree       152:13
  17 37:11        156:5,6         148:24          11:14         155:21,22
  38:20           180:5           164:6,8,        147:6         165:2
  39:15          describes        12 166:21       149:21       distances
  40:6            65:1            167:3,7        disagreed       119:17
  41:17          description     diagrams         115:9        distracted
  43:21           72:18           124:19         149:17         95:10
  78:16           82:14           167:6         disagrees       96:22
  79:25          description     dictated         169:7         105:17
  80:21          s  122:23        59:8          discovery       106:4
  82:11          design          die  175:16      118:18       distraction
  83:15           91:1           Diesel         discuss         104:17
  84:8           details          130:9          20:12        distraction
  89:15           26:13          difference      168:19        s 101:10
  93:16,18       detected         155:18        discussed     distributio
  114:7,13,       107:17         differentia     19:6          n 111:13
  18,22          determinati      l  69:15       20:14        district
  117:3          on  54:2         80:2           71:12          37:24
  134:13,        determine        154:9          130:15       divergence
  14,16,24        25:16           155:20        discusses       160:24
  135:1,4,5       27:14           156:13         171:1        Diverted
  138:2,          170:9,16       difficult      dispatch        108:10
  18,20           174:23          71:11          102:22       diverting
  163:17,        Detroit         dimension      dispute         96:2
  20,22           130:9                          68:1,4       Divide
  168:15                                                        110:9
  176:18
  183:4,9



division
  6:20 7:16

document
  149:21,23

documentati
on   22:13
  25:5
  120:17,19

documents
  118:19

door   51:16
  174:7
  177:6
  178:7,13

dots
  145:19

doubt
  117:16

Douglas
  80:4,5,8

downgrade
  87:20

downhill
  84:5

download
  131:16
  132:17

downloaded
  123:4,6
  132:21,23
  133:12

downloading
  134:4

downloads
  131:25

drag   76:3
  109:20,22
  111:16
  151:14

dragged

53:10,14
58:7,14
75:11
109:17
110:11,22
111:7
175:9

dragging
  73:16,17
  75:15
  109:24

drain
  144:19

drawing
  19:22
  54:24
  55:1,7,9,
  16,19,22
  56:7,8
  124:13
  127:14,17
  128:1,9
  136:2
  142:20
  144:1,3,
  8,10
  146:11
  148:2,12
  149:7,13,
  17 166:24
  167:1,9

drawings
  20:8,10
  55:4,5
  124:16,17
  126:7,23
  141:22
  142:5
  145:10
  168:5
  184:24

drinking
  44:13

drive   53:6

71:23
84:11
96:22,23
109:5
143:4

driven
  38:25
  123:16

driver
  42:6 45:7
  48:20,21
  56:14
  91:25
  92:2
  94:9,21
  103:22
  104:7,24
  106:15
  170:7
  182:5

driver's
  173:21
  174:6,16,
  21,25
  179:18
  180:6
  181:5

drivers
  48:22
  76:8
  94:24
  168:22
  169:5
  171:3
  182:16

drives
  40:21

driving
  46:17,18,
  21 91:18,
  23 92:14
  97:3
  104:18
  105:17

156:3

drop   79:4,
  11,15

dropped
  116:15

drops   57:6

drove
  173:12

drug   75:13
  109:22
  111:12,14
  181:16
  182:17

due   19:17
  90:1
  120:25

duly   4:11

dump   38:24

duties
  23:11

duty
  106:15

DVD   17:9

dynamically
  57:8

dynamics
  6:7 14:15
  21:6,9
  25:10
  30:21,24
  40:11
  79:17
  83:10

―――――――――
     E
―――――――――

E.d.c   21:3

ear   97:24

earlier

131:16
153:5,6
158:5
160:18

early
  82:25

ease   41:24

easier
  153:25
  155:4
  159:8

easily
  134:1

East
  89:17,19
  112:24

ECM   83:9
  123:1,4,
  7,10
  124:2,8
  132:17
  133:12,14
  184:25

EDC   14:15

edge   56:4
  60:3,4
  79:2,4,
  10,15
  139:10
  154:16
  160:3
  164:21

education
  31:8

effect
  105:3,23
  140:15
  153:21
  169:24

Effective
  31:24
  34:4



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 63 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                    Index: Effectively..EXAMINATION

Effectively       83:25          22:12          136:5,8            6:7
  163:9          employer        23:6,13        152:24
                  86:9           24:3                           evaluation
efficacy                         46:24          equipment         6:7 29:16
  96:7           enclosed                        39:24           37:17
                  56:25          engineering     90:20,21        81:14
efforts                           9:1           91:1
  34:19          encompassed      22:15,17                      evaluations
  124:18          125:6           33:8          ES   185:25      5:25
                                  34:16                          29:23
eight-           end   16:19      36:11,12      escapes
  79:3            17:7            55:17          92:4,14        event
                  40:19                          160:5           123:15,21
elbow             47:24          engineers                       130:17,23
  28:20           53:19          7:16 21:7      essentially      132:15
  29:3            54:23          22:5           41:1 44:2        134:8,10
                  58:24          35:17,21       47:21
Electric          59:8          36:17          79:24           events
  80:4,5,8        84:14          135:8          87:23            124:5
                  157:24                        92:20           130:15
electronic        166:2,16      enter   87:5   136:5            176:10
  13:12,13        185:14,19      88:1           139:19
  29:15,16                                      145:11          eventual
  34:4           ended   99:3   entered        158:24           175:4
                  103:17         60:7
elevator          137:14                       established      evidence
  36:5,21         172:16        Enterprises     64:13           33:24
                                 113:11,14      68:20,24        41:2
email            ends   47:22                   107:2           50:21
  126:14          84:12         entire                          53:24
                  172:24         27:11         Estes            54:5,18,
emergency                        183:17         85:6,7,10       19 68:5
  45:8,14,       enforcement                                    76:6
  22,24           21:17,21      entitled       estimate         77:4,10,
  46:1,4,8,       22:6           5:13 15:5      55:18           13 80:11
  16,18,21                                      77:6            93:7
  47:5           engaged        entrance                        119:4
  112:19          147:19         60:7          estimated        147:2,14
  171:3,5,                                      77:9            169:19
  10,12,19       engagement     entrapment      144:17
  176:12          128:10         179:11                        exact   10:3
                                               et al            11:5 32:3
emphasis         engagements    entrapped       78:20           46:4
  140:12          19:18          52:2                           98:10
                                 176:7         evaluate         147:11
emphaticall      engine          179:16         36:18           159:16
y   140:2         91:8,9,11                     39:8            163:1
                  130:9         environment                     165:24
employed                        s   27:23      evaluated        168:1
  23:12          engineer                        24:12
  117:19          5:7 6:16,     equation        48:14          EXAMINATION
                  21 18:14       152:11
employee                                       evaluating
  19:9 82:4      equations



4:12

**Excel**
155:24
162:17

**excerpts**
185:17

**excess**
41:3 94:4

**excessive**
79:10

**excessively**
79:3

**excuse**
48:10
57:17
61:19
158:15

**execute**
89:1

**executed**
41:3
46:14

**executes**
106:11,12

**executing**
94:9

**executives**
12:11

**EXH** 4:24
15:17,19,
21,23
122:13,15
127:3
128:22
135:1,15
142:16
148:24

**exhibit**
5:2 13:3
14:23
37:10

93:17
122:8
126:25
128:21
130:5
135:14
167:2

**exhibits**
93:19
183:24,25
185:7

**expansion**
81:11

**experience**
137:23

**expert**
36:9
44:14
45:10
104:4,9,
16 181:10

**explain**
16:20
135:23

**explanation**
97:9

**exposure**
90:14

**exposures**
27:10

**express**
40:9
85:6,7
140:25

**extends**
178:9

**extent**
9:13
93:25
118:21
127:18,22
128:7,10,

163:24
183:5

**extra**
152:7

**extremity**
28:16,19
80:16

**eye** 44:24
88:7
155:9

**eyes** 96:14

─────────────

─────────────
F
─────────────

**F-o-r-e-m-**
**a-n** 8:5

**face**
20:14,15
88:6

**face-to-**
**face** 20:17

**facility**
85:24

**fact** 26:19
39:2,8
43:15
44:20
49:24
50:11
52:7 62:4
76:15
77:25
107:13
121:10
134:8
136:15,16
137:19,22
140:14,15

**factor**
30:9 48:1
105:9
111:16

151:14

**factor's**
44:14

**factored**
19:5

**factors**
21:5
40:12
44:16,17
45:9 74:6
96:24
136:15

**facts** 68:7

**failed**
81:12

**failures**
36:13

**fair**
104:10,12
117:25
119:1

**Fairfield**
84:25

**fairly**
76:2
111:4
137:14

**fairness**
119:9

**fall** 42:22
43:7

**falls**
42:18
110:1

**familiar**
95:16
171:2

**Farah**
22:22

**Farms**

90:3,5,6

**faster**
63:20,24
65:6,22
73:7 74:3
153:22,24

**fatal**
40:23
79:7
84:15
90:20

**fatalities**
182:9

**fault**
74:12
115:10
170:17

**faulty**
108:19,24

**fear**
175:20

**fearful**
175:7

**features**
167:14

**February**
5:18
117:9,11
132:20
133:9

**Federal**
37:9 49:3

**fee** 9:8

**feel** 184:6

**feet** 39:21
55:20
56:7
58:8,14,
24 59:1,
4,8,20,23
75:12



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
Index: fell..form

| | | | | |
|---|---|---|---|---|
| 109:17,21 | 139:17 | **finish** | **focusing** | 55:14 |
| 110:8 | **file** 14:23 | 102:9 | 25:8 | 56:2,17 |
| 112:10 | 17:9,22 | **finished** | **fog** 41:23 | 61:7 |
| 133:20 | 20:2 | 136:5 | 164:21 | 62:12 |
| 137:18, | 55:1,5, | **fire** 89:20 | **folder** | 64:1,11 |
| 20,23,25 | 10,16 | **firm** 12:24 | 55:5,7 | 67:21 |
| 138:19 | 56:9 | | 126:15 | 68:10 |
| 139:15,19 | 93:19 | **firms** 9:1 | 142:1,4, | 70:19 |
| 151:8,11, | 136:1 | **fixed** | 5,8 | 71:9 |
| 12,21,22, | 137:4 | 155:21 | **folks** 8:24 | 72:10,22 |
| 23 152:2, | 142:22 | **fixture** | 22:22 | 74:4,13 |
| 14 153:12 | 148:12 | 36:14 | 32:24 | 75:2 |
| 154:15,25 | 163:2 | **flashing** | **foot** | 77:11,22 |
| 155:2,12, | 167:19, | 70:24 | 160:24 | 94:13 |
| 14,15,16 | 21,23 | 71:20 | **force** 52:8 | 95:5,12, |
| 156:12 | 168:8 | 72:7 | **forces** | 19 96:11 |
| 157:6,21 | 183:17 | 136:17 | 25:17,24 | 97:5,12, |
| 158:3,25 | 184:1 | **flat** | 27:15 | 20 98:8 |
| 160:18,21 | 185:8,10 | 137:14 | 39:25 | 99:6,16 |
| 161:6,7 | **filed** 91:6 | **flatbed** | **Ford** 35:22 | 100:11 |
| 165:23 | 139:8 | 43:23 | **Foreman** | 101:3,18 |
| 166:2,18 | **files** | **fleet** | 8:5 | 104:3 |
| 177:6 | 16:16 | 23:16 | **forensic** | 105:21 |
| 178:7,13 | 17:11 | **flew** 177:2 | 30:15 | 106:25 |
| **fell** 43:6 | 19:23 | **flooding** | **Forest** | 107:8 |
| **fellows** | 127:17 | 81:13 | 83:24 | 108:15,25 |
| 10:17 | 128:1 | **floor** | **forklift** | 109:18 |
| **felt** 108:7 | 163:3 | 42:16 | 36:14,21 | 110:14, |
| **Female** | 183:19 | 80:18 | 42:20 | 17,24 |
| 28:12,16 | **filings** | 81:12 | 43:3 | 112:6 |
| **females** | 128:3 | **Florida** | 113:7 | 116:19 |
| 28:7 | **final** | 135:7 | **form** 4:7 | 118:3 |
| **field** | 102:10 | **focus** | 13:22 | 119:6 |
| 44:20,24 | 145:4 | 22:25 | 21:25 | 120:12 |
| 126:23 | 173:2 | 25:12 | 25:20 | 123:18 |
| 127:3 | **find** 68:5, | 27:14 | 35:8 | 125:10 |
| **figure** | 12 100:4 | 90:15 | 36:23 | 126:1 |
| 111:19,22 | 109:16 | **focused** | 37:7 | 127:21 |
| 139:4,6, | 163:24 | 96:1 | 45:17 | 129:12,23 |
| 19 165:8 | 170:17 | 119:17 | 48:13,23 | 133:17 |
| 175:1 | 177:18 | | 49:12 | 134:5 |
| **figured** | **fine** | | | 136:25 |
| 114:24 | 118:15 | | | 140:4 |
| | | | | 148:3 |
| | | | | 149:19 |
| | | | | 152:7 |
| | | | | 166:10 |



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 66 of 94

BRIAN BOGGESS, SEA                    October 31, 2013
LITTLE vs. McCLURE                Index: formed..groups

167:4,17
169:3,16
171:6,20
172:1,11,
18
173:15,22
174:12
175:11,18
176:13,22
178:20
180:1,19
181:6,18
182:6,19

**formed**
93:20

**forward**
51:4 63:8
69:20
73:25
81:1
83:17
108:11
117:1
133:20
138:3
154:4
155:8

**foster**
12:8

**found**
115:2
170:18

**four-page**
130:21

**fourth**
29:22
81:12
143:6

**fracture**
29:3

**frame**
126:9
133:13

154:4

**Franklin**
85:12

**free**
111:15
178:25

**Freightline
r** 130:7
156:19
157:2
166:6

**friends**
92:18

**front** 4:21
50:19
51:12,19
53:7
55:22
56:12
71:13
80:10,11
125:21
128:2
137:21
138:9,21
142:9,22
160:1,4
168:12
172:9,25

**front-wheel**
53:6

**full** 6:11
11:3,7
23:21
147:3
164:20

**function**
28:11
110:20
111:11
132:7
174:14
179:21

**Functions**
28:15

_____

**G**

**g's** 137:11
158:17,23

**gaps** 68:14

**gas** 70:14
171:23
172:9

**gave** 33:13
82:14
117:22

**geared**
9:19 34:9

**general**
12:10
18:20
74:25
81:17
87:11
164:14

**generally**
59:12,24
60:20
82:10
180:13

**generate**
168:1

**generated**
161:23
162:4,10,
17,19
163:12
167:25

**gentleman**
42:12

**George**
82:23
83:3,9

**Georgia**
19:11
135:7

**gf** 156:11

**give** 27:5
32:25
35:4
37:22
55:12,17
105:4
116:3
121:25
141:19
150:7
161:13
163:12
168:11,17

**givens**
151:19

**giving**
145:2

**glass** 16:2
85:20,23
156:11

**global**
131:1

**GM** 35:22

**good**
156:17

**Google**
143:2,5,7

**gore** 62:1
64:17
68:21
166:8,13,
15

**Gotthold**
86:19,20,
24 87:1,
7,10,18,
25

**gouge**
144:17
165:22

**governed**
124:10

**grabbed**
142:21

**graduate**
6:1

**Grady**
89:16

**Grant** 8:5

**graph** 16:1

**gravity**
79:18

**gray**
144:15
156:20

**great**
46:11

**greater**
152:19

**green**
135:9
156:21
158:17

**ground**
143:3

**group** 9:7
11:4
12:14
31:11
32:1
33:7,14,
16 34:2,
3,6 35:14
145:5

**grouped**
143:13

**groups**



32:7,8,21
34:14,23
35:2

**Groves**
88:22
89:1

**Groves'**
88:24

**guardrail**
58:4
110:3
145:21,
164:22
174:1
177:6
178:8,9,
14 179:9

**guess**
16:15
37:2
46:25
56:3 57:8
77:24
90:21
119:13
146:11
151:19
155:6
162:20,25

**guy** 6:21
7:5,10

**Guys** 8:4

---

**H**

---

**H-v-a-c**
90:4

**halfway**
64:16
147:20

**hand** 41:2
106:11

129:2
130:16
135:23
150:6
177:3

**handed**
124:22
141:25

**handful**
20:20
32:6
133:20

**handing**
122:18

**handling**
21:8

**hands**
106:10
160:17

**handwritten**
126:20

**Handy**
42:14,25

**hang**
100:3,18

**hanging**
74:1 87:4

**happen**
139:1
140:21

**happened**
24:18
25:17
51:23
56:11
71:7
72:18
90:24
101:14
109:6
113:9
119:17

133:8
169:22

**hard** 29:23
30:8
123:12,
19,21
124:5
130:14,
17,23
131:5,7,
9,10,17
134:8,10
171:24
177:3
178:4,10

**hat** 74:1

**hauling**
42:16

**hay** 43:24

**hazard**
45:3,19
46:3,6,
12,15
47:8,10

**head** 79:6

**header**
132:1

**headset**
93:25
96:16
103:17

**hear** 11:6

**heard**
10:23

**Heartland**
40:9

**heater**
81:12

**heavier**
58:17

**heavy** 14:8
29:22
30:7 31:2
32:14
34:7,8,9
58:16

**height**
176:11

**held** 48:21
104:3,8
106:11
171:4

**helmet**
29:6

**helmets**
26:20
27:2,3,6,
9

**Hgnda's**
156:11

**Hickory**
101:16
102:4

**high** 40:22
79:3
137:5

**higher**
48:21
115:16
137:12

**highly**
41:25
44:6

**highway**
47:20
64:24
83:2
87:1,5,7,
8,22 88:1
144:13

**hill** 12:23
44:4

137:13

**hire** 77:17

**hired** 80:5
81:22
82:15
84:13
90:5,18
91:13

**hit** 50:12,
16,19
51:3,6,9,
19 56:12
71:22
77:21
103:2
108:7
146:23
161:14
171:23
172:9
177:2,
178:3,4,
10 180:7

**hits** 71:22

**hitting**
71:15
179:22

**hold** 35:23
97:2
104:16

**Holder**
113:23
115:3

**holding**
42:21
97:23

**home** 80:17

**Honda** 6:4,
5,10,17
22:24
23:6,12,
14 24:3,



20 31:14
35:22
60:25
62:23
65:16,20,
24 69:20
109:22
119:11
121:7
125:19
136:4
138:3,21
139:6,9,
16,23
140:1
145:12
146:19
147:3,10
148:4
151:12
152:9,13
153:18,23
154:9,15
156:9,22
157:2,5
158:12,25
159:12,20
160:4,5,
8,9,20
161:1,3,
9,16
165:1
166:7
170:1,3,7

Honda's
156:10

hooked
123:5

Hoose
86:25
87:6,9,
10,23
88:2,11

Hosse
86:19

host   35:24

Hotel
88:17

Hotels
88:19

hour   65:20
76:13
132:10,12
152:10,13
155:20
157:3
158:13
159:4,6,
15,23

hours
80:18
162:13,15
163:4
183:3

human
40:12
44:14
45:8

hundreds
6:13,15,
16 7:24

hung
75:20,21

Hunter
60:11,19
61:12,14,
17,18
62:5,6,8,
9 63:7,11
64:9
65:13
66:15
67:1,6,
20,24
68:6,18
69:1,24
72:8
73:1,6

74:7
76:5,11,
24 78:4
184:21

Hunter's
60:6,21
63:5
66:14
67:5,17
68:1 69:9
72:18

hurting
10:2

HVAC   36:14
90:4

————————————

I

————————————

I-16   60:8
62:19,21
63:14,20,
21,23
64:13,15,
20,22,24
65:21,23
94:16
166:7

I-75
94:11,18
166:8

I-85   40:7

idea
162:23

identificat
ion   4:25
15:18,20,
22,24
122:14,16
127:4
128:23
135:2,16
142:17
148:25

identified
181:20

idle   126:8

II   5:17

illustrated
164:14

image
156:8

imaged
130:6

imagery
143:2

images
14:22
15:1,2
16:18
17:6,8,12
143:19
156:5

imagine
181:1

imaging
131:12

immediately
46:19,23
63:17
100:3
158:20

impact
38:14
42:7
54:23
81:22
82:3
165:16,20
166:5
177:10,23

impacted
85:9
88:24

impacting

87:9
146:5,15

impairment
80:15

implies
99:22
102:18

imply
100:8,22

important
94:21,24
95:1
117:24,25
119:2
120:11
168:2

impression
60:21
61:3
152:17
164:22

imprisoned
52:16

improper
87:25

inattention
44:11
95:17,23
97:4,8

inch   132:2

inches
137:23

incident
131:10
132:2
133:1
168:23
172:20

include
10:17
171:25



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 69 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                        Index: included..involvement

included
  26:18

including
  35:25
  136:16

inconsisten
t  77:3,9

incorrect
  68:8
  140:24
  165:12
  169:5

increase
  140:18

increased
  137:3

increments
  17:5

indicating
  144:16
  145:18

indication
  73:6

individual
  124:15

individuals
  71:6
  114:1

industry
  23:24

information
  12:16
  25:1
  26:2,5
  97:17
  129:12
  138:23

initial
  19:17
  56:20
  57:5

71:12
77:18
114:4
126:5
129:17
165:16,
20,25
185:20

initially
  19:13,15
  41:23
  88:8
  109:4
  120:24
  136:2
  138:24
  152:10
  160:20

initials
  140:7
  141:5,11,
  12

initiated
  74:16,22

injure
  27:22

injured
  10:25
  11:6,12
  12:18
  26:12

injuries
  25:25
  27:14
  28:4,7
  29:6
  38:1,13
  39:25
  40:23
  43:7,15
  79:7
  81:3,24
  82:7,8
  83:22

84:15
85:25
90:14,20
165:5
182:4,16

injury
  25:8,12
  26:15,20
  27:21
  28:11,15,
  24  30:4
  33:9
  42:19
  43:8
  46:19
  47:12,16,
  25  48:5
  80:16
  87:11
  88:4,5,
  20,25
  89:22
  182:9,10

input
  57:13
  58:2

inputs
  14:23
  15:3,
  16:4  17:1
  57:12
  156:2

inside
  37:25
  154:1

inspect
  18:5,7
  118:17

inspection
  17:24
  18:3,4
  19:16,17,
  19  20:24
  120:4,11

121:1
125:19
142:5
185:2

inspections
  19:19

Instantaneo
us  47:1

instep
  50:19

institute
  27:8

insurance
  8:24
  10:18
  12:10
  31:9
  32:8,22

intended
  121:21

intending
  67:11

intention
  112:16
  136:17

intentional
  110:1

intentions
  121:23

interaction
  56:15

interaction
s  128:18

interacts
  30:5

interested
  11:25

interior
  88:6

internal
  23:19

internation
al  23:16

interplays
  28:2

Interpretat
ion  13:24

Interpretin
g  14:8

interruptio
n  23:7

intoxicated
  41:25

investigati
on  22:18
  36:4
  118:20

investigati
ons  30:20

invitation
  12:1

invited
  11:18,22
  33:15

involved
  5:21  8:25
  9:23  10:5
  23:23
  25:24
  28:17
  40:1
  81:25
  120:23
  125:17,
  22,24
  126:3
  130:7
  168:22

involvement
  125:13



126:18

**involving**
42:12

**IPTM** 135:7

**issue**
140:1

**issues**
18:18
30:11
40:13
79:18
83:5 84:7
164:12

**items**
108:23
162:21

———————
**J**
———————

**J-o-a-n-i-e**
134:21

**January**
117:9,10

**Japan** 7:2

**Japanese**
6:21

**Jason**
88:22

**jersey**
40:20

**Joanie**
134:21

**job** 6:5
7:18 8:8,
9,10
23:4,11

**John** 7:5,9
43:23

**join** 9:8
10:12

35:17

**Joint**
28:20

**Jordan**
86:19,20,
24 87:1,
8,10,18,
25

**judge**
136:18

**judgment**
175:23

**judgments**
176:11

**July** 43:10

**jump** 72:3
174:2
176:6
179:19,24

**jumped**
175:17
177:7
178:10,12

**jumps**
179:23

**June** 78:16

———————
**K**
———————

**KAM** 85:1,5

**Kathy**
102:7
128:24

**Kaylor**
91:4,5,9

**killed**
40:8 83:3
91:20

**kind** 16:18
17:6

38:10
41:22
46:23
47:2
58:3,4,18
60:3
70:12
73:19
75:16
85:23
94:17
112:13
132:7
135:22
139:18
148:16
155:9
162:16
181:10

**kinds**
155:5

**king**
154:25

**kingpin**
137:19,25
151:9
155:1

**kitchen**
80:18

**knew** 75:25
109:24

**Knott**
89:16

**knowing**
61:19

**knowledge**
20:22
117:6
130:11
135:24
183:5

**Kurt**
165:13

———————
**L**
———————

**lab** 6:1,
25:11
26:7
27:20,21

**labeled**
144:16

**lack** 176:7
180:16

**lacks** 43:8

**lag** 138:14

**laid** 80:17

**lane** 40:18
45:15,16,
18 47:4,
11,17,19
48:3,7,11
49:6,7,
10,23
50:7
54:21
59:15
60:8,17,
23 61:1,
9,14,21
62:11,14,
16 63:21
64:13
65:23,25
66:16,22
67:11
68:20
70:17
73:4
74:20,24
75:6
84:10,12
94:16,17,
19,23
95:3
101:7,8
103:23

105:1,25
106:20,
21,22,24
107:3,6,
11 108:21
119:12,
13,14
136:19
138:7,8,
11 139:7,
9 151:16,
17,20,21
152:2,6
154:13,14
157:7,8,
25 160:24
164:20
166:7
169:10,
180:15

**lanes**
68:24
94:11,23
95:3
105:18
146:9

**large**
85:22
90:9

**Larkins**
112:22

**laser**
22:21

**lateral**
157:5

**laterally**
80:13

**Laura**
165:13

**law** 21:17,
21 22:6



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
Index: Lawrenceville..Lumber

Lawrencevil
le 19:11

lawsuits
9:15

lay 92:21

laying
127:16

layouts
128:9

leading
79:15

leak 90:5,
8

leap 175:8

leave 35:4
96:20
148:19
174:24
183:21

leaves
180:6

left 40:18
43:24
44:2
51:12
52:11
56:12
57:19
63:21
65:23
71:22
80:12
83:25
84:10,13
91:19
101:7
105:25
107:10,14
108:8
111:14
134:7
145:11

155:10
159:1
160:4,19
169:10
173:21
174:16,20
176:21
179:16,18

leg 126:5
129:17

legal
106:23
107:1

length
138:19
139:16
151:7,8,
10,11
153:6,11
155:1
167:12

lets
161:13

letting
70:14

level
143:3
171:4

liability
33:10,24
36:6,22
88:17

licensing
48:25

life
131:14
175:8

light 70:6
78:2,3
136:17
145:15

lighter
58:17

limited
5:7 9:10
128:9

Lindsay
134:14

Lindsey
29:10
184:22

linear
152:5

lined
92:23

lines
85:6,8
144:14
166:17

list 16:3
30:14
112:21
114:20,22
115:16
116:15,24
117:3

listed
5:14 9:4
115:1,8
132:3

listen
35:3

lists
101:23
129:15

literally
133:25

litigation
8:21,23
9:4,11
10:10,18
11:10,11

12:4

Little's
47:4,11
48:3
49:10
50:8,20
51:3,20
52:2,9,
12,21
53:9,16,
21 54:14
57:6
59:15
61:9,20
66:6
67:1,3,16
69:10
74:12,21
77:14
107:6,20

Littlefield
86:14

load 86:5
87:2,4,25

loading
27:23,25
28:1,12,
19,20
33:9 43:4
87:3

loads
86:10

location
92:15
147:4,5

lock 112:8

log 98:22
156:21

logo 144:5

logs
132:1,2

long 11:16
45:2,4
55:25
155:20
182:2,3

longer
71:14
155:22

looked
16:11
100:19,20
101:5
107:22
109:9
125:6
148:14
157:12
166:25
167:21
177:5
178:6,12,
15 181:7,
22

loose
174:15
179:22,23

Lorraine
134:14
184:18

lost 79:4

lot 27:6,
10 34:7
35:24
52:9 84:1
127:14
135:21
163:6

lower
56:24
80:16

Lumber
83:16,18,
20



lunch
  102:12,14

M

machines
  36:16

made  11:12
  38:10
  82:5
  83:18
  101:7
  102:4
  105:25
  122:2
  139:7
  148:11,13
  149:3
  153:9
  161:25
  167:2,13
  168:5
  172:10,15
  173:1
  174:3
  176:11
  177:1

Magic  40:2

magnifying
  16:2

magnitude
  112:15
  128:17

main
  170:10,11

maintained
  158:13

maintaining
  57:22
  79:10

maintains
  58:1

160:10
162:18

majority
  162:8
  170:25

make  54:2
  59:14
  94:17
  150:3
  152:6
  157:16
  169:9
  171:18
  174:25
  180:15

makes
  23:14
  37:24
  40:18
  70:22
  176:3
  179:10

making
  10:1
  31:24
  37:23
  43:24
  57:9  72:2
  73:15
  84:10,13
  103:23
  136:17
  138:7,8,
  16
  152:22,25
  172:17
  174:20

man's
  143:3

manage
  11:1

Management
  8:21  9:4,
  11  11:10

12:4

manager
  7:9,10

managers
  6:20
  10:18
  12:9
  32:22

managing
  9:19,20,
  24

maneuver
  56:14
  75:18
  89:4
  94:10
  106:12
  112:19
  119:12
  139:22
  157:11
  159:16,17
  160:14,23

manner
  69:7
  90:24
  159:11

Manual
  181:5

manufacture
r  89:17

mapping
  22:19,20,
  21

March
  125:19,24
  129:11
  132:19
  133:3,5

marches
  17:4

margin
  158:8
  159:1,10

Marine
  89:17,19

mark
  122:12
  126:24
  130:4
  134:23
  135:13
  137:10
  141:22
  142:11,
  12,14
  144:15,16
  145:8,11,
  15  165:22
  168:2
  185:23

marked
  4:24  5:2
  13:3
  14:22
  15:17,20,
  21,23
  122:7,13,
  126:16
  127:3
  128:20,23
  130:1
  135:2,16
  142:4,16
  148:24
  185:6,22

marker
  70:6,24
  155:7,9

marketing
  32:24
  34:19

marking
  128:25

markings
  135:18,23

marks
  51:10,21
  56:23
  58:10,12,
  13,16,17
  59:20
  145:25
  146:18,
  20,21
  147:5

Marriott
  88:16,17,
  18,20

match
  33:24
  132:18

matched
  65:11

matching
  123:13

material
  17:22
  86:12
  135:6

materials
  14:20
  20:8
  127:13
  185:12

math  99:8,
  9  101:21
  139:19,22
  151:6
  152:22
  153:5

Matt  8:4

matter
  81:8
  119:9
  174:10



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
Index: Max..merge

Max  39:1,5
maximum
 111:25
 112:4
 161:5

MCARTHUR
 4:13 5:1
 14:2
 15:14,25
 16:5
 23:10
 24:8 26:1
 35:13
 37:4,8
 45:21
 48:19
 49:1,14
 54:10,12
 55:15
 56:10
 57:18
 61:8
 62:18
 63:3
 64:4,19
 67:25
 68:16
 70:20
 71:16
 72:12 ·
 73:5
 74:10,14
 75:5
 76:23
 78:8
 95:7,15,
 22 97:1,
 7,16,25
 98:13
 100:7,12
 101:20,24
 102:9,13,
 25 104:8,
 15 105:14
 106:2,17,
 19 107:4,

12 108:18
 109:7,19
 110:15,19
 111:1
 112:20
 116:21
 118:6,12,
 24 119:23
 120:1,15
 121:25
 122:4,9,
 12,17
 124:1
 125:15
 126:11,24
 127:2,5,
 24 129:4,
 6,9 130:3
 134:12,23
 135:3,13,
 17 140:5
 141:22,24
 142:10,
 14,18,23
 148:9
 149:4,12,
 25
 150:10,
 12,24
 163:16,23
 165:3,7
 166:14
 167:8
 168:4
 169:12,17
 171:9,22
 172:2,14
 173:4,17
 174:8,13
 175:14,22
 176:14,23
 177:18,20
 179:1
 180:4,22
 181:9
 182:1,14,
 22 184:9,

 15,16
 185:25

Mcclure
 47:4,11
 48:10,20
 49:5,9,
 15,16
 50:7
 61:19
 63:6,11
 66:25
 67:4
 74:20,23
 93:20
 95:2,8
 97:9
 99:2,25
 101:6
 102:17
 103:21
 104:11,23
 107:5,9,
 13,19
 118:1
 119:3
 134:15
 169:1,6,
 9,14
 180:17
 181:15
 184:19

Mcclure's
 52:3
 60:10
 66:6
 93:13
 100:8
 103:25
 108:19

Mccray
 113:1

Mcdonald
 81:18
 82:14

Mcgomery
 82:13

meaning
 13:25
 115:17
 173:8,12,
 13

meaningless
 120:14

meant
 141:8,9,
 17,20

measure
 55:11
 166:20

measured
 137:22

measurement
 19:24
 168:1,9

measurement
s  18:25
 19:1,4
 25:15
 122:24,25
 154:24
 167:11,14
 168:6

measuring
 56:5

mechanic
 40:15

mechanical
 36:10,12,
 13,17
 39:22
 55:17
 81:14
 90:25

mechanism
 43:8

median
 40:20

medical
 80:19
 81:13

Meece
 43:12,15

meet  23:18

meetings
 9:2 10:15

member
 35:14

members
 9:22
 10:17

memory
 71:5
 108:19,23

mention
 12:18

mentioned
 7:7 13:5
 14:11

merge
 49:5,9,17
 57:22
 59:15
 60:16,23
 61:25
 62:16
 67:11
 68:22
 69:12,15
 70:4,10,
 13 73:24
 74:23
 75:4,
 94:11,18
 107:10
 170:1,2
 176:9



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 74 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                          Index: merged..necessarily

merged
  47:17
  48:3
  49:23
  50:7
  67:14
  74:20
  75:6,7,9
  106:21
  164:25

merging
  45:15
  47:11,19
  48:11
  50:17
  62:3
  63:15
  65:9
  68:23
  71:15
  87:22
  94:12
  101:7
  107:6
  140:17
  164:25
  172:8
  180:25

messages
  92:23

met   20:12

metallic
  145:22

methodologi
es   26:19
  30:21

methodology
  21:16
  30:15,16

middle
  80:24
  119:13
  151:21

Middlebrook
s   116:18

mile   87:19
  110:8,10,
  132:11
  154:8
  155:20
  159:23

mileages
  132:18

miles
  65:20
  76:13
  131:11,
  13,18
  152:10,12
  157:2
  158:13
  159:4,6,
  15

military
  26:21
  27:24
  78:23
  79:9

mind   35:1
  118:11

minor
  90:14

minus
  137:18

minute
  93:8
  133:15
  150:25

minutes
  92:16
  93:1  99:4
  100:1
  101:16
  102:5
  105:1

mirror
  107:15,22
  108:4,8
  109:9,12,
  15

mirrors
  66:8,11
  105:12
  107:24,25

misjudge
  109:2

misjudged
  109:3

missed
  48:16
  50:1,3
  62:2
  105:10
  108:22
  109:3
  161:7,16
  180:21

missing
  159:20

mission
  10:6
  11:3,
  12:7

missions
  12:8,14

misstepped
  43:5

misstepping
  42:23

mistaken
  113:22

Mitchell
  85:13

mitigation
  25:12

Model

126:7

modeler
  122:23
  144:22

modeling
  128:9
  185:16

modificatio
ns   153:9

modules
  13:13
  34:4

Monnett
  12:24

month
  116:22
  133:7,10

morning
  82:25

Mosley
  84:11

motion
  58:5

Motor   49:3

motorcycle
  43:25

motoring
  23:25

move   57:9
  61:1,2,5
  65:25
  66:1
  70:2,12
  73:3,7,12
  132:11
  152:5
  154:1,3

moved
  61:11
  66:18

76:6
  123:22,24
  133:2
  139:9
  160:20

movement
  43:3

movements
  59:25
  76:10

moves   38:9

moving
  16:22,24
  57:3  60:1
  73:13
  76:9
  80:12
  153:22,
  23,24,25
  154:2
  175:9
  180:7

multiple
  6:20  47:7
  57:1
  89:16

Mutual
  82:13

- - - - - - - - - - - - -
          N
- - - - - - - - - - - - -

narrower
  38:8

NC   33:18

NCADA
  33:17

necessarily
  12:1
  46:10
  74:16
  125:12
  146:21



147:4
183:18

**needed**
45:23
111:20
112:2
167:25

**negligence**
89:12

**neighborhood**  56:6
58:11

**Neumag**
90:18

**Nicol**
78:20,25

**Nicols**
79:6

**night**
41:20

**nighttime**
84:9

**nine-inch**
79:3

**Nitza**
26:3,9

**North**
33:14,21
94:11
101:16
135:6
181:4

**Northern**
26:10

**Northwestern**  5:11,18
13:5 22:3
116:12
117:8

**nose**

153:10,20
154:24
158:25

**notary**
4:22

**note**
125:13
137:15,18
144:21

**noted**
138:4
144:17
167:16

**notes**
126:21,23
127:3,6,8
139:2
142:5
149:21
167:22
185:3

**notice**  4:5

**noticed**
129:2
177:4
178:5

**noting**
137:5,24
146:17

**November**
116:3
117:8,10

**number**
6:13 9:23
13:3
21:13
28:8
32:20
36:11
37:10
55:2,12
77:5
95:21

96:24
112:9
124:11
126:25
128:21
129:10
130:24
131:1
135:14
137:6,25
142:11,15
143:16,17
144:7
163:1,3
165:24
167:2,5

**numbered**
143:15

**numbering**
130:20

**numbers**
21:23
46:24
130:25
139:1,4,
15 143:21
153:12
154:5,20
157:18
168:16,17

——— ———
O
——— ———

**object**
13:22
21:25
24:6
25:20
35:8
36:23
37:7
45:17
48:13,23
49:12

55:14
56:2,17
61:7
62:12
64:1,11
67:21
68:10
70:19
71:9
72:10,22
74:4,13
75:2
76:14
77:11,22
94:13
95:5,12,
19 96:11
97:5,12,
20 98:8
99:6,16
100:11
101:3,18
104:2
105:21
106:25
107:8
108:15,25
109:18
110:14,
17,24
112:6
116:19
118:3
119:6
120:12
123:18
125:10
126:1
127:21
129:1,23
133:17
134:5
136:25
140:4
148:3
149:19
166:10

167:4,17
169:3,16
171:6,20
172:1,11,
18
173:15,22
174:12
175:11,18
176:13,22
177:17
178:20
180:1,19
181:6,18
182:6,19

**objection**
105:6

**objections**
4:5,6

**objects**
155:19

**obliviously**
146:19

**obstruction**
66:5,12

**occupant**
23:21
30:5

**occupied**
49:6
107:11

**occupies**
153:14

**occur**
46:20
182:16

**occurred**
17:25
37:21
52:1
99:15
100:13
121:1



131:17              officer's        58:21           order             overlap
132:21               145:2           69:4 71:2        22:7,11           100:23
133:22                               82:8             23:17
165:17             officers          93:20            27:25           overtake
173:24               21:22           105:2,5,         111:8             69:2
                     22:14           13,16,19         118:25
occurring            123:25          106:7                            overtaken
 166:7                               140:22          organizatio        65:2
                   offtracked        169:8           n  8:23
occurs               38:6            170:19           9:14,24         overtaking
 121:1                               175:10,12        10:4             63:7 65:1
 159:3             offtracks                          11:11
                     37:24           opinions                         overtook
October                              19:3            original          60:10,11
 37:11             Oklahoma          100:21           142:13,14        62:21,24
 115:25              37:14           104:6            161:9            63:21,23
 116:1,3,                            107:2                             65:22
 5,8,23,24         older             119:16          originals         69:5
                     123:20          165:4            128:25           72:19
odd  112:9                           170:12           142:2,9
 156:12            on/off            182:13           150:7           overturned
                     57:2            183:14                            85:24
odometer                                             ounce
 131:11,19         one's            opportuniti       149:9           overwritten
 132:1,2             140:16         es  11:24                          134:1
                                                     outer
OEMS  35:21        ongoing          opportunity       56:21          Owens
                     47:5,8,10       41:5 46:7                         89:14,16
Oerlikon                             170:15,23       outfitted
 90:12,17,         open  42:16       173:2            78:22          owned
 18,20               168:8                                            91:21
                     174:7          opposed         outline
offer  36:3          179:24          12:1            74:18           owner
 66:12                               42:22                            91:22
 121:16,18         opened            140:20         outlined
                     179:9           145:1           119:16         ─────────
offered                                              139:7              P
 36:8             operated          opposite                       ─────────
                    38:25            78:22          output
offering            78:23                            16:15          P-6  129:21
 100:21             79:21           optical          17:11
 107:1              83:3             70:21                           p.m.
 182:13                             option          outputs          119:24,25
                  operating          97:15          14:24            187:3
office              43:22            107:18          15:4
 102:18             82:4 85:8                                       P4  122:12
 124:21                             options         outputting
                  operation          101:8          183:19         packet
officer             42:20            141:19                          185:17
 22:18                                              outs
 102:22           opinion                            143:21        pages
 134:15             38:13                                            125:6
 184:18             39:10,12                        overhead         130:21
                    44:10                            55:8            144:4
                                                                     161:8



167:6

**paired**
26:10

**pallet**
42:13

**panel**
10:14

**panels**
85:23

**panic**
75:17
112:18

**paper**
29:25
30:3,14,
16 44:21

**papers**
28:8,11
29:1,15
30:23
95:21
184:25

**parallel**
62:16
138:6
158:5
161:1

**parameters**
17:2,3

**parenthesis**
136:11

**parked**
133:10

**parking**
84:1

**part** 5:22
9:4,6
10:9
11:15
13:17
15:2

24:10,23
38:4
50:11
51:9
64:24
73:25
84:23
94:18
104:4
149:2
163:20
167:25
175:23

**participate
d** 10:14
18:2

**parties**
11:12
12:9,18

**partnered**
26:8

**parts**
89:13,18
90:2

**party** 11:6
79:8
85:16
86:1,16

**pass** 61:10
67:6
121:10

**passed**
60:11,22,
24 61:4,
12,17
62:14,22
64:5,7
65:15,23
66:18
72:25
73:1,10
77:1
178:8

**passenger**
34:8
38:2,11
48:22
50:24
51:16
80:1
82:24
159:14
177:6
178:7,13
179:24

**passing**
60:16
61:4,5
62:10
63:11
64:9
65:18
66:14

**past** 70:12
73:13
76:6,9
115:18
121:2
181:23

**path** 38:8
58:1 59:9
80:13
160:10

**paths**
147:3

**patterns**
26:15

**pavement**
79:2
144:14

**pay** 94:25

**paying**
94:22
95:2

**PDF** 17:9

**pedestrian**
23:21
41:19,21,
22,24
42:6,7
82:24

**pending**
88:14

**people**
7:17
9:21,23
96:8,20
137:7
171:18,21
180:25

**People's**
77:7

**perceive**
45:2
106:5

**perceived**
70:17

**percent**
63:13
114:18

**percentage**
27:1,5,
36:19
114:24
115:12

**percentile**
28:16
137:7

**perception**
44:20
47:1
81:25
84:7
87:24
89:1,8
91:24
108:16
136:10,

14,23
158:22
160:1
161:11
175:2

**perceptiona
ry** 40:12
41:4 42:5
151:13
152:19

**perfectly**
138:15

**perform**
118:19

**performance**
24:13
91:8

**performed**
151:4

**period**
26:23
133:10
146:11
181:16

**Perry**
85:12

**person**
25:15
36:4 96:6
120:7
123:5
175:8
182:2,3,4

**person's**
88:9

**personal**
84:1
88:20
89:22

**personally**
6:12
17:20



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
Index: personnel..PLF

19:13
120:9,10

personnel
22:6

persons
22:4
26:12

perspective
22:17
176:15

pertain
5:14

pertaining
123:10
131:20

pertains
124:7

Peter's
145:1

Peters
18:10
19:7,18,
20 20:9,
12,16,23
120:20,25
121:11,
16,19,21
122:20
124:17,
21,24
125:7,17
126:5
127:7
128:15
129:21,25
137:22
142:21
143:20
147:7
148:1,10
149:7
165:10,11
166:23

167:10
185:3,15

Peters'
18:12
20:2
129:15
145:10
154:23
166:24
167:1,22

pgsition
156:11

phases
47:7

phone
20:15
57:7
91:25
92:7,13,
18,19
93:2,5,6,
7,14,21
94:2,4
95:9,11,
18,24
96:10,16,
25 97:3,
14,18,23
98:2
99:3,10,
11,14,19
100:9,16,
25 101:1,
15
103:11,25
104:6,10,
17,24
105:3,8,
18,20,24
118:1
119:4
126:17
177:2
181:3

phones
96:8,20

photo
122:23
124:22
126:7
128:9
143:22
144:7,22
185:16

Photo-01
143:15

Photo-11
143:15

photogramme
try  19:23
125:4
143:19

photograph
166:18

photographs
25:15
54:4,6,18
55:3
124:20,23
126:6
143:20,
23,24
144:20,
21,24
145:1
165:11

photos
20:2,5
122:25
124:19
142:16
143:8,10
144:22
184:21,22

physical
39:23
54:19

68:5
77:4,10,
12

physically
55:11

pick-up
80:3

picked
39:21
133:13

pickup
43:12

picture
10:9
145:6
146:8,15
147:7

pictures
19:23
20:1
128:4
145:5

piece  51:2
90:20

ping  98:20

pinned
110:16,22

place
36:18
85:21
99:13
103:10
112:12
138:4
147:9,15
152:8
155:12

placement
63:12

places
69:24

74:7 78:4
97:23
151:11
173:7

plain  63:6
64:9
66:16,25
67:4

plaintiff
86:22
87:15
88:23
114:8,15,
25 115:1,
4,17
126:25
128:20

plaintiff's
5:2 9:18
37:10
130:5

plaintiffs
10:25
12:21
89:16,21
115:13

planning
104:11

plausible
95:9,14
97:15

play  9:10
152:25

playing
160:22

plays  12:3

plaza
81:13

PLF  4:24
15:17,19,
21,23
122:13,15



127:3
128:22
135:1,15
142:16
148:24

plot
130:23
155:24

plug  152:7

plumbing
36:14
81:7,9,
10,14

pneumonia
90:5,7

point
10:16
13:19
16:16
50:23
52:14,15,
21 53:1,
9,22
54:23
60:15
62:1
64:8,
66:17,19
67:13
68:3,21,
24 69:13
73:14
77:15
93:19
102:8
104:4
108:3
111:20
125:12,13
134:2,3
138:16
145:2
146:14
147:12,22

148:6,8
149:6
151:25
158:1,12
159:19
164:16
166:8,13,
15 167:12
169:21
172:5
173:23
174:9,24
175:1
176:2
178:24
179:5
180:12
181:13

pointing
145:17

points
147:1
148:17
167:20
168:9

police
22:9,17
54:6
144:20,23
184:22
185:18

portion
50:14
51:4,15
134:17

position
8:10 67:7
77:14,
144:18
147:11
148:6
153:20
155:7
156:10

157:4,5,6
158:2,3

positional
105:11

positioned
83:6

positioning
60:2
172:4

positions
69:19
74:9
147:13
148:17
155:23
170:21

possibly
183:19

post  10:12
138:20

potential
29:20
30:4
38:19
47:12,16,
20 48:4,
7,8 115:1
119:19

potentially
96:4
111:15
117:22
171:15

potentials
124:11

pounds
111:4

Power
82:23
83:3,9

Powerpoint

128:3

Powerpoints
185:14

pre-sunrise
83:1

preceding
92:16,25
93:8
94:18

precursors
22:12

predepositi
on  139:17

predict
160:2

premises
33:10
36:6,22
88:17,20

prepare
124:23
183:12,23

prepared
183:13,
14,24

preparing
124:19

present
18:4

presentatio
n  33:1,3
35:4

presentatio
ns  21:14
34:18,22,
24 35:6

presented
46:5,12

presents
45:19

preserve
134:7

presume
126:4
143:11

presuming
141:9
153:17

pretty
70:22
71:18
94:10
126:8

prevention
28:21
30:2

primarily
9:15

primary
22:25
27:17,19
90:14

print
124:23
132:24

printed
129:25
130:19
131:2
132:25
149:23

printout
55:10

prior
19:18
41:4
44:13
48:11
90:23
105:1
114:16
115:19



BRIAN BOGGESS, SEA                                October 31, 2013
LITTLE vs. McCLURE                        Index: problem..questions

116:17          129:11          76:20           purchased       57:11
117:14          professiona     93:10,13          90:22         138:21
131:18          l  35:15        97:17                           153:7
138:17,18         48:20         98:4            purpose
147:1                           118:18            11:8          _____
166:8,12,       professiona     127:13
13              ls  10:19       142:22          purposes             Q
                141:3           166:23            7:22
problem                                           19:24        qualified
  164:1         profiles        providers         137:1          45:9
                  125:3           12:12           139:24
problems          128:5                           149:15       quantify
  100:17          185:14        pseudo            164:14         175:21
                                  38:21           168:3,18
Procedure       program           39:16                        query  37:9
  4:4             16:25                          pursuant
                  122:23        public            28:24        question
proceeded                         24:1            118:22         23:9 24:7
  61:2 66:1     project           135:7                         39:1,22
                  5:7 18:14                       pushed         46:6,13,
proceedings       119:1         publication       110:6         23,25
  23:7            125:12        s  29:8,11                       54:13
                  128:22         30:10           pushing         64:15
process           129:12                          55:24         67:22
  42:17           143:17        published                       68:11
  68:23                          30:1            put  12:17      77:8
  70:13         promoted         44:21            17:9,18        78:10,12
  180:7           8:12                            21:7          80:15
                                pull              22:22         86:4 98:9
processed       propelling       108:11          46:24         102:10
  124:20          81:1           109:14          64:25         104:14
                                 142:6           75:14         114:12
processes       proper           162:21          90:7          118:13,25
  96:2            89:1           178:24          92:19         121:3
                                                 99:4          168:25
produce         property        pulled           101:17        170:6,22
  143:25          88:21          60:3            102:5          177:9,16
  162:2           90:10,15       80:10           111:24        178:23
                  91:5           91:15,19        128:4
produced                         93:3           134:24        questioned
  183:13        protect          107:13          138:6          137:11
                  23:25          133:19          140:3
producing                        145:12          162:24       questioning
  165:4         protection       185:11          168:9          98:18
                  23:2                           172:23         118:11
product                         pulling          173:5         138:18
  43:5 86:3     provide           67:8
  90:1,9          55:2                           puts  99:14   questions
                                pulls             146:19        42:19
production      provided          57:25                         68:2 83:4
  124:13          5:3 15:6,       84:1           putting        84:3
                  10,14
products          25:1,4
  33:23



85:25
90:23
91:24
100:4
109:8
119:15
168:10
184:11

quick 54:8

quickly
76:2
106:5

Quikrete
42:13

quote 11:1

——— R ———

radius
38:9

rail 56:24
60:4

railing
146:12

rails
42:17

ramp 60:8
62:1,15
63:14,15,
22 64:16,
17,21,22,
23 65:10
66:20
73:15,19
87:2,3,18

ran 151:5
169:13

rapidly
69:8

rate 40:22
41:3

120:16
148:10
179:5

raw 16:12
152:7

re-
researched
181:22

reaches
159:19

react
45:4,20
46:7,19
106:5,12
161:13

reacted
45:23
137:8

reaction
44:6,9
45:7
46:14
47:2
75:25
80:23
81:25
83:8 84:7
87:24
89:2,8
91:24
119:19
136:10,
14,21,23
151:13
152:19
158:22
161:11
172:21
175:2,3
180:16

reactions
180:11

reacts

57:8

read 4:16,
19 11:6
12:15
16:2 66:3
72:24
96:12
106:7
163:1,17

readily
119:11

reading
4:8 12:16
131:12,20
162:5
177:13,17

real 25:1
58:2
143:9

realistical
ly 59:23
84:4
101:9
160:10,15

reality
137:8

realization
176:3

realized
173:19

rear 43:12
51:15
52:5,8,9,
11,15
53:6,15
57:25
67:1,5
75:19
80:25
82:3,6
84:14
87:9
88:24

108:7
111:14
138:2,9,
13 151:9
155:8,13
159:1
160:3

rearward
52:4 57:3

reask
78:10

reason
95:9,14
99:25
105:9
113:20
131:21,22
142:8

reasonable
46:22
78:6
170:15

reasons
61:25
105:11
149:22

recalculati
ng 139:14

recall
22:3
27:12
31:5,11
32:3
35:10,12
41:2,12,
16 49:15,
18,24,25
53:20,
77:25
80:1
81:22
82:1,18
85:3,10,
14 86:15,

16 87:4,
19 98:6,
10 102:17
103:5
113:6,25
115:5
116:15
117:16
121:13
123:5
124:9,11
135:25
141:8,18
182:8

recalls
72:6

rechecking
109:15

recollectio
n 71:25

reconstruct
6:10
13:20
21:22
25:23
38:3
79:13
117:23

reconstruct
ed 20:21
24:12

reconstruct
ing 5:21
7:23
14:16
24:23
25:2,9
26:14

reconstruct
ion 5:10,
13,15,17,
24 13:6,
17 14:1,7
17:18



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 82 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                        Index: reconstructionist..requests

18:17,22
21:2,11,
16,20
22:2,10
24:4,19
25:6,16
26:6
29:9,12,
25 30:9
31:1,23
34:12,16
36:1
37:16
40:10
42:4
43:13
44:18
45:1
81:2,23
82:6
83:21
85:11
113:15
116:7
117:13
122:21
127:12,19
128:8

reconstruct
ionist
  31:24
  148:11

reconstruct
ionists
  21:15

reconstruct
ions  18:20

record
  4:14
  15:15
  93:1,10,
  14 94:3
  98:5
  99:11
  102:15,22

123:13,22
126:12
131:3
132:5,17
149:1,16
162:13

Recorders
  14:9

records
  92:13
  94:6
  97:18,22
  98:12
  103:2,11
  130:14

Recover
  134:6

recovery
  29:15
  34:10

rectangle
  70:6

rectangular
  70:24

reduced
  153:14
  161:5

reduces
  152:12

reenter
  79:4

reference
  124:25
  135:6
  145:9

references
  151:15
  184:19

referring
  70:6
  76:17

reflect
  103:2
  127:25
  129:14
  146:22
  149:1,17

reflected
  125:18

reflects
  94:3 98:5
  129:20

regard
  30:22

registered
  9:6 10:13

regular
  8:16

regulated
  23:18

regulation
  183:1

regulations
  49:3
  181:11

related
  25:10,11
  37:1 84:7
  130:16

Relation
  33:9

relative
  57:3 59:6
  68:20
  69:16,19,
  21 74:8
  76:10
  83:21
  155:18,23
  173:10

released
  123:24

relevant
  118:19

remain
  46:13

remainder
  139:13
  170:25

remained
  60:8

remains
  170:6

remember
  34:2
  84:21,22
  89:13
  114:3,11,
  13

removed
  149:2

rendition
  68:7

repair
  56:23

repeat
  23:8
  104:13

replaced
  56:22

report
  74:18
  101:15,22
  102:21
  104:5
  106:8
  118:16
  119:10,16
  120:2,3
  128:13,22
  129:11
  130:10
  131:2,10
  132:25

135:5,14,
15 139:8
164:4,6
168:22
170:13,25
172:5
174:17,19
183:7
184:20,
23,25
185:2,5,
20

reported
  154:14

reportedly
  42:18
  83:1

REPORTER
  184:12

reports
  130:1,6
  132:3
  185:18

representat
ives  32:10
  35:7

representin
g  10:25

reprinted
  129:18

request
  17:17
  101:13
  125:3,8

requested
  118:17

requesting
  126:18

requests
  118:22
  119:8



require
    154:19

required
    22:12,14
    49:2

requirement
s  23:18,19

research
    21:15
    24:24
    27:7
    44:19
    95:21
    118:19

researched
    104:19
    181:12

reserved
    4:7

reset
    132:11,12

residential
    92:24

resistance
    73:17

resolution
    44:25

respond
    27:25

Response
    28:19

responsibil
ities  7:20

responsible
    79:9

rest  22:6
    146:25
    165:1

restart
    130:19

restarts
    130:22

restate
    67:2

resting
    179:6

restroom
    54:9

result
    40:23
    43:9,16,
    19  47:24
    52:12
    88:25
    145:11

resulting
    79:7

retained
    37:19
    39:5
    40:2,9
    42:8,25
    43:17
    44:1
    78:18,24
    81:4
    82:5,23
    83:19,24
    84:16,24
    85:4,7,16
    86:2,17,
    21  88:8,
    11,13
    89:18
    92:5
    112:22
    113:2,5,
    7,12,13
    114:2
    115:13

Retaliative
    166:12

retention

115:16

retired
    124:15

retrieval
    13:11
    14:3  34:5

retrieving
    13:21
    14:12

returned
    7:2

review
    118:18
    121:8

reviewed
    123:1,8
    127:9,11
    184:2,17
    185:4

reviewing
    183:8

ride  42:2

right-hand
    146:16

rights
    132:14

risk  10:17
    12:9
    26:20
    27:22
    28:6,11,
    12,15
    29:3

road  41:21
    48:22
    53:10
    70:18
    74:25
    79:4,5
    96:15
    108:11,12

123:25
    144:15
    146:14
    147:20
    162:3
    165:2

roadway
    54:18
    79:9,10
    80:7,9
    91:16,18
    96:17
    108:9
    109:23
    147:2,14

rock  38:23
    39:2,8

role  7:19
    9:10  12:3
    18:12
    37:15
    38:3,12
    39:4,7
    42:3,24
    78:18
    79:12
    85:24

roll  79:18

roller
    39:18

rolling
    73:17
    110:12,
    20,21
    111:8,16

Roofing
    91:22
    92:3,15

Rose  90:3,
    5,6

roughly
    47:21
    99:9

111:3
    157:17
    159:19

round
    43:23

Rowland
    80:24
    81:4

Rozelsky
    13:22
    15:7  16:4
    19:15
    21:25
    24:6
    25:20
    35:8
    36:23
    37:7
    45:17
    48:13,23
    49:12
    54:7
    55:14
    56:2,17
    61:7
    62:12
    64:1,11
    67:21
    68:10
    70:19
    71:9
    72:10,22
    74:4,13
    75:2
    76:14
    77:11,22
    94:13
    95:5,12,
    19  96:11
    97:5,12,
    20  98:8
    99:6,16
    100:11
    101:3,18
    102:7,11



Case 5:12-cv-00147-MTT    Document 61    Filed 07/30/14    Page 84 of 94

BRIAN BOGGESS, SEA                           October 31, 2013
LITTLE vs. McCLURE                    Index: Rozelsky's..sees

104:2,12          178:20          20,21,24        scenes          seat  23:22
105:6,21          180:1,19        24:10,24          22:23           88:2
106:25            181:6,18        48:21             25:4,23         125:19
107:8             182:6,19        74:25                             173:21
108:15,25         183:21          91:2            school  6:1       174:6,16,
109:18            184:11,                         scientific        21,25
110:14,           13,14           sat  126:8        30:14           176:21
17,24             187:1           satellite                         179:18,24
112:6                               143:8,10      scope             180:6
116:19            Rozelsky's                        119:1
118:3,9,          17:17           scaled            181:19         secondarily
15 119:6          121:23           164:12                           170:22
120:12,24                           166:21        scrape
121:15            rub  147:25       167:2,7         160:3,7        seconds
122:2,7,          148:5                                             136:14
10 123:18         rubbed          scan  96:17     scraped           137:6
125:10            60:3                              59:21           139:5
126:1,2,                          scanned                           151:14,
10,12             rubber           105:12         scraping          152:16
127:1,21          56:24                             55:25           153:15
128:14,24                         scanning                          154:6,7,
129:5,8,          rule  104:5      22:21,23       screen            19,22
20,23             181:24                            15:21           157:17,
133:17                            scared            16:18           158:20,24
134:5             rules  4:4        175:7                           159:17,25
136:25            74:25                           SEA  5:7          160:15
140:4             182:9,11        scenario          9:10            161:13
142:12                             158:21          12:3,5
148:3             run  8:15        160:22          15:17           sections
149:1,19          160:21           161:9           19:9             130:19
150:6,16,         172:12           171:25          32:21,24
18,21                                              34:20           securement
156:16            running         scenarios        35:16           87:25  .
163:14,18         154:5            161:14          78:24
164:1,10          158:10           172:6           116:4,8,        sedan
165:6,12          159:15                           12,22           43:12
166:10                            scene            117:15,20
167:4,17          ───────────      18:5,25        118:16          seeking
169:3,16                 S         19:1,           120:7            80:19
171:6,20          ───────────      20:4,6,24      124:15
172:1,11,                          22:13          144:5           seemingly
18                S-e-m-a-n        24:17,22        148:11           106:22
173:15,22         8:4              25:14           184:20          107:2
174:12                             54:5                            108:10
175:11,18         S-u-g-a-m-a      118:17         Sean             110:25
176:13,22         6:23             120:4,10,       134:15
177:16                             21,25          135:4,14        seemly
                  safe  65:20      121:4,5         151:5           75:9
                  safety           122:25         165:13
                  6:1,6,16         133:24         184:17          sees  70:9,
                  7:15,22          167:7,22       185:2,5,7        23 78:2
                  23:5,13,



sell  23:17

Seman  8:4

semi-trailer
  166:6

send  17:10
  26:4

sending
  92:23

senior
  24:3

sentence
  140:2
  168:21
  169:4

separate
  176:9,16

separated
  133:25

separating
  133:22

separation
  66:21

series
  17:8

server
  99:20

servers
  98:20

service
  12:11
  99:21

services
  37:19

set  14:22
  17:1,2
  33:1
  34:18
  93:25
  103:17

133:5,7
150:22
155:25
157:2

setback
  137:19

sets  100:5

setting
  152:24
  185:1

setup
  157:1

sheet
  148:22

sheets
  148:21
  161:25
  162:21

Shelco
  82:16

Shelnutt
  113:23
  115:3

shift
  69:20
  138:6,10,
  11,14
  155:21,23
  157:16,25
  158:5

shifted
  87:2
  138:25
  157:20,21

shifts
  154:16
  174:1

shipping
  113:5,8

short  74:5
  117:15

118:9
181:16

shorter
  155:2,3

shortly
  17:24
  73:19
  87:3

shot  15:21

shots
  16:18

shoulder
  75:19
  108:11
  109:5
  112:17
  133:19
  165:2

shoving
  87:10

show  10:8
  16:13
  17:6  35:3
  54:25
  59:21
  66:9  93:2
  146:7
  147:3
  151:6

showing
  128:13
  143:1
  145:10
  146:17
  147:3,12,
  15,17
  157:10,
  19,23
  159:9

shown  16:9
  94:2
  144:12
  147:1

shows
  96:19
  115:16
  122:6,20
  144:19
  146:4,13
  152:10

Shuler
  113:11,17

side  37:19
  48:16
  52:19
  56:5,19
  57:16,19
  58:6,7,
  12,14,19
  59:18,20,
  22  69:21
  70:6
  71:20,23,
  24  75:9,
  10  77:14
  79:1 80:7
  84:2 87:4
  91:12,20
  107:21,22
  108:1,4
  110:5
  123:25
  139:10
  143:7
  145:24
  146:14
  153:8
  156:9,10,
  25  157:1
  159:13
  161:1,2

side-by-side  136:3

side-view
  109:9

sideswipe
  37:25

sideswiping
  38:11

sight  44:4

sign  4:16,
  19 91:16,
  20 93:3
  163:17

signad
  156:12

signal
  61:1
  65:16,25
  70:8
  71:19
  72:5,6
  73:3,11,
  22 74:2
  100:16
  136:11
  161:10
  173:9

signals
  70:2

signed
  129:21

significant
  80:16
  167:14

signing
  4:8

Simbro
  124:13,14
  125:7

similar
  10:22
  14:10
  30:21
  32:5,21
  34:14
  49:20
  106:7
  149:13



simple
  36:13
  99:9
  101:20
  127:14

simplify
  136:20

simply
  43:5
  100:21
  105:11
  137:5
  139:9,14
  141:10
  147:3,15
  149:22
  157:10
  159:8
  174:24

simulation
  16:6,21,
  24 17:14
  183:20

simulations
  14:16
  138:13

simultaneou
sly  154:2

single
  94:17
  150:19

sit  13:2
  22:8
  53:25
  55:2
  85:14
  98:11
  116:15
  124:12
  181:24
  182:7
  183:17

site  20:24

86:3
110:4

sitting
  58:3
  140:20

situation
  45:4,8,14
  46:17,18
  47:3,5,9,
  10 171:3,
  5,10
  180:5

six-digit
  143:16

size  57:22

sketch
  40:24

slammed
  52:7,14
  53:16

slid  52:4

slide
  112:9
  159:12

slides
  72:4
  159:2

sliding
  57:15
  71:22,23

slight
  59:25
  160:5

slightly
  73:17
  147:9
  153:22
  161:4,5

slipped
  154:4

slow  70:13
slowed
  171:13
slower
  87:21
  96:23,24
  153:25
  161:12
slowing
  57:13,14
  73:13,17
small  17:5
  28:12
  111:5
smashed
  110:3
Smith  84:2
  113:4
  134:14
  169:20
  184:18
snagged
  39:18
Society
  21:7
  35:16,20
  135:8
sooner
  160:16
sorts
  183:10
sounds
  10:22
South  4:4
space  30:5
  58:18
  96:21
  174:2
  179:9
Spangler

43:24
  44:3
Spangler's
  44:5
Sparks
  88:22,23
  89:3
speak
  11:18,20,
  22 32:25
  33:15
  34:19
  95:25
speaking
  11:24
  59:12
  82:10
  171:8
  180:14
speaks
  178:22
specialty
  18:18
specific
  21:12
  26:18
  27:15
  33:13
specificall
y  5:13
  10:14
  13:7
  25:4,17
  27:9,13
  35:10,12
  84:4
  118:17
  181:8
specifics
  82:19
  84:22
  85:4,14
  86:15

specs
  185:4,18
sped  72:9
  171:13
speed
  25:10
  40:23
  41:3
  69:15
  70:12
  72:13
  73:20
  75:14
  76:5,
  77:9
  83:8,10
  84:4,7
  111:9,19,
  22,25
  112:1,3,
  4,11
  124:10
  132:9,10,
  13 154:9
  158:14
  159:25
  161:15
speeds
  38:17
  42:5
  65:11
  79:13
  84:3
  87:22
  112:13
  170:21
split
  89:13
  159:23
sponsor
  9:12
sponsored
  26:9



sponsorship 155:19
  12:6

spot 48:15
  63:10
  64:25
  146:5
  180:20
  181:1

spots
  71:25

spreadsheet
  162:17

Spring
  60:7

stand
  33:20

standard
  48:21
  171:7

standards
  91:3

standpoint
  39:22
  43:7
  117:21
  154:12

start
  16:19
  17:2
  29:14
  37:11
  47:24
  116:22
  130:24
  178:15
  180:25

started
  49:17
  55:24
  62:3 70:2
  116:4,8
  136:4,7

155:19
159:7
169:14

starting
  135:21
  153:5
  159:4
  160:1

starts
  47:22
  69:12
  70:10
  73:23
  158:20
  161:1
  173:11
  176:8

State 4:14

stated
  25:22

statement
  12:20
  24:7
  101:19
  116:20

statements
  111:21

States
  78:21
  79:7

stationary
  160:20

stats
  151:13

stays
  99:25

steer
  50:23
  53:1,4
  72:17
  139:22
  140:16

157:11
160:13,17
178:24

steered
  52:24
  171:14

steering
  17:3 45:5
  53:3
  106:10
  138:9
  140:1,14
  154:12
  159:16
  160:17,23
  173:20

steers
  160:18
  161:6

step
  50:21,24
  51:14,15,
  22 56:13,
  20 153:1
  159:14

Stephens
  85:1

stepped
  41:25
  83:1

steps
  30:16
  51:10

Stewart
  12:23
  44:5

Stewart's
  44:1

Stewarts
  43:22

stipulated
  4:2

STIPULATION
  4:1

stop 29:23
  47:5
  75:16
  76:2
  91:16,20
  93:3
  111:9,20
  118:14
  123:12,22
  124:5,6
  130:14,20
  132:5,7,
  9,14,16,
  19 133:21
  134:1

stopped
  59:2

stops 30:8
  57:7

Store
  42:14

stored
  13:12

Stores
  82:4

straight
  41:20
  89:5,6
  138:15
  157:14
  158:13
  160:10,12

straighten
  157:15

strain
  30:25

Strayer
  183:9
  184:2

Street
  60:7

strike
  106:17

striking
  54:21

strong
  25:11

struck
  42:2
  43:11
  77:20
  80:3,8
  83:3 84:2
  88:5 89:3
  91:20
  108:10
  168:24
  169:1

structure
  23:22

studied
  95:20

studies
  44:19
  95:16
  96:7

study
  28:17
  45:1
  96:13

studying
  13:12
  14:13
  23:23
  27:18

stuff
  92:20
  142:9

subject
  118:23
  170:15



subsequent
  26:20
  38:18

subsequentl
y  91:9

sued
  113:24

suffered
  40:23
  84:15
  90:19

suffers
  42:18

Sugama
  6:22

suggest
  77:16

suggested
  80:11
  123:20

suing
  114:1
  115:8

suit  91:6
  113:25
  114:5

suits
  115:7

summaries
  134:13,
  16,19,24
  135:1
  184:24

summary
  76:12,18,
  20 134:14

supervisor
  6:19

supervisors
  7:8,15

supplement
  163:18,21

supplied
  90:8,21

supplier
  89:18

suppliers
  35:22

support
  14:24
  35:23
  119:4
  149:10

supported
  93:4

supporting
  139:3

supposed
  181:15
  182:4,5,
  17

supposedly
  68:21

supposing
  65:14

surfaces
  146:9

surrounding
s  94:25

surveillanc
e  84:6

sustained
  87:11
  88:5,19,
  25 89:22

SUV  82:4

swirl
  51:10,21

sworn
  4:11,21

swung
  39:21

sync
  131:24
  133:3

synced
  100:15
  103:14

system
  36:14
  81:15
  90:7
  98:16,19,
  23 103:4
  129:18
  132:10,11
  162:1,18

systems
  13:15
  24:11
  31:2
  32:15
  36:16

———————
      T
———————

T-a-k-a-y-
u-k-i  6:22

T-u-r-l-e-y
  7:6

tab  126:15

table
  156:18
  157:11

tables
  14:24
  15:3,11
  17:4

Takayuki
  6:22

takes

38:8,9
  140:17
  155:21
  180:15

taking
  22:19
  117:14
  138:4
  139:16
  154:21
  165:11

talk  33:13
  95:17

talked
  20:17,18
  35:2
  61:24
  68:19
  77:6
  130:13
  148:15
  150:2
  153:6
  157:8
  165:23
  170:20
  173:8,24

talking
  6:12 21:1
  29:5
  30:22
  31:17,20
  34:14
  47:2
  63:22
  68:3
  93:21
  95:8,10
  96:8,15
  98:2
  102:11
  103:21
  104:24
  111:14
  136:3

138:11
  140:13
  153:23
  158:4
  173:14
  176:5
  180:12
  185:15

tandem
  160:7

tandems
  52:5,8
  145:12

tank  81:11

tapers
  145:22

task  96:1

tasked
  7:21
  23:15
  25:2,5
  26:14
  27:21

taught
  31:1,2,25
  32:18

teachings
  34:25

technically
  86:5
  91:21

technician
  14:4
  124:21

technology
  34:11

telephone
  41:11,15
  105:16

ten  92:16



tendency
79:19

tenth
110:10,11

terms   7:14
68:2 76:4
106:15
109:23
115:15,17
133:14
138:10,14
149:18
155:13
161:7
172:20

test   26:18
137:3

tested
181:16
182:5,17
183:2

testified
4:11
49:16
80:17
86:1
88:25
94:15
103:16
108:7,13
115:18
119:19
154:13
176:1,18
181:13
183:4

testifies
57:24
69:11
138:2
179:20

testify
18:20,23
68:8

92:7,10
169:22
183:12

testifying
40:25
41:7 43:1
114:9

testimony
18:2
41:13
60:6,12
62:6,23
63:5 65:7
67:18
68:1,13
69:9,10
70:5,23
71:2
73:21
75:24,25
76:17,22
84:23
87:16,23
93:24
97:22
107:19
114:17,
20,21
115:11,19
116:14
121:20
138:22
149:9
168:22
173:6
174:17
178:21
179:8
180:3

testing
21:16
24:11,14,
15

text   92:23

texting
92:17
96:14

theory
171:2

Thereabouts
51:25

thereof
38:19
44:25
70:15

thesis
27:9

thing
14:10
16:23
34:15
39:20
96:3
144:8
145:4
155:6
157:22
158:1
170:10,11
184:15

things
15:14,16
16:1
18:16
36:8
45:2,5
46:25
68:17
71:11
72:2,3
74:17
92:11
96:3,9
99:17
109:2
130:13
135:22
139:5,15

144:14
147:8
151:19
170:21
171:15
176:6
183:10
185:6

thinking
20:13

thinks
57:23
178:22

third-party
10:20

Thomas
7:10

thought
57:24
75:18
78:11
103:16
105:22
115:6
140:22
150:8
175:16

three-page
130:20

three-
tenths
87:19

three-
vehicle
40:7
78:21
80:22

thresholds
27:22

throttle
17:3
57:13

73:16

throw
148:14

thumb   42:1
181:24

thumbnail
37:22
40:24
43:1
78:19

tier   35:22

ties
128:15

tighter
38:9

time   4:7
5:25 6:9
7:11,13
8:17,20
15:19
16:1,23
17:5
22:24
27:1 42:7
44:2,7
46:24
47:2
60:22
61:5
63:16
65:8,12
67:14
69:12,14
71:6 74:5
81:25
87:24
88:3,15
92:19,21
93:5,21
94:4
98:11,24
99:14,15,
23 100:9
101:1,14



| | | | | |
|---|---|---|---|---|
| 102:23 | 98:18 | **tools** | 119:12 | 84:14 |
| 103:1,9, | 99:13 | 14:17 | 137:17,25 | 107:21 |
| 12,23 | 100:22 | | 138:7,22 | 108:3 |
| 105:8 | 115:12 | **top** 48:11 | 145:13 | 109:10 |
| 111:9 | 136:7 | 75:7 | 153:12, | 111:17 |
| 115:20 | 140:10 | 107:6 | 19,22 | 112:7 |
| 117:15,21 | | 132:1,25 | 154:11 | 113:14, |
| 119:5 | **timing** | 135:21 | 156:9 | 17,21 |
| 125:11 | 45:2 | 136:3 | 157:4,13, | 119:12 |
| 126:9 | 61:22 | 145:23 | 20,23 | 137:18,20 |
| 128:11 | 175:1 | 156:24 | 158:3,11 | 138:7,14, |
| 129:24 | | | 159:20 | 22 145:13 |
| 131:12,16 | **timings** | **topic** | 170:1,2 | 151:8 |
| 132:8,19, | 79:14 | 104:20 | 177:10,23 | 153:12, |
| 25 133:1, | | | 181:2 | 19,22 |
| 13,15,23 | **tire** 18:18 | **touch** 8:14 | | 154:11 |
| 136:7,10, | 50:23 | 27:3 | **traffic** | 155:1 |
| 23 138:4 | 51:19 | | 5:17 13:6 | 156:9,20 |
| 139:11, | 144:16 | **touches** | 22:2 69:8 | 157:13,23 |
| 21,23 | 145:8,11, | 13:23 | 180:21 | 158:2,11 |
| 140:17,19 | 15 168:1 | | | 159:2,21 |
| 143:10 | | **tow** 56:25 | **trailer** | 160:3 |
| 147:21 | **tires** | 84:14 | 37:24 | 161:10 |
| 152:6,15 | 52:15 | | 38:5,6 | 167:16 |
| 153:16,18 | 53:16 | **track** | 40:17 | 170:1,2 |
| 154:4,6, | 59:2 | 115:19 | 42:16,18 | 172:8,24 |
| 17,19 | 139:10 | | 43:6 | 173:7,10 |
| 155:22 | 176:20 | **tracked** | 50:13 | 174:22 |
| 156:24,25 | 179:7 | 165:1 | 52:2,6,8, | 176:20 |
| 157:24 | | | 15,17,20, | 177:10,23 |
| 158:7 | **title** 5:8 | **traction** | 22,23 | 179:7,14 |
| 161:25 | **titled** | 53:7 | 53:17,23 | 180:8 |
| 162:2,8, | 14:3 | **tractor** | 54:14,15 | 181:2 |
| 21,22,23 | | 38:7,8,10 | 56:19,25 | |
| 163:8 | **today** | 40:17 | 57:4 | **trailer$** |
| 174:5 | 15:6,11, | 43:23 | 58:6,19, | 156:12 |
| 180:15 | 15 16:14 | 44:2 | 23,24 | |
| 181:17 | 129:18 | 50:14 | 59:2,14, | **trailers** |
| 183:10 | 166:22 | 56:19 | 24 63:20 | 137:24 |
| 184:8 | 168:10 | 57:3 | 65:21 | |
| | 183:16 | 62:19 | 69:11,21, | **training** |
| **times** | | 63:20 | 22 70:7 | 21:20,22 |
| 20:18 | **told** 9:21 | 65:21 | 71:20,24 | 135:7 |
| 32:6,12, | 58:22 | 69:14,21, | 72:1 | |
| 14,20,23 | 82:13 | 22 71:13 | 73:22,23 | **trainings** |
| 33:12 | 121:15 | 73:25 | 76:8 | 22:16 |
| 72:24 | 165:20 | 76:8 79:5 | 77:15 | |
| | | 111:17 | 78:3 | **transcript** |
| | **tomorrow** | 112:7 | | 4:17 |
| | 163:14,15 | 113:14, | | |
| | | 17,21 | | |



Case 5:12-cv-00147-MTT     Document 61     Filed 07/30/14     Page 91 of 94

BRIAN BOGGESS, SEA                          October 31, 2013
LITTLE vs. McCLURE                 Index: transition..typically

93:18                trial  4:7        95:4               84:25              turns
183:9                43:10,19          103:1,22           85:1,5             64:16
184:4                82:2              104:7,24           103:22
                     89:11             106:21             113:1,3            Twenty-
transition           113:9             107:22             181:11             three
144:14               114:15,16         108:4                                 137:25
                                       109:5,22           true  25:9
transpired           truck             110:21             112:1,3            Two-
68:22                29:22             111:7,19           169:13             passenger
121:14               38:25             121:6              171:19             43:11
                     39:3              123:16,24          181:15
transpires           41:20,22          124:3                                 two-thirds
71:14                43:13             133:9              Tucker              117:17,18
                     45:14,19          136:4,6,           43:11
transport            47:17             7,18                                   two-vehicle
80:25                48:3,20           138:3              Turley              37:13
86:4                 50:8,11,          146:4,5,           7:5,9              81:22
                     13,25             14                                    82:3
Transportat          51:17             147:13,           turn  37:23         83:16
ion  81:4            52:3              16,18              38:1,9             84:9
                     53:10,17          148:6,17,          43:24              114:2
trapped              54:15,20          20 151:10          44:3 53:2          115:9
59:13                55:23             152:13             61:1
107:21               56:12             153:24             65:16              two-year
108:3                57:14,19          154:4,17,          70:1,7             26:23
109:10               59:9,11           19,24              71:19              117:22
175:6                60:10,22,         158:20             72:5,6
                     23,24             159:3,5,           73:3,11,           type  12:5
trauma               61:3              14,                15,22              16:15
26:10                62:6,9,           160:19             74:1               26:5,12
                     10,14,22,         161:15             132:10             32:21
travel               24 63:23          164:25             155:7              34:14
48:3                 64:5,7,8,         165:16             156:11             36:12,13,
54:22                10 65:1,          174:10,15          157:14             16 45:3
61:15                6,15,17,          175:6,9,           158:21             89:4
92:23                23 69:2,          25 176:8,          161:10             112:19
106:21               5,17,25           19                 162:16
107:3                70:13             177:11,24          173:9              typed  4:17
                     71:1,14           178:18,25
traveled             72:19,25          179:5,22           turned             types
54:20                73:7 74:3         180:14,15          19:19              18:16,19
137:17               76:6,12,          182:4,16          61:1               36:8
                     25 77:10                             65:25              68:25
traveling            80:3,7,11         truck's            70:2               137:24
41:3                 83:17,18          147:11             73:3,11
63:20,23             94:8,10,                             158:19             typical
65:19,22             21,24             trucking           45:7
76:5                                   37:20              turning            92:23
78:25                                                     84:15
80:6                                                                         typically
92:25                                                                        21:23
                                                                             34:21



Case 5:12-cv-00147-MTT   Document 61   Filed 07/30/14   Page 92 of 94

BRIAN BOGGESS, SEA                                    October 31, 2013
LITTLE vs. McCLURE                               Index: ultimate..vehicles

| | | | | |
|---|---|---|---|---|
| 96:20,23 141:10 | 138:20 156:6 183:2 | 28:16,18 **usage** 96:25 | 19,20,21, 24 31:2, 32:18 | 80:1,10, 12,24 81:1,2 |
| **U** | **understandi ng** 9:17 10:20 | **utilities** 113:5,8 | 33:4,9 34:8,9,15 37:1 | 82:6,24 83:3,9, 10,17,19 |
| **ultimate** 77:15 | 14:13 27:21 94:1 | **utilized** 30:16 | 38:2,11, 21,24 39:9,16, | 84:1,10, 12 85:9, 10 86:25 |
| **ultimately** 52:4 57:10,25 62:2 172:23 | 128:8 153:17 165:3 184:4 | **V** | 17,19,20 40:19,22 41:19 42:1,2,5 | 87:6,8,9 88:24 91:8,19, 21,23 |
| **unavailabil ity** 120:25 | **understood** 169:20 173:18 | **V-i-s-c-h- e-r** 134:22 **van** 78:22 | 43:11 47:18,19, 21 48:4, 12,18 | 92:15 106:12 107:11,20 108:1 |
| **unavailable** 19:17 121:14 | **United** 78:21 79:7 | 79:21,23 86:19,25 87:6,8, 10,23 | 49:6,10 50:8,22 51:5,11 52:5,10, | 109:9,14, 17 110:3, 6,12,22 111:4,6, |
| **unavoidable** 152:21 | **University** 26:7 135:6 | 88:2,11 **variables** 68:25 | 12,14,16, 24 53:2, 6,9,16, | 11 120:4 132:8,12 133:1,24 |
| **unaware** 15:16 109:25 | **unknown** 73:20 148:7 | 83:8 153:2 **variation** | 17,21,22 54:14,16, 21 56:13 | 138:9,10, 11 140:16,18 |
| **undercarria ge** 52:18, 23 59:14 | **unlit** 83:2 **unloading** 42:13,17 | 58:16 **variations** 83:7 | 57:10,12, 14,16,17, 20 58:2, 4,7,22 | 152:3,12 153:25 155:3,8, 11,13,15 |
| **underlined** 135:5,9 139:25 | 85:22 **unstable** 86:9 | **varied** 34:13 56:18,23 | 59:1,4,6, 7 60:2 61:20,23 | 158:8 174:6 175:9 |
| **underneath** 72:16 76:1 153:19 | **unwilling** 11:9 48:2,5 | **Vasquez** 82:3 **vehicle** | 66:6,11, 14 67:1, 4,5,16 70:11 | 176:6,19 180:6 185:3,18 |
| 154:1,10 155:4,11 158:7 | **update** 98:20 **updated** | 6:11 13:15 14:8,15 | 72:2,4,5 74:21 75:3,7,8, | **vehicle's** 13:13 131:14 |
| **understand** 25:25 26:15 28:1,2 | 149:10 **upload** 10:15 | 17:1,2 21:6,9 23:21 24:5 28:2 | 12,15,22 76:1,3 77:14,21 78:25 | **vehicles** 6:6,7,8 7:21 16:23 |
| 64:23 71:4 102:16 | **Upper** | 29:23 30:1,5,7, | 79:1,5,6, 16,17,20 | 18:8 20:4 22:23 |



23:1,14,
15,16,17,
20  29:16,
19,20
30:13
34:7
37:23,25
38:17
51:23
56:15
60:1
69:25
76:10
78:4
79:14
84:4
86:25
87:21
119:18
127:17
128:10,
133:19,23
143:4
145:2
148:18
151:22
152:1
153:7
155:24
156:9
159:4,15
164:18
165:1
170:20

Velez
86:22
87:5,9,13
88:8
114:9,10

velocity
38:17
136:6
152:9

vendors
10:20

venue  32:3

verdict
43:20
113:10

version
146:11
187:2

versus
22:17
36:20
41:19
43:12
80:2
82:24
98:19
111:17
115:14
176:7
182:9,10

video
16:15
17:11
84:5,6
183:19

view  63:6
64:9
66:6,16,
25  67:4
120:21
121:4,6
143:4
145:3

viewing
120:10

Vilter
90:7,8

Virginia
26:11

Virginia's
26:7

virtually
107:6

Vischer
134:21

visibility
87:20

visual
44:20,21,
24

visually
16:11

vivid  78:1

vividly
72:6

_____

W

_____

waiting
140:21

waive  4:8,
18

waived  4:6

walking
143:3

Wand  40:2

wanted
23:11

Warnick
88:16,19

wash  39:18

Wash's
40:3

watching
180:20

water
81:11

wearing
88:2

website
12:16

weeks
17:15,18
161:24

weigh
111:2

weight
111:6,7,
13

Werner
113:11,13

west  166:7

whatsoever
107:5

wheel
50:19
51:11,12
52:18
53:2,3
56:12,22
71:23
106:11
110:22
111:14
154:25
159:13
160:17
177:4,10
178:4,5

wheels
50:12
52:22
53:7
54:15
58:24
75:21
79:1
107:21
110:12,16
160:7
174:22
179:12,14
180:8

white

139:10
145:25
146:18,20
154:16
164:21

wide
167:11

width
151:20,
21,22
152:3
164:20

widths
154:14

Wilke
80:3,6,13

Williams
134:15
184:18

Wilson
113:1,3

window
117:22

windshield
38:23
66:13
177:3

wiped
123:23

wiper
39:18

wise
114:13

witnesses
41:1  71:5
76:7
112:12

Witt  80:23
81:3

Wood's



BRIAN BOGGESS, SEA
LITTLE vs. McCLURE

October 31, 2013
Index: word..zipping

```
   80:25        world  25:2     wrong              _____
                                  20:24                 Z
word   11:6    wreck   16:7       68:9,13         _____
  45:24          24:18,23        70:16
  46:1,5,12      25:9,18         71:6            zipping
words            37:21           140:23           69:7
  49:19          38:3,14         164:17
  64:3           41:8            171:18
  95:25          74:11,19
  141:10,13      82:9          wrote
work   5:23      87:16           28:6,24
  10:1           93:11,14,       129:3
  17:19          22 94:5         135:21,23
  19:21          98:15           136:10
  22:25          99:12,15        140:7
  24:23          100:9,13        141:4,10
  25:7,13        101:1,14,
  26:18          15 103:3,    _____
  27:6,11        6 105:3
  28:25          114:8             Y
  35:24          115:12       _____
  36:19          117:24
  83:25          119:5        yawning
  85:21          123:11,17      40:20
  86:3 91:8      124:8
  93:4           130:12       year   11:22
  117:5          132:21,22      12:21
  121:21         133:8,9,       17:25
  125:18         14,15,16       27:3,11
  126:6          181:17         33:6
  129:17         182:3          116:2,17
  167:24,25
  183:18       wrecks         years   8:19
  184:6          21:22          10:15
worked           25:8 29:9      11:17
  12:22          36:5,20        31:4,12,
  23:5           71:5,6         20 32:6,
working                         20 33:13
  27:1 58:5    write   28:8     34:1 35:2
  88:18          129:2,6        90:22
workplace        141:4,12       113:19
  36:15,20       149:20         114:6,23
  90:19        writing          117:4
  113:6          114:14       yellow
                 145:6          145:15
               written        York   82:14
                 149:18
```

